USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/24/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
MATTHEW HERRICK,                                   :
                                                   :
                              Plaintiff,           :
                                                   :                17-CV-932 (VEC)
                      -against-                    :
                                                   :                OPINION AND ORDER
GRINDR, LLC,                                       :
                                                   :
                              Defendant.    :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Before the Court is Plaintiff's application to renew a temporary restraining order entered

by the New York State Supreme Court on January 27, 2017.  For the reasons that follow,

Plaintiff's application is DENIED.[1]

## BACKGROUND

Plaintiff is a former user of Defendant's web-based dating application, "Grindr."[2]  He

alleges that over the past five months, a former love interest, known as "JC," has impersonated

him on Grindr by creating profiles bearing Plaintiff's image and personal information, including

his home and work address.  Compl. (Dkt. 14 Ex. 1) ¶¶ 1, 25.  Some of the fake profiles describe

Plaintiff as being interested in fetishistic sex, bondage, role playing, and rape fantasies and

encourage potential suitors to go to his home or workplace for sex.  *Id.* ¶¶ 33, 45.  Plaintiff

alleges that dozens[3] of men have responded to the profiles, some of whom have physically

---

[1]        The parties were informed on February 22, 2017, that the motion for extension of the temporary restraining order was denied (Dkt. 19) and that an opinion would follow.

[2]        Grindr is similar to other dating applications available for use on smart telephones.  Its target audience is gay and bisexual men.

[3]        Plaintiff has at times described the total number of persons as "approximately 400."  Am. Notice of Removal (Dkt. 14) Ex. 4 at 7.

assaulted or threatened Plaintiff and his friends and co-workers.  *E.g., id.* ¶¶ 42, 46, 48-49.

According to Plaintiff, he has filed more than fifty complaints with Grindr, but he has received

no response other than a form email acknowledging receipt of his complaint.  *Id.* ¶¶ 50, 52.

Plaintiff brings seven claims against Grindr.  He asserts claims for negligence, intentional

infliction of emotional distress, negligent infliction of emotional distress, and failure to warn, in

connection with Grindr's alleged failure to monitor its users, prevent abuse of the Grindr

application, or respond adequately to Plaintiff's complaints.  *Id.* ¶¶ 61-63, 69, 102-03, 111, 114,

119-22.  Plaintiff also brings claims for false advertising and deceptive business practices under

New York General Business Law Sections 349 and 350, and a common law claim for negligent

misrepresentation based on Grindr's alleged misrepresentations regarding the safety of the

Grindr user community generally and Grindr's alleged knowledge of JC's history of harassment.

*Id.* ¶¶ 20-21, 79, 81, 89, 119-23, 127-28, 130-31, 134.

Plaintiff filed his complaint in New York Supreme Court on January 27, 2017.  The

Supreme Court entered a TRO the same day, compelling Grindr to "immediately disable all

impersonating profiles created under Plaintiff's name or with identifying information relating to

Plaintiff, Plaintiff's photograph, address, phone number, email account or place of work."  Am.

Notice of Removal Ex. 7 at 2.  Defendant removed this action on the basis of diversity on

February 8, 2017, and filed an amended notice of removal on February 17, 2017.  Dkts. 1, 14.

On February 21, 2017, Plaintiff moved for an extension of the state court's TRO.  Dkts. 16, 18.

The Court held a hearing with respect to Plaintiff's application for an extension of the TRO on

February 22, 2017.

## DISCUSSION

Temporary restraining orders entered prior to removal expire at the earlier of 14 days

from the date of removal or the date set by the state court.  *See Carrabus v. Schneider*, 111 F.

Supp. 2d 204, 210-11 (E.D.N.Y. 2000); *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda Cty.*, 415 U.S. 423, 438 (1974).[4]  The Court may extend a temporary restraining order for not more than 14 days upon a showing of "good cause."  Fed. R. Civ. P. 65(b)(2).  Although the Rule does not define "good cause," the Court considers as relevant the same factors as are relevant to whether to grant a TRO in the first place.[5]  *See Flying Cross Check, LLC v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1261 (D. Kan. 2001); Charles Alan Wright & Arthur R. Miller, 11A Federal Practice & Procedure § 2953 (3d ed. 2016).

