## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MATTHEW HERRICK
                    Plaintiff,

          v.

GRINDR, LLC; KL GRINDR
HOLDINGS, INC.; and GRINDR
HOLDING COMPANY
                    Defendants.

Case No. 1:17-CV-00932 (VEC)

**FIRST AMENDED
COMPLAINT**

**DEMAND FOR JURY TRIAL**

PLAINTIFF, by his attorneys C. A. Goldberg, PLLC, and Tor Ekeland PC, files this

Complaint as follows:

### PRELIMINARY STATEMENT

1.  This is a case about a company abdicating responsibility for a dangerous product it
    released into the stream of commerce. Grindr, a geosocial networking app used for
    online dating, has put Plaintiff's life in imminent and ongoing danger. Defendants
    Grindr LLC, KL Grindr Holdings, Inc., and Grindr Holding Company (collectively
    "Grindr") own, maintain and control this product.

2.  Grindr own and operate two online geo-social networking applications "Grindr" and
    "GrindrX".[1]

3.  The geolocating capabilities of Grindr distinguish it from standard interactive
    computer services. Grindr actively generates mapping information and directs
    individuals towards one another for offline meetings.

4.  Grindr's software and services do far more than merely publish third party content.

---

[1] Depending on the context, the term "Grindr" is used both to refer to the Grindr Defendants and the Grindr app
throughout this complaint.

Grindr's algorithms actively and autonomously facilitate matches between potential sexual partners by analyzing and crunching data and computing the best possible partners for a user. It is far more than a bulletin board or blog. It is a sex marketplace, telling its users who meet their sexual preferences, and where they are in relation to one another. It is not merely a forum for user communication, but originates content to guide and connect users.

5. For five months Plaintiff Matthew Herrick ("Plaintiff") has been impersonated on Grindr through multiple profiles, resulting in as many as 16 individuals per day going to his home and work aggressively demanding sex, sometimes violently.

6. Plaintiff submitted numerous requests to Grindr, asking it to implement basic control over its product and to disable the impersonating accounts. Plaintiff filed this action because Grindr failed to respond to those requests. Instead, Grindr's inaction enables the weaponization of its products and services, and Grindr continues to facilitate the attempted rape and murder scheme brought by a Grindr user against Plaintiff.

7. Grindr does not warn its subscribers that its product may be used to target them for purposes of harassment, rape, and physical assault. Upon information and belief, Grindr does not verify the identity of its subscribers, and takes no precautions to prevent subscribers using proxies and other technical methods to mask their true identity. Upon information and belief, Grindr does not use even standard, widely available software programs such as key word searching, proxy blocking, and image recognition software, all routinely used by interactive service providers to control their sites and products and to facilitate the safety and security of their users and the public.

8. The unwanted visits continued for Plaintiff, and increased in quantity and severity after a New York state court ordered Grindr to stop the impersonating accounts.

Plaintiff, his friends, lawyers, and family members have made approximately one hundred complaints to Grindr reporting the impersonations and its harms and specifically identifying the impersonating accounts.

9. Grindr claims it cannot control who uses its product and that it lacks the basic software capabilities used by its competitors and the social media industry. For months, Plaintiff's life has been interrupted at all hours of the day and night at his home and workplace by strangers expecting hardcore sex. Plaintiff has been helpless, completely at the mercy of Grindr which refuses to exercise control of its product and content.

10. Plaintiff is in imminent danger because of Grindr's recklessness. Grindr knowingly and negligently participated in furthering criminal and tortious activity.

11. Grindr failed to implement or exercise commonplace user safeguards, interested only in increasing its profit, at the expense of its users and their safety.

12. Plaintiff has experienced grave emotional distress and trauma because Grindr's products and services marshaled an endless stream of horny and violent strangers into his life.

13. Plaintiff seeks injunctive relief and recovery on his claims for:

    a)   product liability arising out of defects in design, manufacture, inspection, testing, failure to warn, and breach of warranty;

    b)  general and gross negligence;

    c)  copyright infringement;

    d)  promissory estoppel;

    e)  fraud;

    f)  New York Business Law violations;

    g)  intentional and negligent infliction of emotional distress; and

h)  negligent misrepresentation.

## PARTIES, JURISDICTION, AND VENUE

14. Plaintiff, age 32, is a citizen and resident of the County and State of New York.

15. Defendant Grindr, LLC is a Limited Liability Company organized in the State of California with its principal place of business in West Hollywood, California.

16. Upon information and belief Grindr LLC has two corporate members: KL Grindr Holdings Inc. and Grindr Holding Company.

17. KL Grindr Holdings, Inc., is, upon information and belief, incorporated under the laws of Delaware with a principal place of business in China.

18. Grindr Holding Company is, upon information and belief, incorporated under the laws of Delaware and has its principal place of business in California.

19. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) as a substantial part of the events that gave rise to this Complaint occurred in New York: Defendants extensively and intentionally market to New York residents[2], including Plaintiff; the mobile app was downloaded in New York; and Defendants sent data to and from New York in connection with its software products, including supporting approximately 400,000 accounts in New York. In the alternative, venue is proper under 28 U.S.C. § 1391(c), as Defendants are subject to the personal jurisdiction of the Southern District of New York.

20. Subject matter jurisdiction is proper under 28 U.S.C. § 1332 because the amount in controversy is over $75,000.00 and there is complete diversity of the parties. Subject

---

[2] Including, for example, hosting lavish and highly promoted promotional events. *See, e.g.* Taylor Harris, "Grindr Throws SLUMBR party for N.Y. Pride Weekend," WWD, June 27, 2016, at https://wwd.com/eye/parties/grindr-slumbr-party-ny-pride-weekend-alexander-wang-zachary-quinto-10473383/ (last visited March 31, 2017).

matter for claims arising under the United States Copyright Act are proper under 28 U.S.C. § 1331.

## FACTS

### Grindr's geolocation and user interface

21. Grindr is an application ("App") for smartphones designed to facilitate the coupling of gay and bisexual men in a given geographic area.

22. Grindr's geolocation code is integral to its business model. Geolocation is the identification or estimation of the real-world geographic location of an object, such as a mobile phone or computer.

23. Grindr's innovation to the world of dating apps is its geolocation feature, designed to make hook-ups quick and convenient with potential matches selected by Grindr and organized based on users' distance from one another, from nearest to furthest.

24. Grindr's software is written to retrieve the latitude and longitude of a user's mobile device, without any affirmative action from the user. Once a match is made, the Grindr mobile App allows a user to generate and send a map showing the geographical relation between the parties to facilitate the meeting

25. Grindr is not merely a platform for users to submit content or publish information about themselves.

26. Grindr itself directly produces and delivers new content – including but not limited to the aforementioned geolocation mapping – to drive users to one another.