"It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."  *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008).  Under that familiar standard, the movant must "demonstrate '(1) irreparable harm in the absence of the [TRO] and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor.'"  *Id.* (quoting *MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004)).  When the movant seeks affirmative

---

[4]     Plaintiff argues alternatively that the 14-day period under *Granny Goose* should be measured from February 17, 2017, the date Defendant filed an amended notice of removal, Dkt. 14.  Plaintiff has not cited any authority in support of this position, and the Court rejects it.  The original notice of removal did not specify the principal place of business of Defendant's members.  Plaintiff does not argue that the members' principal place of business defeats diversity jurisdiction in this case and the oversight appears to be entirely a matter of form.  The Court had jurisdiction as of the date the original notice of removal was filed.

        Perhaps more importantly, whether or not Plaintiff believed the notice of removal was defective, as of February 8, 2017, he was on notice that Grindr had removed the case and that the TRO would ordinarily expire 14 days from the date of removal unless Plaintiff sought an extension.  *See Granny Goose*, 415 U.S. at 438.  Plaintiff has had the benefit of the full 14-day standstill allowed under Rule 65(b).  He chose not to seek an extension of the TRO or file a motion to remand until February 21, 2017, one day before the TRO was set to expire.

[5]     Where the court has already concluded that the movant is entitled to a TRO it may be appropriate for the court to extend the TRO for a variety of reasons, including the convenience of the parties and the court.  *See R.L.E. Corp. d/b/a Casa Imports v. Ferraro Foods, Inc.*, 15-CV-123 (GLS), 2015 WL 1456178, at *1 (N.D.N.Y. Mar. 30, 2015).  But when a case comes to the court via removal and the court's first opportunity to consider the propriety of a TRO is the movant's request for an extension, "good cause" necessarily requires the court to address whether a TRO is warranted in the first place.

and not merely prohibitory relief, the plaintiff must make either a heightened showing on the

merits or show that "extreme or very serious damage" will flow from denial of an injunction.

*See Somoza v. N.Y. City Dep't of Educ.*, No. 06-CV-5025 (VM), 2006 WL 1981758, at *4

(S.D.N.Y. July 10, 2006) (quoting *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)).

The critical question for the Court is whether Plaintiff has adequately demonstrated that

there are "sufficiently serious questions going to the merits to make them a fair grounds for

litigation." *Andino*, 555 F. Supp. 2d at 419.  The Court assumes for purposes of analysis that

Plaintiff's allegations that he is at risk of physical injury unless the TRO is extended satisfy the

irreparable harm requirement.  The Court also assumes that the balance of equities favors

Plaintiff in light of the substantial risk he faces and the fact that Defendant has not asserted any

pecuniary burden of compliance.[6]  "The 'serious questions' standard permits a district court to

grant a preliminary injunction in situations where it cannot determine with certainty that the

moving party is more likely than not to prevail on the merits of the underlying claims, but where

the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v.*

*VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-36 (2d Cir. 2010).  Plaintiff has

not met this standard.

The Communications Decency Act (CDA) immunizes an "interactive computer service"

(ICS) from liability for content created and posted by a third party "information content

provider." *See* 47 U.S.C. §§ 230(c)(1), (f)(2)-(3); *Fed. Trade Comm'n v. LeadClick Media, LLC*,

838 F.3d 158, 173 (2d Cir. 2016).  At this early stage, it appears likely to the Court that Section

230 bars many (if not all) of Plaintiff's tort claims.  While the CDA may not apply to Plaintiff's

---

[6]     In fact, during oral argument Defendant committed to continue voluntarily to monitor the Grindr
application for fake profiles associated with Plaintiff's personal information as it has in response to the existing TRO
even if this Court does not extend the TRO.

claims based on false advertising and deceptive business practices (Counts II, III, & VII), Plaintiff has not made an adequate showing of his prospects for success on those claims, and they appear to the Court to be untethered from any of Plaintiff's alleged injuries.

1.     **Negligence, Failure to Warn, and Infliction of Emotional Distress**

Section 230(c) shields a defendant from liability if "the defendant (1) 'is a provider . . . of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat the defendant as the publisher or speaker of that information.'"  *LeadClick Media, LLC*, 838 F.3d at 173 (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016)).  There does not appear to be any real dispute that Grindr is an "interactive computer service."  The Court concludes that there are not serious questions going to the merits whether the second and third elements required for CDA immunity are met in this case as well, at least as to Counts I, IV, V, and VI.