27. Grindr also profits from collecting user data. This includes both data voluntarily entered by a user, such as profile photos, as well as user metadata such as browsing habits, device identification data, and browsing history. It sells this information, and uses it to optimize its software for purposes of profit.

28. Grindr provides software for iOS and Android smartphone operating systems, which are available for download at the Apple App Store and Google Play. The App interacts with Grindr's servers, including third-party services used by Grindr, which create, collect, and analyze many types of data sent to and from the mobile App.

29. Originally launched in 2009, Grindr is purportedly the largest and most popular app for gay and bisexual men in the world with nearly 10,000,000 users in 192 countries. Approximately 10,000 men join the App daily. Grindr has roughly 2,660,000 users in the United States with approximately 426,000 in New York City, making New York its top metro area globally by far. 7,000,000 chats are sent through the App per day and 2,000,000,000 monthly impressions are made.

30. Grindr describes itself on the App Store as "the world's #1 FREE mobile social networking app for gay and bi guys to connect. Chat and meet sexy, attractive and interesting guys for free, or upgrade to Grindr XTRA for more features and fun."

31. Grindr's software processes user data in part to create and deliver an endless scroll of images of men to the app users, matching the user's sexual preferences, arranged from nearest to farthest away. Users post a brief profile about themselves and can see others' profiles by tapping on their image. Users can then chat with one another on the interface with the expectation that the chat will ultimately lead to a date or sexual encounter. *See, e.g.*,



32. To set up a Grindr account, users enter their email address, date of birth, and choose a password. They can then choose whether to opt in for special offers from Grindr and lastly, must accept the terms of service. After that, users can personalize a portion of their profile with their own content: display name, profile photo and "about me" section. The rest of the profile content is selected from drop-down menus with Grindr-created content: age, height, weight, body type, position (i.e. top, vers top, versatile,

vers bottom, bottom), ethnicity, relationship status, "tribes" (i.e. Bear, Clean-cut, Daddy, Discreet, Geek, Jock, Leather, Otter, Poz, Rugged, Trans, and Twink.), "I'm looking for," "HIV status" and "last tested date."

33. Grindr Xtra is the paid-for subscription version of Grindr which is advertisement free and has other features, such as the ability to load up to 300 users at once, unlimited blocking of other users and quick swiping between profiles. It also allows users to filter by additional categories.

34. Users on Grindr can link their social media accounts to their profile, but are otherwise identified publicly on the App only by username – not by real name or email address.

35. Advertisements are another revenue source for Grindr, especially for businesses using the App's geolocation features to finely curate their target audience by neighborhood. As its website states to potential advertisers: "Our geo-targeting lets you find the right audience in your neighborhood or around the world." (*See* Grindr AdKit, https://s3.amazonaws.com/grindr_marketing/US+Media+Kit+05.2014.pdf (last visited March 31, 2017) and https://www.grindr.com/gay-advertising (last visited March 31, 2017).)

36. Upon information and belief, licensing user data to other companies is another revenue stream for Grindr. Per its Privacy Policy, "[w]e may share some or all of your Personal Data with our parent company, any subsidiaries, joint ventures, or other companies. . . (See Grindr Privacy Policy June 10, 2015, visited January 27, 2017.[3])

37. This is not Grindr's first failure to protect its users' safety and privacy. In 2014, privacy vulnerabilities resulting from flaws in the design of Grindr's software code

---

[3] Grindr's Privacy Policy was substantially revised on February 10, 2017, thirteen days after service of Plaintiff's January 27, 2017 Complaint.

allowed for precise geographical pinpointing of individual users. This generated negative publicity for Grindr. Despite being on notice of the flaws in its products, Grindr did not fix the problems. In May of 2016, WIRED Magazine showed that pinpointing is still possible via a technique called colluding-trilateration[4] even when users disable the "show distance" option on the App to hide their location. Per WIRED, any targeted user could be easily and cheaply pinpointed without hacking. (Andy Greenberg, "Gay Dating Apps Promise Privacy But Leak Your Exact Location," WIRED, (May 20, 2016), https://www.wired.com/2016/05/grindr-promises-privacy-still-leaks-exact-location/, (last visited March 30, 2017).

38. Before Plaintiff served his first Complaint on Grindr, Grindr neither warned users of this location exposure vulnerability, nor that Grindr could be used to direct scores of potentially dangerous individuals to their workplace and home. If Grindr had warned Plaintiff that this could occur, Plaintiff would not have used Grindr in the past.

39. Grindr has a history of negligently managing its App. Upon information and belief, in 2012, a 13-year-old minor misrepresented his age and was sexually assaulted by two adult males he met through the App. Serial killer Stephen Port used Grindr to carry out his sick fantasies, drugging, raping, filming and murdering men he met through the App. One website exists just to rank the top 25 violent crimes committed through the Grindr App. ( http://www.ranker.com/list/grindr-horror-stories/jacob-shelton, last visited March 30, 2017)

---

[4] This method uses the distance-sorted user list, created and delivered by Grindr's server-side software , to correlate a user's exact location based on location data generated from the Grindr mobile Apps of other users. *See* Nguyen Hoang, Yasuhtio Asano, & Masatoshi Yoshikawa, "Your Neighbors Are My Spies: Location and other Privacy Concerns in GLBT-focused Location-based Dating Applications," ICACT-TACT Vol. 5, Iss 3, May 2016, pp. 853-855, available at http://icact.org/upload/2016/0284/20160284_finalpaper.pdf.

40. At all relevant times, Grindr represented to users in its advertising and community values page that it protects users from "behaviors that endanger them."

41. On its website at Grindr.com, Grindr described itself as a "global community for men of all backgrounds to connect with one another. We strive to create a safe space where all are welcome to be who they are and express themselves without fear of judgment. In order for everyone to have the best time possible, we have a system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about." [5]

42. At all relevant times, Grindr represented its ability to ban abusive accounts in its Terms and Conditions of Service ("Terms of Service").

  a. "WE MAY DELETE YOUR SUBMISSIONS AND WE MAY BAN YOUR ACCOUNT.  Grindr can request that You delete, or Grindr may delete, any User Content [defined elsewhere] at any time for any reason or no reason whatsoever. Any violation of the Guidelines by your User Content, as determined by Grindr, may result in Your User Account being banned and may lead to the termination of Your access to the Grindr Services."

  b. "You will NOT use the Grindr Services or any information displayed within the Grindr Services to 'stalk,' harass abuse, defame, threaten or defraud other Users; violate the privacy or other rights of Users; or collect, attempt to collect, store, or disclose without permission location or personal information about other Users."