Plaintiff argues that Grindr is not merely a publisher of third-party content but is also a creator of content by virtue of the sorting and matching functions and geo-locational services that it integrated into the Grindr application.  While dating applications with Grindr's functionality appear to represent relatively new technological territory for the CDA, past cases suggest strongly that Plaintiff's attempt to artfully plead his case in order to separate the Defendant from the protections of the CDA is a losing proposition.  The fact that an ICS contributed to the production or presentation of content is not enough to defeat CDA immunity.  Rather, an ICS only loses its immunity if it assists in the "development of what [makes] the content unlawful." *LeadClick Media, LLC*, 838 F.3d at 174 (quoting *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009)).  An ICS may not be held liable for "neutral assistance"—tools and functionality made available equally to malefactors and the application's intended user-base.  *Id.*;

*see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1171-72 (9th Cir. 2008).

Plaintiff has not identified any acts by Grindr—other than "neutral assistance"—that might make Grindr the "provider" of the false profiles created by JC.  The Complaint describes the information collected by Grindr to set up an account, such as a profile photograph, name, and "about me" and "I'm looking for" sections.  Compl. ¶ 11.  Add-on services allow users to block other users, swipe between profiles, and filter by additional categories.  *Id.* ¶ 12.  All of these functions appear to be available equally to all Grindr users, and they are quintessential examples of "neutral assistance."  *See Roommates.Com, LLC*, 521 F.3d at 1169 (identifying as an example of neutral assistance a dating site that "requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines").  The fact that these offerings have been weaponized by a particular Grindr user does not make Grindr the creator of the allegedly tortious content.  Moreover, to the extent Grindr has "contributed" to the harassment by providing functionality such as geo-location assistance, that is not what makes the false profiles tortious.  *See LeadClick Media, LLC*, 838 F.3d at 174.[7]

Although Plaintiff asserts that his claim is like the claim in *Roomates.Com*, the Court disagrees.  In *Roommates.Com*, the Ninth Circuit concluded that a website that offered to connect individuals looking for housing could be held liable for violations of the Fair Housing Act, notwithstanding the CDA.  521 F.3d at 1169-70.  The Court explained that what set Roommate.com apart from a provider of neutral assistance was that Roommate.com designed the

---

[7]       At oral argument, Plaintiff asserted that Grindr is not immune because its product is inherently dangerous. The problem, of course, is that the product is only dangerous in combination with the sort of false content JC has created.  While the Court gives Plaintiff credit for his creativity in formulating this argument, his claim rests, at bottom, on the tortious nature of the content that JC created and posted.  Congress has clearly stated that an ICS cannot be liable for offensive content created by others.  Plaintiff's theory that Grindr has created a platform that is susceptible to misuse is fundamentally the same.

website's filters to hide certain listings based on protected personal characteristics.  "[T]he act of hiding certain listings [was] itself unlawful under the Fair Housing Act," *id.* at 1169, regardless of the content supplied by individual users.  By comparison, there is nothing inherently illegal about the Grindr features described in the Complaint.  Critically, Grindr has not contributed anything to the objectionable profiles; the profiles are objectionable solely because of the false information supplied by Plaintiff's tormenter.

The Complaint also plainly seeks to hold Grindr liable "as the publisher or speaker of that information," the third element of the test under the CDA.  Allegations premised on an ICS's failure to "block, screen, or otherwise prevent the dissemination of a third party's content," seek to hold the defendant liable in its capacity as a "publisher."  *Gibson v. Craigslist, Inc.*, No. 08-CV-7735 (RMB), 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009).  Plaintiff's tort claims are highly similar to the theory of liability rejected by Judge Berman in *Gibson*.  Plaintiff's negligence claim is based on Grindr's failure to "exercise reasonable care in operating its app, monitoring users, screening users, and acting on reports of abuse and stalking" and "screen users to stop abusers from using the service to target and victimize others."  Compl. ¶¶ 63, 69. Likewise, Plaintiff's intentional infliction of emotional distress and negligent infliction of emotional distress claims are premised on Grindr's failure to "control its product," and "intervene and disable the accounts that were ruining [Plaintiff's] life."  *Id.* ¶¶ 101-02, 111-12. Plaintiff's failure to warn claim is also premised on Grindr's alleged unwillingness to ban JC from the platform, *id.* ¶ 119, and its breach of an alleged duty to "screen, monitor, warn, and [ban] users using the service for unlawful purposes," *id.* ¶ 122.[8]

---

[8]     Because Plaintiff's failure-to-warn claim is based in part on Grindr's misrepresentations as to the safety of the application, it shares some similarities with Plaintiff's false advertising and deceptive practices theories.  To the extent the failure-to-warn claim is premised on Grindr's false advertising, rather than its failure to prevent other users from harassing Plaintiff, it suffers from the same flaws as the false advertising claims described below.