---

[5] As of March 14, 2017, the webpage at https://www.grindr.com/our-values/ included the statement: "... we have a system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about." As of March 31, 2017, that address leads to a "page not found" error.

c. "You will NOT use the Grindr Services for the commission or encouragement of any illegal purpose, or in violation of any local, state, national, or international law, including laws governing criminal acts, prohibited or controlled substances, intellectual property and other proprietary rights, data protection and privacy, and import or export control;"

d. "You will NOT impersonate any person or entity, falsely claim an affiliation with any person or entity, or access the Grindr User Accounts of other Users;"

e. "You will NOT misrepresent the source, identity or content of information transmitted via the Grindr Services; You will NOT intentionally interfere with or damage operation of the Grindr Services or any User's enjoyment of them, by any means, including uploading or otherwise disseminating viruses, worms, or other malicious code;"

f. "You will NOT post, store, send, transmit, or disseminate any information or material which a reasonable person could deem to be objectionable, defamatory, libelous, offensive, obscene, indecent, pornographic, harassing, threatening, embarrassing, distressing, vulgar, hateful, racially or ethnically or otherwise offensive to any group or individual, intentionally misleading, false, or otherwise inappropriate, regardless of whether this material or its dissemination is unlawful;"

g. "You will NOT interfere with anyone's ability to use or enjoy the Grindr Service, or aid or encourage any activity prohibited by this Agreement.

h. "If we believe that Your profile content or Your conduct within the Grindr Software or Grindr Services violates Our Terms of Service, Your access and User Account may be immediately terminated and all payments forfeited."

    i.   "GRINDR RESERVES THE RIGHT TO REFUSE OR SUSPEND ACCESS TO ANY USER, FOR ANY REASON OR NO REASON, AND WITHOUT ANY NOTICE."

43. Although it represents that it will take a hard line against anyone who uses Grindr's products in abusive ways, in reality Grindr does not. In the case of Plaintiff, Grindr took no action despite repeated pleas from Plaintiff and third parties.

44. Upon information and belief, Grindr's owners and operators make little to no effort to screen and monitor the activities of its members or to ban abusive accounts and abusive users although they are well aware of the dangerous uses of their product. Grindr does not utilize proven and common software that would allow it to identify and block abusive users.

45. Other similarly situated apps lock out abusive users in the exercise of ordinary care. For example, similar hook-up apps called "Scruff" and "Jack'd" employ staff who are responsive to user complaints – they confirm the identity of the person making the complaint, navigate the complainant through their system to help them identify the offending user, and, within 24 hours, can locate and remove the offending profiles and ban IP addresses and specific devices from creating new profiles. Scruff also keeps complainants informed and sends a notification when the problem is resolved.

**Plaintiff joins Grindr**

46. On or about May 2011, Plaintiff first joined Grindr by downloading the Grindr iOS mobile App from Apple's App store. He used the App on and off for several years.

47. To use the App, Plaintiff and Grindr entered into the standard agreement required of all Grindr users.

48.  On or about June, 2015 Plaintiff met a man on Grindr and the two began a dating

relationship. On or about November 2015, Plaintiff removed his Grindr profile

because the relationship had become more serious and exclusive.

49. Starting in October, 2016 Plaintiff's then-recent ex-boyfriend began using Grindr to

impersonate Plaintiff. From October 2016 through the end of March 2017, Grindr

directed approximately 1100 strangers to Plaintiff's home and work. Upon information

and belief, the pinpointing geolocation vulnerabilities enabled users to be directed to

Plaintiff.

50. Impersonating profiles included names like "Raw Pig Bottom" "Hi," "hey," and

"muscle daddy" and contained photographs of Plaintiff and accurate descriptions of

Plaintiff's height, weight, ethnicity, body type, etc. The profiles would state at times

"hosting in Harlem, into serious kink and many fantasy scenes" and "hosting in

Harlem, ff[6], ws[7], kink" and indicated that Plaintiff is a "Top" and on "PrEP." Grindr

presented Plaintiff as HIV positive, interested in hardcore and unprotected sex (e.g.

fisting), bondage, and had drugs to provide.

51. One impersonating profile, named "Gang Bang Now!" describes Plaintiff as "Waiting

on all 4's with my ass lubed."  Another one, named "⬛⬇Hosting⬛⬆" describes Plaintiff

as "Looking for a group of hung tops to come over and destroy my ass." *See, e.g.,*

---

[6] FF is colloquial slang for "fist fucking," meaning sex acts involving hand insertion.
[7] WS is colloquial slang for "watersports," meaning sex acts involving urine.






52. Grindr's geolocation directed strangers to Plaintiff's home and work addresses, and direct messages were used to transmit maps of Plaintiff's locations and to arrange the sex dates.

53. Upon information and belief, Grindr's algorithms analyzed and sorted data from Grindr mobile Apps and from user account data to specifically select users to direct towards Plaintiff.

54. From October, 2016 to the present, Plaintiff received between 1 and 16 individuals per day showing up to his home and restaurant workplace expecting sex. The typical number of visitors per day was 4 to 8 at home and at its peak, an additional 4 to 8 visitors per Plaintiff's 6-hour work shift.

15

55. For instance, between January 13, 2017 and January 17, 2017, Grindr directed 4 to 13 men to Plaintiff's work every single day under the pretenses that Plaintiff was going to have sex with them in the bathroom. Several stayed even after Plaintiff informed them about the impersonation, and one lingered, watching him for an additional 30 minutes. On January 16, 2017, 2 men who came to Plaintiff's home refused to leave and loitered outside his home even after Plaintiff explained he was being impersonated.

56. On January 17, 2017, 13 men visited Plaintiff's home and job expecting to have sex with him. Grindr directed these men to Plaintiff, based on, among other data, location data generated by the Grindr mobile Apps. On that day, during a 4-minute time span (12:22pm to 12:26pm), 6 different men visited Plaintiff at work.

57. On January 18, 2017, Grindr directed another 13 men to Plaintiff's home and job, including one man who followed Plaintiff to the bathroom at work expecting to have sex.

58. On January 19, 2017, Plaintiff's day off from work, a co-worker vaguely resembling Plaintiff was mistaken for Plaintiff by 5 different men Grindr had selected and directed towards Plaintiff.

59. On January 22, 2017, an individual selected and directed to Plaintiff by Grindr got into Plaintiff's apartment building and refused to leave. The man persisted in demanding to see Plaintiff even after Plaintiff's roommate told him to leave. When Plaintiff's roommate went into the hall to tell the intruder he was calling the police, the man lunged at the roommate, grabbed the roommate's phone and they started wrestling. Plaintiff had to break up the fight. The man ran away.