2.      **False Advertising, Deceptive Practices, and Negligent Misrepresentation**

Plaintiff alleges that Grindr falsely advertises that it monitors its users for inappropriate behavior.  Based on these allegedly false promises, Plaintiff brings claims under New York General Business Law Sections 349 and 350, and for common law negligent misrepresentation.  *See* Compl. ¶¶ 76-99, 127-137.  Grindr allegedly advertises that it has "a system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about."[9]  *Id.* ¶¶ 20-21.  Assuming that Plaintiff may be able to prove that these statements are misleading, Plaintiff's injuries are so attenuated from the misstatements that it is highly unlikely Plaintiff will be able to prove causation.

A claim under Section 349 has three elements: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *Merck Eprova AG v. Brookstone Pharm., LLC,* 920 F. Supp. 2d 404, 425 (S.D.N.Y. 2013) (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)).  Section 350 is similar, but it requires additional proof of plaintiff's reliance on the misleading practice or statements.  *See Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005).  Causation is an "essential" element of a claim under Sections 349 and 350.  *Belfiore v. Procter & Gamble Co*., 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015).[10]

The causal nexus identified by Plaintiff is as follows:  Plaintiff signed up for Grindr in May 2011 in part because he believed Grindr's advertisements representing Grindr to be a "safe space."  Compl. ¶¶ 28, 81, 83, 89, 95-97.  Approximately four years later, Plaintiff met JC on

---

[9]      Plaintiff also relies on Grindr's terms of service, which warn users that they may be banned or blocked from the application for inappropriate conduct.  Compl. ¶ 22.  Assuming that the terms of service could mislead or constitute an advertisement for purposes of Sections 349 and 350, the analysis is the same as in respect of the other misstatements identified in the Complaint.

[10]      Negligent misrepresentation also requires proof of causation.  *See Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011).

Grindr and began an intimate relationship with him.  *Id.* ¶ 29.  More than a year after that, in

October 2016, Plaintiff ended his relationship with JC.  *Id.* ¶ 30.  Thereafter, JC began using

Grindr to harass Plaintiff.  *Id.* ¶ 31.  Put slightly differently, the only connection between

Plaintiff's present day injury and Grindr's alleged misrepresentations approximately five years

ago is the fact that Plaintiff would not have otherwise joined Grindr in 2011 and would not have

otherwise met JC.  This is an exceedingly remote connection.  The fact that "but for" Grindr's

advertising, Plaintiff would not have joined Grindr some five years before the harassment

relevant to this case—assuming that to be true—is insufficient, standing alone, to establish

causation.  *See M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 217 (E.D.N.Y.

2010) (quoting *City of N.Y. v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 623 (2009) ("but for"

causation inadequate to state a claim under Section 349)).

    In sum, taking into account the risk of irreparable injury, the fact that Plaintiff seeks an

affirmative injunction that would potentially insert the Court into day-to-day supervision of

Grindr's compliance, and the Court's conclusion that Plaintiff has not shown that there are

sufficiently serious questions going to the merits to make them "fair grounds" for litigation, the

Court DENIES Plaintiff's application for an extension of the TRO.  The Court decides today

only that Plaintiff is not entitled to the extraordinary remedy of a TRO.

**CONCLUSION**

Plaintiff's application for an extension of the TRO is DENIED.  The parties are directed to appear as previously ordered for an initial pre-trial conference on March 10, 2017. Defendant's deadline to respond to the order to show cause, previously set for March 7, 2017, is adjourned as moot.  The Court will set a briefing schedule for Plaintiff's potential motion to remand and Defendant's anticipated motion to dismiss at the March 10, 2017 conference.  The Clerk of Court is respectfully requested to close the open motion at docket entry 18.

**SO ORDERED.**

**Date:  February 24, 2017**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**