60. On one occasion while Plaintiff was working a busy brunch shift, a stranger came for sex, and when Plaintiff told him about the impersonation, the man screamed at

Plaintiff in front of all the staff, management and guests, at the top of the lungs "YOU

LYING WHORE!!! ANOTHER WHORE FROM GRINDR!!" and repeatedly

hollered "FUCK YOU!"

61. On two occasions in January 2017, men selected and directed by Grindr stood outside

Plaintiff's apartment building for over 30 minutes even after he told them about the

impersonation. In another situation, a man waited at the end of Plaintiff's block for at

least thirty minutes after being turned away.

62. Grindr's direct message feature was used to precondition these visitors to expect

Plaintiff's resistance as part of an agreed upon rape fantasy or role play. One of the

visitors who entered the building and stood outside Plaintiff's unit door, returned 15

minutes later insisting that Plaintiff had just communicated with him on Grindr, urging

him to return.

63. Plaintiff is not safe in his own home. The men Grindr selects and directs towards him

are often intimidating and on drugs or seeking drugs from Plaintiff based on

representations made on Grindr. Upon information and belief, Grindr does not screen

its service for individuals offering the sale and use of illegal drugs and, in fact,

developed new icons that signify various drugs offered through the App.

64. Individuals selected and directed by Grindr have banged on the window of Plaintiff's

roommate demanding access to Plaintiff. Multiple men have shown up sweating

profusely, have entered Plaintiff's apartment building and refused to leave until they

were physically escorted off the premises. On one occasion, a man high on drugs who

visited Plaintiff's home was told about the impersonation, and then became hostile and

aggressive toward Plaintiff's roommate when asked to leave. He had to be escorted

away by the police. That same man returned another day. Even when Plaintiff is not at

home, unwanted visitors from Grindr come, disrupting the daily life of his roommates. At no time during Plaintiff's limited use of Grindr did Grindr ever warn him of the possibility of this occurring.

65. In addition to deactivating his apartment buzzer, Plaintiff has posted signs in the building windows telling visitors not to go up to his apartment: "WARNING GRINDR USERS: Do Not Buzz for or Enter Apt [**]. FAKE PROFILE. REPORT to GRINDR" On January 27, 2017 a Grindr user ripped the sign off the front door and aggressively tried to barge into Plaintiff's home, causing Plaintiff to call the police.

66. Grindr knowingly and negligently allows its service to be used as a weapon of hostility and violence toward Plaintiff. It allows its platform to be used to pick fights in Plaintiff's name with other Grindr users and allows Plaintiff to be portrayed as a racist. Individuals who were in contact with Plaintiff's impersonating profile have called the restaurant where he works, threatening him and telling the hostess they'd spoken to him on Grindr and that if Plaintiff continued to call people the "N word" they were going to come and beat him. Upon information and belief, Grindr does not use keyword searches or algorithms to screen for or remove hateful comments and language meant to incite violence against users and non-users alike. Nor does it warn users of the possibility that using the App may result in the user becoming a victim of violence and harassment.

67. The individuals Grindr selects and directs towards Plaintiff are often sexually aggressive toward Plaintiff, based on how Plaintiff is falsely portrayed on Grindr's software -- as interested in bondage, fisting, watersports, and unprotected sex. The App also represents Plaintiff as HIV Positive, which he is not. Upon information and

belief, Grindr does nothing to verify any of the information entered by a user before it processes the information and selects and directs users to others.

68. Between approximately November 2016 and January 2017, Plaintiff reported the abusive accounts to Grindr through its interface approximately 50 times.

69. Between approximately January 27, 2017 through the end of March 2017, the impersonating profiles were reported approximately fifty times by Plaintiff, the visitors and/or his counsel.

70. Plaintiff's sister and two roommates have also faced harassment due to the impersonating accounts, and have reported this to Grindr numerous times – on Plaintiff's behalf and their own.

71. In response to Plaintiff's detailed pleas, at best Grindr responded with an auto-generated reply stating, "Thank you for your report." No further action was taken.

72. At times, there were multiple impersonating accounts side-by-side with the same name and similar photos – an obvious and unambiguous demonstration of policy violations, such as on January 20, 2017 when two accounts both named "HUNGRY BTTM⬇!!!" were both posted, both soliciting men interested in unprotected sex (i.e. "My hairy ⬚needs a BIG ⬚ NOW!!! I prefer my veggies raw!" and "My hungry hairy ass is always looking for good ⬚. I prefer my veggies raw.")

73. Plaintiff has filed approximately 14 police reports and petitioned in Family Court for an order of protection to stop the impersonation.

74. On January 24, 2017, Plaintiff's attorney sent a cease and desist and preservation letter to Grindr.

**The Temporary Restraining Order**

75. On January 27, 2017, New York State Supreme Court Justice Kathryn E. Freed issued an *ex parte* preliminary injunction and temporary restraining order ("TRO") against Grindr in the matter of *Matthew Herrick v Grindr, LLC*, Index No. 150903/2017. The TRO compelled Grindr to "immediately disable all impersonating profiles created under Plaintiff's name or with identifying information related to Plaintiff, Plaintiff's photograph, address, phone number, email account or place of work, including but not limited to all impersonating accounts under the control [of Plaintiff's malefactor]."

76. On January 27, 2017, the TRO was served on Grindr Defendants.

77. The TRO expired as a matter of law February 22, 2017 following Grindr's removal of the case to federal court.

78. Grindr violated the TRO. During the 27 days when the TRO was in effect, there was no change in the number of unwanted visitors Grindr selected and directed toward Plaintiff. During those 27 days, 57 men showed up because of the impersonating Grindr accounts.

79. The impersonating accounts have repeatedly used the same photographs of Plaintiff, primarily photos for which Plaintiff holds the copyright, interspersed with images of male genitals purported to be Plaintiff's but which are not. Upon information and belief, Grindr has not used proven and common image recognition or duplicate-detection software to identify known photographs of Plaintiff and ban accounts using them. Upon information and belief, Grindr does not use any such software to protect its users and the public from the dangerous uses of its defectively designed product.

80. Direct messages from Grindr users selected and directed by Grindr to Plaintiff's home repeatedly use the same words and phrases – "[Plaintiff's address]," "Buzz 101," "vers kiss oral rim," and "buzz a few times its buggy." Upon information and belief, Grindr

does not use proven and common software to key word search its messaging system to protect its users and the public from the dangerous uses of its defectively designed product.

81. Plaintiff and third parties reported his nightmarish ordeal to Grindr through its support interface approximately 100 times. Furthermore, Plaintiff's counsel provided images, addresses, quotes, screen captures, and other information to counsel for Grindr in the hopes that Grindr would use that information, along with proven and common software methods, to eliminate the dangerous threat to Plaintiff that Grindr's product created by selecting and directing users to Plaintiff.

82. Counsel for Grindr Defendants say their client "cannot search for photographs, confirm profiles based on generic display names, [or] search chat contents." (March 20, 2017 email from Daniel Waxman, Esq.) They say they cannot search for IP addresses, block the use of VPN, proxies, spoofing to mask actual IP addresses, or recognize devices through the use of MAC Addresses and ICC Numbers. If true, Grindr's technology is decades behind all other tech companies. Grindr acts as if software stopped developing after the mid 1990's, or that their software architecture creates implausibly high barriers to necessary and common administration tasks.

83. Grindr could identify and ban the impersonating accounts through the language used in the direct messages. But it intentionally, knowingly, and negligently refuses to. Upon information and belief, common software could be used to flag the specific phrases used repeatedly in the offending accounts.

84. Grindr could identify and ban the impersonating accounts through industry standard software, such as PhotoDNA technology[8]. But it intentionally, knowingly and negligently refuses to. The offending accounts repeatedly use the same images of Plaintiff.

85. Grindr Defendants could use geofencing[9] or multiple source location verification[10] to stop or detect the impersonating accounts. But it intentionally, knowingly, and negligently refuses to do so. Plaintiff provided Grindr Defendants with the addresses from where the offending account is most likely controlled as well as Plaintiff's home and work addresses where the unwanted visitors are sent. Grindr's geolocation technology not only could flag it when the offending account is used at the specific address, but it could also block use of its product in specified locations.

86. Grindr could take any number of basic measures to make its product safer and stop Plaintiff's hell – it could institute user account verification, notify users in Plaintiff's region, populate a community standards and safety department with human beings, or ban the use of generic display names. But it does not.

87. Instead, despite the serious physical dangers, Grindr's counsel says they can only help if Plaintiff interacts directly with the visitors -- individuals seeking anonymous, hardcore, unprotected, and often violent sex. They instruct Plaintiff to convince these

---

[8] PhotoDNA works by computing a unique hash that represents an image and it enables tech companies to flag accounts that are using unauthorized photographs. Upon information and belief Microsoft offers PhotoDNA to tech companies through the Azure Marketplace. Upon information and belief, it is used by Bing, OneDrive, Google, Gmail, Twitter, Facebook, and the Center for Missing and Exploited Children.

[9] "Geofencing" creates a virtual fence for a real-world location. Grindr could use it to block accounts that reference Plaintiff's real world addresses. See *https://en.wikipedia.org/wiki/Geo-fence* (last accessed March 30, 2017).

[10] A smartphone contains multiple sources of location data, and verifying those sources against one another is a standard practice to prevent location spoofing. *See, e.g.* Einverne in Stackexchange forum thread, "How do location-based apps avoid getting cheated by emulated GPS?," available at *https://security.stackexchange.com/a/65215* (last visited March 31, 2017); *see also* Geomoby Blog, "How to avoid getting your location-based app spoofed?," available at *http://blog.geomoby.com/2015/01/25/how-to-avoid-getting-your-location-based-app-spoofed/* (last visited March 31, 2017).

visitors to "favorite" the fake profiles and photograph the chats, and give Plaintiff their email addresses. This is not a practicable solution. Plaintiff should not have to expose himself to greater danger because Grindr selected and directed users towards him. Grindr controls its defective product, generates the data at issue, and therefore must take steps to eliminate its use as a weapon by unscrupulous others.

88. Upon information and belief, despite having copious resources to do so, Grindr does not invest in the safety of its product, and does not prioritize the safety of its users over its own profit.

89. Industry standards, common practices, and commonsense measures all provide methods by which Grindr could mitigate the unsafe design of its software.

90. Per its updated Privacy Policy, Grindr collects the very data that it would need to stop the abuse, including but not limited to mobile device identifiers, unique user hashes, image files, location data, browser type, operating system information, IP addresses, cookies, messages and photos exchanged in direct messages to other users.

91. Instead of investing in the safety of its defective and dangerous product, Grindr expends its capital elsewhere. In March 2017, at the height of Plaintiff's abuse, Grindr unveiled 500 new "Gaymojis.[11]" These included, among other things, multiple variations of an eggplant and a cartoon banana hammock.

92. Plaintiff suffered and continues to suffer serious pain and mental distress as a result of Grindr's role in facilitating this incessant nightmare.

93. Before this, Plaintiff was a private person living a quiet and low-key life. He worked at a restaurant full-time to pursue his career in acting and modeling.

---

[11] A portmanteau of "gay" and "emoji." An emoji is an ideogram, often a Unicode character, rendered as images in many apps, browsers, and operating systems that can be used like a text character. *See, e.g.*

94. Now, photographers are afraid to work with Plaintiff on a professional level. He had to drop a sponsorship with a South African touring company. His colleagues resent, and have at times been endangered by, the sketchy, dangerous, and unwanted visitors.

95. Plaintiff is subject to humiliation on an hourly basis and afraid to be in public places or even at home alone. He is afraid to walk his dog alone at night. He is in a constant state of hyper-vigilance, afraid that Grindr has again directed its sexual marketplace, now rife with impersonating accounts, to entice the wrong person – somebody who will make good on threats to attack or rape him. His home and work life is constantly interrupted to inform strangers that, no, he does not want to have sex with them.

96. Plaintiff is in danger of immediate and severe harm. Over a thousand men, some on drugs, some aggressive and violent, continue to track Plaintiff at his home and work demanding sex. These men are under the impression that Plaintiff wants rough sex, has rape fantasies, and wants them to loiter even after being sent away.  These dangerous unwarranted assumptions – knowingly facilitated through Grindr – about Plaintiff's sexual desire cause these men to believe he is a consenting participant and that his fear is a theatric act performed to instigate more aggressive attempts.

### Section 230 of the Communications Decency Act
### Does Not Immunize Defendants from Liability

97. The grant of immunity for interactive computer services under the Communications Decency Act, 47 U.S.C. Section 230 ("Section 230") does not apply to content that the computer service itself has created or developed.

98. Grindr itself creates and/or develops much of its own content. Grindr created the categories in its dropdown menus which portrayed Plaintiff as interested in hardcore sex, leading dangerous people to Plaintiff. Grindr's mobile apps create, develop, and send location data. Grindr's server-side software analyzes, interprets, and re-packages

that location data, along with other metrics, and creates lists and graphical features to suggest users to one another. In these and other ways, Grindr is a content provider as well as an interactive computer service. Grindr itself is the creator and publisher of the targeted mapping content, of the location and preference -sorted user lists, and map graphics showing user locations.

99. Additionally, Grindr does not qualify for Section 230 immunity for each of the following additional reasons: 1) Grindr played a direct role in tortious conduct through the sale or distribution of the defective product and its failure to warn users; 2) Grindr promised to stop tortious conduct and failed to do so; 3) Grindr breached a legal duty by violating the January 27, 2017 Temporary Restraining Order demanding that it stop directing unwanted visitors to Plaintiff; 4) Section 230 does not apply to claims under the United States Copyright Act.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Product Liability – Defect in design

100.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

101.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr apps in the stream of commerce. The apps contain defective conditions and is fundamentally unsafe.

102.     The design defect made the apps unreasonably dangerous.

103.     The apps as designed by Grindr were not modified by Plaintiff at the time of his injury.

104.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr server-side software in the stream of commerce. The server-side software contains defective conditions and is fundamentally unsafe.

105.     The design defects made the server-side software unreasonably dangerous.

106.     The server-side software as designed by Grindr were not modified or misused by Plaintiff at the time of his injury.

107.     As a direct and proximate cause of Defendant's design, coding, engineering, manufacture, testing, inspection, production, assembly, and sale, Plaintiff sustained permanent injuries and suffered extreme pain and agony.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## SECOND CAUSE OF ACTION
### Product Liability – Defect in Manufacture

108.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

109.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr apps in the stream of commerce. The apps contained a manufacturing flaw by failing to incorporate widely used, proven and common software to flag and detect abusive accounts that resulted in Grindr selecting and directing an incessant stream men demanding sex from Plaintiff.

110.     The manufacturing defect made the App unreasonably dangerous.

111.     The App as manufactured by Grindr was not modified by Plaintiff at the time of the injury.

112.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr server-side software in the stream of commerce. The server-side software contains defective conditions and is fundamentally unsafe.

113.     The design defects made the server-side software unreasonably dangerous.

114.     The server-side software as designed by Grindr were not modified or misused by Plaintiff at the time of his injury.

115.     As a direct and proximate cause of Defendant's design, coding, engineering, manufacture, testing, inspection, production, assembly, and sale, Plaintiff sustained permanent injuries and suffered extreme pain and agony.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

### THIRD CAUSE OF ACTION
### Product Liability – Defect in Warning

116.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

117.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr app in the stream of commerce. The App contained a defective condition in that Grindr should be accompanied by a warning that the App can be weaponized and used to impersonate and abuse, that users can be geographically pinpointed, and also warning that the features on the interface to report abusive accounts are merely decorative, and further warning that they shun the basic technology widely used in their industry to prevent or stop known abuse. If the App had contained or been accompanied by such warnings, Plaintiff would never have

downloaded the Grindr app in the first place and many of the unwanted visitors likely would not have either.

118.     The warning defect made the App unreasonably dangerous.

119.     The App as designed and manufactured by Grindr Defendants has not been changed and was in the same condition at the time of the injury.

120.     As a direct and proximate cause of Defendant's design, coding, engineering, manufacture, production, assembly, and sale, Plaintiff sustained permanent injuries and suffered extreme pain and agony.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

**FOURTH CAUSE OF ACTION**
**Negligent Design**

121.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr mobile apps in the stream of commerce despite its defective design. Grindr owed a duty to Plaintiff to design the App in such a way that made it safe for its intended use.

123.     Grindr knew or should have known when producing the App that they were designed defectively, creating an unreasonable risk of injury to its users, including Plaintiff.

124.     Grindr designed, coded, engineered, manufactured, produced, assembled, and placed the Grindr server-side software in the stream of commerce. Grindr owed a duty

to Plaintiff to design the server-side software in such a way that made it safe for its intended use.

125.     Grindr knew or should have known when producing the server-side software that it was designed defectively, creating an unreasonable risk of injury to its users, including Plaintiff.

126.     Grindr was negligent in failing to properly design, manufacture, and communicate the defect in the App and server-side software to Plaintiff and other users, creating a clear and immediate risk of serious injury to users such as Plaintiff. As a direct and proximate result, Plaintiff sustained permanent injuries and suffered extreme pain and agony.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

### FIFTH CAUSE OF ACTION
### Negligence – Failure to Warn or to Provide Adequate Instruction

127.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

128.     Grindr owed a duty to Plaintiff to only place in the stream of commerce a set of software products containing adequate warning and instruction. Without such warning or instruction, the products were unreasonably dangerous.

129.     The software was placed into the stream of commerce by Grindr and was sold to Plaintiff and others in a defective and unreasonably dangerous condition in that it should have contained or been accompanied by warning that the App can be weaponized and used to impersonate and abuse, that users can be geographically

pinpointed, and further warning that the features on the interface to report abusive accounts are merely decorative and abuse complaints will not be dealt with in any effective fashion, and further warning that Grindr shuns the basic technology widely used in their industry to prevent or stop known abuse. If the App had contained or been accompanied by such a warning, Plaintiff would never have downloaded the Grindr app in the first place and many of the unwanted visitors likely would not have either.

130.     As a direct and proximate cause of Defendant's negligent failure to provide adequate instruction and warning, Plaintiff sustained permanent injuries and suffered extreme pain and agony.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

### SIXTH CAUSE OF ACTION
### Negligence

131.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

132.     Grindr had a duty to Plaintiff to exercise reasonable care in the designing, manufacturing, researching, coding, development, promoting, and distribution of its apps and other software into the stream of commerce, including a duty to assure that the product would not cause users and the public to suffer unreasonable dangerous effects.

133.     Grindr voluntarily undertook a duty to screen, monitor, and take action to ban members who misuse their products.

134.     Grindr knew or should have known of the foreseeable risk of harm to Plaintiff
by ignoring his repeated requests to deactivate abusive and impersonating Grindr
accounts.

135.     Grindr knew about the dangerous ways its product was used, yet Grindr took
no effective steps to mitigate the use of its App by serial killers, rapists, and stalkers.

136.     Grindr failed to exercise reasonable care in operating its App, monitoring
users, screening users, and acting on reports of abuse and stalking.

137.     Compared to like products and businesses, the standard of care exercised by
Grindr is not reasonably prudent.

138.     Grindr negligently failed to investigate and respond to Plaintiff's reports of
abuse, impersonation, and stalking.

139.     Grindr negligently failed to comply with its own written policies to protect its
users and ban abusive accounts as promised in its Terms of Service.

140.     Grindr negligently failed to enact or enforce policies, procedures, or a system
for banning abusive or harassing users.

141.     Grindr negligently failed to properly supervise its employees to ensure that
they acted upon and investigated reports of abuse facilitated through the software
products.

142.     Grindr negligently failed to screen users to stop abusers from using the service
to target and victimize others.

143.     Grindr was and is negligent per se.

144.     As a direct and proximate cause of Grindr's negligence, Plaintiff was
impersonated and stalked, resulting in approximately 1100 persons coming to his
home and workplace expecting to have sex with him, causing him to suffer from

emotional distress, pain and suffering, lost past and future wages, and loss of enjoyment of life.

145.     Each of the foregoing acts, omissions, and factual allegations contained in the preceding paragraphs constitute an independent act of negligence on the part of Grindr and one or more or all above stated acts were direct or proximate causes of the injuries sustained by Plaintiff.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## SEVENTH CAUSE OF ACTION
## Copyright Infringement

146.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.     Plaintiff is the sole owner of the copyrights in certain photographs (the "Copyrighted Works") that repeatedly appear in impersonating Grindr profiles and direct messages. Each of these Copyrighted Works has been properly registered with the United States Copyright Office. The registration numbers for the Copyrighted Works are: "The registration numbers for the Copyrighted Works are as follows:  1-4725091321; 1-4725091253; 1-4725091368;1-4725091465.

148.     The Copyrighted Works are copyrightable subject matter under 17 U.S.C. Section 102(a)(5) and Plaintiff has complied with all provisions of the Copyright Act and regulations thereunder.

149.     Plaintiff has the exclusive rights over the Copyrighted Images under 17 U.S.C. Section 106 to 1) reproduce, 2) prepare derivative works based, 3) distribute copies, and 4) display.

150.     Without Plaintiff's permission, Grindr has allowed Plaintiff's Copyrighted

Works to be reproduced, displayed, and distributed through its platform, including but

not limited to approximately 1100 strangers on profile pictures and direct messages

("Infringing Uses"). In doing so, Grindr infringed Plaintiff's exclusive rights of

reproduction and distribution.

151.     Grindr induced, caused, or materially contributed to the infringing uses.

152.     Upon information and belief, some of the Infringing Use took place after the

Copyrighted Works were registered with the Copyright Office and that Grindr's

infringement was willful and intentional with indifference to Plaintiff's rights.

153.     Upon information and belief, Grindr has or should have the technology to

remove each and every Infringing Use that is hosted on its platform.

154.     On March 29, 2017 through his attorneys, Plaintiff sent a Digital Millennium

Copyright Act ("DMCA") notice to counsel for Grindr, demanding that Grindr remove

the infringing image.  Counsel consented to service and indicated he "would forward

the DMCA notice to Grindr's DMCA agent." (Daniel Waxman, Esq. email, March 29,

2017)

155.     Grindr's conduct has caused Plaintiff great and irreparable injury that can

neither be fully compensated nor measured in money. Grindr will continue to cause

such harm unless it is enjoined by this Court. Plaintiff is thus entitled to injunctive

relief prohibiting Grindr from further Infringing Use of the Copyrighted Works and

ordering Grindr to affirmatively monitor its site for further Infringing Uses of these

images.

WHEREFORE, Plaintiff is entitled to temporary and permanent injunctions

preventing and restraining Infringing Use of the Copyrighted Images under 17 U.S.C.

33

Section 502; an order requiring destruction of all copies made by or under the control of Grindr under 17 U.S.C. Section 503; actual and statutory damages, and defendants' profits attributable to the infringement, under 17 U.S.C. Section 504; a judgement that Grindr infringement was willful and an increased statutory award under 17 U.S.C. Section 504(c)(2); and costs and attorney fees under 17 U.S.C. Section 505.

## EIGHTH CAUSE OF ACTION
### Promissory Estoppel

156.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

157.    Plaintiff and Grindr entered a clear and unambiguous promise when Plaintiff signed up to use the software products.

158.    Plaintiff relied on the terms of use and privacy representations and had a reasonable expectation that Grindr would enforce them.

159.    Plaintiff also relied on Grindr's representation that it would respond to reports and emails if its product was being used as a weapon and that Grindr would not continue its contractual relationship with any third parties so weaponizing its products.

160.    Plaintiff suffered an injury, an unconscionable one, by relying on Grindr's promise.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## NINTH CAUSE OF ACTION
### Fraud

161.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

162.     Grindr made a material misrepresentation in its advertising and Terms of Services by representing itself as a safe platform that can take action against those who abuse others with its product.

163.     Grindr knew its misrepresentations were false and that in fact it does not adequately staff its company to respond to user's complaints of abuse, nor does it even adhere to the industry standards to stop abuse and impersonation once it occurs.

164.     Grindr intended to induce people, including Plaintiff, to use its products on the false premise that it would and could respond to user abuse.

165.     Plaintiff reasonably relied on Grindr's misrepresentations.

166.     Plaintiff suffered damage as a direct, immediate and proximate result of the misrepresentation.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## TENTH CAUSE OF ACTION
### Grindr's violation of N.Y. Gen. Bus. Law Section 349 (the "Deceptive Business Practices Act")

167.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

168.     Defendant Grindr "conducted a business" or "furnished a service" as those terms are defined in N.Y. Gen. Bus. Law Section 349 (the "Deceptive Practices Act").

169.     Defendant Grindr knowingly and willfully violated the Deceptive Practices Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business.

170. These practices include, but are not limited to misleading and deceptive statements in promoting its products as set forth above and in its privacy policies, community guidelines, and abuse reporting mechanisms.

171. Grindr's deceptive false and misleading statements were made with the goal of attracting more consumers to the product, to give those consumers a false sense of safety, and to induce users to rely on and trust Grindr into believing Grindr would intervene if the App was put to ill use.

172. The public is harmed by Grindr's false and/or misleading representations.

173. Plaintiff suffered damages as a proximate result of Grindr's deceptive acts; he experienced emotional distress, harm to his reputation and career, and put him in imminent danger of being raped and murdered. The injury has cost and continues to cost Plaintiff.

174. Defendant Grindr's deceptive acts involved communications and statements digitally communicated to consumers in New York State and caused injury in New York State, and were part of a pattern directed at the public, including the numerous consumers in New York who visit the website to download Grindr and use it.

175. Defendant Grindr's practices have had and continue to have a broad impact on hundreds of thousands of consumers throughout New York State.

WHEREFORE, Defendant Grindr's statements and actions described here entitle Plaintiff to increased damages, attorneys' fees, and injunctive relief under N.Y. Gen. Bus. Law Section 349 (h).

## ELEVENTH CAUSE OF ACTION
### Violation of N.Y. Gen Bus. Law Sections 350, 350-a ("False Advertising")

176. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177.     Grindr's promotion, marketing, and advertising of its services and products is misleading in a material respect, deceptive, and is directed at the general public and consumers within the State of New York.

178.     Such promotion, marketing and advertising include statements made in writing and by Internet communication to Plaintiff and consumers like Plaintiff regarding the nature and efficacy of Grindr's product and safety features.

179.     To an egregious extent, the promotion, marketing, and advertising fail to reveal facts material to Grindr's product.

180.     Defendant's false advertisements include, but are not limited to the misleading and deceptive statements in the Terms of Service.

181.     Upon information and belief, those representations made by Grindr were disseminated from 2009 through and including, March 28, 2017.

182.     Grindr's product has been and continues to be advertised and available within the State of New York.

183.     Grindr's false advertising, marketing and promotion intentionally, deliberately, willfully or knowingly deceived the public and consumers, confused or was likely to confuse the public and consumers, and materially misled consumers as to the nature, characteristics, and/or qualities of its products or services.

184.     Consumers, including Plaintiff, have reasonably relied upon these misrepresentations and in making decisions and have been injured and damaged and are likely to be further injured and damaged by Grindr's statements and actions in violation of N.Y. Gen Bus. Law 350, 350-a.

185.     A reasonable consumer acting reasonably under the circumstances would have believed, as Plaintiff did, that Grindr's representations made in writing and electronically regarding the nature and efficacy of its product were truthful.

186.     Plaintiff was injured as a result of Grindr's deceptive advertising, marketing, and promotion. Plaintiff relied on the statements made therein resulting in his use of the Grindr product induced by trust that Grindr would enforce its policies against users who flagrantly use its product to abuse and destroy. The injury has cost and continues to cost Plaintiff considerable expense, both tangible and intangible.

187.     Plaintiff's false advertising violates the rules and regulations of statutes administered by the Federal Trade Commission.

WHEREFORE, Grindr's statements and actions entitle Plaintiff to increased damages, reasonable attorneys' fees and injunctive relief under N.Y. Gen. Bus Law Section 350-e.

## TWELFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

188.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

189.     Grindr's acts and omissions involved in handling Plaintiff's pleas for it to control its product and disable the accounts used to destroy his life were extreme and outrageous, and beyond all possible bounds of decency, and utterly intolerable in a civilized community.

190.     Grindr was intentional and reckless in the acts and omissions that ignored Plaintiff's repeated requests to intervene and disable the accounts that were ruining his life and endangering him. Grindr either intended to cause or disregarded the substantial probability of causing Plaintiff severe emotional distress. Grindr was

interested in its profit and evinced an outrageous and shocking disregard for the safety of its users and the public.

191.     Plaintiff experienced emotional distress as a result of Grindr's actions and omissions.

192.     Grindr directly caused Plaintiff's emotional distress because its App that the selected and directed hundreds and hundreds of unwanted visitors to Plaintiff in his private home and workplace expecting sex.

193.     Grindr was, and is, in the exclusive position to stop the harm Plaintiff was experiencing and yet refused to do so.

194.     Grindr is liable for Plaintiff's injuries, pain and suffering, treatment, and all other damages allowed by law, including all special, compensatory, incidental, consequential, economic, and punitive damages.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

### THIRTEENTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

195.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

196.     Grindr owed a duty to Plaintiff to abide by its own terms of use and to responsibly control its product to prevent it from being used to destroy another person's peaceful life.

197.     Grindr breached its duty of care.

198.     Grindr breached its duty to Plaintiff through the acts and omissions involved in handling Plaintiff's numerous complaints and requests for Grindr to control its product and disable the accounts being used to destroy his life.

199.     Breach of its duty resulted in hundreds of strangers coming to Plaintiff's home and workplace seeking unprotected sex and drugs, thereby endangering Plaintiff's physical safety or caused Plaintiff to fear for his physical safety.

200.     Grindr's breach of its duty resulted directly in emotional harm to Plaintiff.

201.     Grindr was intentional and reckless in the acts and omissions that ignored Plaintiff's repeated requests to intervene and disable the accounts that were ruining his life.  Grindr either intended to cause or disregarded the substantial probability of severe emotion distress.

202.     Plaintiff experienced emotional distress as a result of Grindr's actions and omissions.

203.     Grindr directly caused Plaintiff's emotional distress because its App selected and directed hundreds and hundreds of unwanted visitors to Plaintiff in his private home and workplace expecting sex.

204.     Grindr was in the exclusive position to stop the harm Plaintiff was experiencing and yet refused to do so.

205.     Grindr is liable for Plaintiff's injuries, pain and suffering, treatment, and all other damages allowed under the law, including all special, compensatory, incidental, consequential, economic, and punitive damages.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## FOURTEENTH CAUSE OF ACTION
### Negligent Misrepresentation

206.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

207.     Grindr made statements in its Terms of Service. Grindr was aware that the statements made therein were to be used for a particular purpose or purposes – presumably to create an agreement with users and assure them that they applied community standards to make its product safe.

208.     Plaintiff and all Grindr users relied on the assurances from Grindr that it would enforce its user policies.

209.     Grindr is aware that its users use its product. The use of the Grindr's product links Grindr and Plaintiff.

210.     Grindr's statements and conduct exaggerated or misstated certain facts – those relating to the oversight of its product and safety of its users.

211.     Grindr was negligent and/or lacking in due diligence for making such misstatements about the safety features of its product when in fact it does not enforce safety measures.

212.     Grindr is bound to Plaintiff by a relation or duty of care beyond a mere contract between the parties.

213.     Grindr is in a special position of confidence and trust in relation to Plaintiff. Grindr was in the unique and exclusive position to stop the injury to Plaintiff and did not do so.

214.     Plaintiff relied on Grindr's misstatements.  Had he known that Grindr did not enforce its policies, he never would have become a Grindr user in the first place.

215.     Plaintiff suffered damages as a result.

41

216.    Grindr is liable for Plaintiff's injuries, pain and suffering, treatment, and all

other damages allowed under the law, including all special, compensatory, incidental,

consequential, economic, and punitive damages.

WHEREFORE, Plaintiff demands judgment against Grindr for compensatory and punitive

damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the

court deems proper.

## PLAINTIFF'S REQUEST FOR A JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial.


Dated:        Brooklyn, New York
              March 31, 2017

                                           Respectfully submitted,


                                           /s/Carrie Goldberg
                                           Carrie Goldberg (CA7873)
                                           C.A. Goldberg, PLLC
                                           16 Court Street
                                           Suite 2500
                                           Brooklyn, NY 11241
                                           Tel:  646 666. 8908
                                           Fax: 718.514.7436
                                           carrie@cagoldberglaw.com


                                           /s/Tor Ekeland
                                           Tor Ekeland (TE5608)
                                           Tor Ekeland, P.C.
                                           43 West 43rd Street
                                           Suite 50
                                           New York, NY 10036-7424
                                           Tel:  646 287 0135
                                           Fax: 718.504.5417
                                           tor@torekeland.com