**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

✕————————————————————————✕

MATTHEW HERRICK

　　　　　　Plaintiff,

　　　v.

GRINDR, LLC; KL GRINDR HOLDINGS,
INC., and GRINDR HOLDING COMPANY

　　　　　　Defendants.

✕————————————————————————✕

No. 1:17-CV-00932

**CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO GRINDR
LLC'S, GRINDR HOLDINGS, INC.'S, AND GRINDR HOLDING COMPANY'S
MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................. 1

LEGAL STANDARD ........................................................................................ 4

Statement of Facts ............................................................................................ 5

   Terms of Service and Privacy Policy .......................................................... 5

   Events Giving Rise to the Complaint .......................................................... 6

ARGUMENT ..................................................................................................... 8

   I.    GRINDR IS A DEFECTIVE AND DANGEROUS PRODUCT .......................... 8

      a.   Software Has Been Considered a Product Since the 1980s ................................ 9

   II. CDA IMMUNITY DOES NOT PROTECT DEFENDANT
       FROM THE CONSEQUENCES OF ITS DEFECTIVE
       AND DANGEROUS PRODUCT ...................................................................... 16

      a.   Discovery is Required to Evaluate Any Claim of CDA Immunity .................... 16

      b.   Grindr is an Information Content Provider ...................................................... 19

      c.   Grindr is Being Sued for its Own Bad Acts—Not JC's .................................... 23

   III.   ACCEPTING ALL OF PLAINTIFF'S FACTUAL
       ALLEGATIONS AS TRUE, PLAINTIFF STATES
       PLAUSIBLE CLAIMS ON WHICH RELIEF MAY BE GRANTED ............... 23

      a.   Negligence .................................................................................................... 23

      b.   Promissory Estoppel (Count VIII) ................................................................. 29

      c.   Fraud (Count IX) .......................................................................................... 30

      d.   Deceptive Business Practices (Count X) & False Advertising (Count XI) ........ 32

      e.   IIED (Count XII) and NIED (Count XIII) ...................................................... 36

      f.   Copyright Infringement (VII) ........................................................................ 38

   IV.   THIS COURT HAS JURISDICTION OVER
       ALL DEFENDANTS  TO HEAR THIS CASE .................................................. 44

      a.   This Court Has Jurisdiction Over All Defendants ........................................... 44

      b.   Plaintiff Did Not "Lump" Defendants ............................................................ 48

CONCLUSION .................................................................................................. 50

## TABLE OF AUTHORITIES

**Cases**

*A Star Grp., Inc. v. Manitoba Hydro*,
   621 F. App'x 681 (2d Cir. 2015) ................................................................. 38

*Advent Sys. Ltd. v. Unisys Corp.*,
   925 F.2d 670 (3rd Cir.1991) .................................................................... 12

*Apple Barrel Prods., Inc. v. Beard*,
   730 F.2d 384 (5th Cir. 1984) ................................................................... 39

*Architectronics, Inc., v. Control Systems, Inc.*,
   935 F. Supp. 425 (S.D.N.Y. 1996) ...................................................... 9, 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................ 4, 49

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001) .................................................................. 48

*Barnes v Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ................................................................. 18

*Bassett v. Electronic Arts Inc.*,
   2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) ............................................ 29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................... 4, 23, 48

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) ....................................................... 30

*Brown v. Snapchat, Inc.*,
   2014 WL 12573368 (C.D. Ca. Feb. 3, 2014) ............................................ 9

*Burchette v. Abercrombie & Fitch Stores, Inc.*,
   2009 WL 856682 (S.D.N.Y. Mar. 30, 2009) ...................................... 45, 47

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ................................................................................ 45

*Burrow By and Through Burrow v. Postville Cmty. Sch. Dist.*,
   929 F. Supp. 1193 (N.D Iowa 1996) ........................................................ 37

*Chanko v. Am. Broadcasting Companies Inc.*,
   27 N.Y.3d 46 (N.Y. Ct. App. 2016)........................................................... 36

*Chevrestt v. Am. Media, Inc.*,
   204 F. Supp. 3d 629, 631 (S.D.N.Y. 2016)................................................ 44

*Cmty. For Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989)................................................................................... 42

*Commc'ns Groups, Inc. v. Warner Commc'ns, Inc.*,
   138 Misc. 2d 80 (N.Y. Civ. Ct. 1988)................................................... 9, 11

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   775 F.Supp. 554 (E.D.N.Y.1991) ............................................................. 41

*Conan Properties, Inc. v. Mattel, Inc.*,
   601 F. Supp. 1179 (S.D.N.Y. 1984).......................................................... 40

*Cosmetic Ideas Inc. v. IAC/InteractiveCorp*,
   606 F.3d 612 (9th Cir. 2010) .................................................................... 39

*Credit Lyonnais Sec. (USA), Inc. v. Alcantara*,
   183 F.3d 151 (2d Cir. 1999)...................................................................... 45

*Cyberchron Corp. v. Calldata Sys. Dev., Inc.*,
   47 F.3d 39 (2d Cir. 1995).......................................................................... 29

*Data Processing Servs., Inc. v. L.H. Smith Oil Corp.*,
   492 N.E.2d 314 (Ind. Ct. App.), *aff'd on reh'g*, 493 N.E.2d 1272 (Ind. Ct. App. 1986)
   .................................................................................................................... 14

*Devlin v. Empire Blue Cross & Blue Shield*,
   274 F.3d 76 (2d Cir. 2001)........................................................................ 29

*Doctor's Assocs., Inc. v. QIP Holder, LLC*,
   No. 06-cv-1710, 2010 WL 669870 (D. Conn. Feb. 19, 2010)..................... 20

*Doctor's Assocs., Inc. v. QIP Holders, LLC*,
   No. 06-cv-1710, 2007 WL 1186026 (D. Conn. Apr. 19, 2007) .................. 17

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ............................................................... 21, 22

*Erickson v. Pardus*,
   551 U.S. 89 (2007).................................................................................... 48

*F.T.C. v. LeanSpa, LLC,*
  920 F. Supp. 2d 270 (D. Conn. 2013) ................................................................. 18, 20

*Fair Hous. Council of San Fernando Valley v Roommates.com, LLC,*
  521 F.3d 1157 (9th Cir. 2008) .......................................................... 19, 20, 22

*FTC v Accusearch, Inc.,*
  570 F.3d 1187 (10th Cir. 2009) ............................................................. 19, 20

*Gaidon v. Guardian Life Ins. Co. of Am.,*
  96 N.Y.2d 201 (N.Y. Ct. App. 2002) .................................................................. 34

*Gattoni v. Tibi, LLC,*
  No. 16 CIV. 7527, 2017 WL 2313882 (S.D.N.Y. May 25, 2017) ............................... 39

*Gibson v Craigslist, Inc.,*
  2009 WL 1704355 (S.D.N.Y. June 15, 2009) ........................................................ 18

*Goldstein v. Pataki,*
  516 F.3d 50 (2d Cir. 2008) ................................................................................ 4

*Gorran v. Atkins Nutritionals, Inc.,*
  464 F. Supp. 2d. 315 (SDNY 2006) ................................................................. 12, 14

*Green v America Online (AOL),*
  318 F.3d 465 (3d Cir. 2003) ............................................................................. 18

*Hidalgo v. Johnson & Johnson Consumer Companies, Inc.,*
  148 F. Supp 3d 285 (S.D.N.Y. 2015) .................................................................. 34

*Hollins v. U.S. Tennis Ass'n,*
  469 F. Supp. 2d 67 (E.D.N.Y. 2006) ............................................................. 45, 46

*Howell v. Grindr, LLC,*
  2016 WL 1668243 (S.D. Calif. 2016) .................................................................. 9

*Hydro Investors, Inc., v. Trafalgar Power Inc.,*
  227 F.3d 8 (2d Cir. 2000) ................................................................................ 27

*Icahn Sch. Med. Mount Sinai v. Health Care Serv. Corp.,*
  2017 WL 635648 (S.D.N.Y. Feb. 15, 2017) .......................................................... 27

*In re LightSquad Inc.,*
  504 B.R. 321 (Bankr. S.D.N.Y. 2013) ................................................................. 32

*In re Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003) ................................................................. 46

*In re September 11 Litigation*,
  280 F. Supp. 2d 279 (S.D.N.Y. 2003) ................................................... 26

*Infectious Disease Solutions, P.C. v. Synamed, LLC*,
  2012 WL 1106847 (E.D.N.Y Mar. 30, 2012) ......................................... 9

*Intellect Art Multimedia, Inc. v Milewski*,
  2009 WL 2915273 (Sup. Ct. N.Y. Cnty. Sept. 11, 2009) ..................... 14

*J. Racenstein & Co. v. Wallace*,
  96 Civ. 9222, 1997 WL 605107 (S.D.N.Y. Oct. 1, 1997) ..................... 41

*Jalee Consulting Group, Inc. v. XenoOne, Inc.*,
  908 F. Supp. 2d 387 (S.D.N.Y. 2012) ................................................... 31

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ......................................................... 12, 14

*Jane Doe No. 1 v Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016) .................................................................. 19

*Jones v Dirty World Entm't Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) ................................................................ 18

*Kimmell v. Schaefer*,
  89 N.Y.2d 257 (N.Y. Ct. App. 1996) ................................................ 27, 28

*King v. N.Y. City Emps. Retirement Sys.*,
  212 F. Supp. 3d 371 (E.D.N.Y. 2016) ................................................... 32

*Laine v. Pride*,
  08 Civ. 3057, 2010 WL 199927 (S.D.N.Y. Jan. 19, 2010) ................... 41

*Leider v. Ralfe*,
  387 F. Supp. 2d 283 (S.D.N.Y. 2005) ................................................... 33

*Lennon v. Seaman*,
  84 F. Supp. 2d 522 (S.D.N.Y. 2000) ..................................................... 42

*Mackenzie Architects, PC v. VLG Real Estates Developers, LLC*,
  No. 1:15-CV-1105, 2016 WL 4703736 (N.D.N.Y. Sept. 8, 2016) ........ 43

*Marshall v. Hyundai Motor Am.*,
    51 F. Supp. 3d 451 (S.D.N.Y. 2014).......................................................................... 34

*Mazzola v. Roomster Corp.*,
    849 F. Supp. 2d 395 (S.D.N.Y. 2012)................................................................... 30, 31

*McCarthy v. Olin Corp*,
    119 F.3d 148 (2d Cir. 1997)...................................................................................... 24

*Membler.com LLC v. Barber*,
    No. 12–CV-4941, 2013 WL 5348546 (E.D.N.Y. Sept. 23, 2013)............................... 40

*Merex A.G. v. Fairchild Weston Systems, Inc.*,
    29 F.3d 821 (2d Cir. 1994)........................................................................................ 29

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)................................................................................... 44, 45

*Meyer v. Kalanick*,
    200 F. Supp. 3d 408 (S.D.N.Y. 2016)........................................................................ 29

*Mortise v. U.S.*,
    102 F.3d 693 (2d Cir. 1996)...................................................................................... 37

*Neilson Bus. Equip Ctr., Inc v Italo V. Monteleone, MD., P.A.*,
    524 A.2d 1172 (Del. 1987) ....................................................................................... 14

*New World Solutions, Inc., v. NameMedia Inc.*,
    150 F. Supp. 3d 287 (S.D.N.Y. 2015)........................................................................ 33

*Noveck v. PV Holdings Corp.*,
    742 F. Supp. 2d 284 (E.D.N.Y. 2010) .................................................................. 24, 25

*O'Kroley v Fastcase Inc.*,
    2014 WL 2881526 (M.D. Tenn, June 25, 2014)......................................................... 19

*Olcott Intern. v. Micro Data*,
    793 N.E.2d 1063 (Ind. Ct. App. 2003)....................................................................... 11

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20 (N.Y. Ct. App. 1995)............................................................................ 35

*Positive Black Talk Inc. v. Cash Money Records Inc.*,
    394 F.3d 357 (5th Cir. 2004) .................................................................................... 39

*Psyihoyos v. John Wiley & Sons, Inc.*,
    748 F.3d 120 (2d Cir. 2014)............................................................. 38, 40

*Purdy v. Public Adm'r of Westchester County*,
    72 N.Y.2d 1 (N.Y. Ct. App. 1988) ................................................... 25

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010).......................................................................... 43

*Rivers v. Towers, Perrin, Forster & Cosby Inc.*,
    2009 WL 817852 (E.D.N.Y. Mar. 27, 2009) ................................... 38

*Rottner v. AVG Technologies*,
    943 F. Supp. 2d 222 (D. Mass 2013) ............................................ 9, 11

*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008).............................................................. 4

*Sanders v Acclaim Entm't, Inc.*,
    188 F. Supp. 2d 1264 (D. Col. 2002) ............................................. 14

*Saponara v Grindr, LLC*,
    93 F. Supp. 3d 319 (D.N.J. 2015) .......................................... 18, 26, 27

*Schwartzco Enters. LLC v. TMH Mgmt., LLC*,
    60 F. Supp. 3d 331 (E.D.N.Y. 2014) .............................................. 27

*Seldon v Magedson*,
    2012 WL 4475274 (S.D.N.Y. July 10, 2012) ................................. 19

*Simulados Software, LTD. V Photon Infotech Private, LTD*,
    40 F. Supp. 3d 1191 (N.D. Cal. 2014) ........................................... 11

*Software AG, Inc. v. Consist Software Solutions, Inc.*,
    2008 WL 563449 (S.D.N.Y. Feb. 21, 2008)...................................... 9

*Solomon by Solomon v. City of New York*,
    489 66 N.Y.2d 1026 (N.Y. Ct. App. 1985)..................................... 24

*Spagnola v. Chubb Corp.*,
    574 F.3d 64 (2d Cir. 2009)............................................................... 32

*Sullivan v. Duncan*,
    No. 13-CV-1640, 2015 WL 4393316 (S.D.N.Y. July 17, 2015) .......... 39, 43

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002) .......................................................................... 48

*Telenor E. Invest AS v. Altimo Holdings & Invs. Ltd.*,
    567 F. Supp. 2d 432 (S.D.N.Y. 2008) ................................................. 28

*Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*,
    31 F. App'x 738 (2d Cir. 2002) ......................................................... 46

*Travis v. Alcon laboratories, Inc.*,
    202 W. Va. 369 (W. Va. Sup. Ct. App. 1998) .......................................... 37

*Weinreb v. Hospital for Joint Disease Orthopaedic Institute*,
    404 F.3d 167 (2d Cir. 2005)............................................................. 29

*Whimsicality, Inc. v. Rubie's Costume Co, Inc.*,
    891 F.2d 452 (2d Cir. 1989)............................................................. 43

*Winston & Strawn v. Dong Won Sec. Co*.,
    2002 WL 31444625 (S.D.N.Y. Nov. 1, 2002) ................................... 45, 46

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) ....................................................... 9, 13

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ....................................................................... 47

*Wu v. John Wiley & Sons, Inc.*,
    No. 14 CIV. 6746, 2015 WL 5254885 (S.D.N.Y. Sept. 10, 2015) ......... 40, 41

*Wynder v. McMahon*,
    360 F.3d 73 (2d Cir. 2004)................................................................ 48

*Zeran v America Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ............................................................ 18

**Statutes**
47 U.S.C. § 230 ....................................................................... 16, 17

17 U.S.C. § 410 ............................................................................ 42

17 U.S.C. § 411 ............................................................................ 42

**Other Authorities**

David Berke, Note, *Products Liability in the Sharing Community*,
33 YALE J. ON REG. 603, 611-12 (2016) ............................................................. 9, 12, 13

Frances E. Zollers et al., *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come of Age*,
21 SANTA CLARA COMPUTER & HIGH TECH. L.J. 745, 768-69 (2005) .................. 12, 14

FREDERICK W. DINGLEDY & ALEX BERRIO MATAMOROS, DIGITAL RIGHTS MANAGEMENT: THE LIBRARIAN'S GUIDE 4-5 (2016) ............................................................. 5

Gary D. Spivey, *Computer Software Sales and Licenses as Subject to Article 2 of Uniform Commercial Code*,
26 A.L.R. 7th Art. 10 (2017) ................................................................................... 9

JAMES GRIMMELMANN, INTERNET LAW: CASES AND PROBLEMS 17 (6th ed. 2016).......... 13

Michael C. Gemignani, *Product Liability and Software*,
8 RUTGERS COMPUTER & TECH. L.J. 173, 203 (1981) ................................... 12

N.Y. U.C.C. Article 2 105(1) ........................................................................... 11

Nguyen Phong Hoang, Yasuhito Asano, Masatoshi Yoshikawa, *Your Neighbors Are My Spies: Location and Other Privacy Concerns in GLBT-Focused Location-Based Dating Applications, in* Advanced Communication Technology (2016) .................... 26

RESTATEMENT (THIRD) OF TORTS (1998)...................................................... 10, 13

Susan Nycum, *Liability for Malfunction of a Computer Program*,
7 RUTGERS COMPUTER & TECH. L.J. 1, 17 (1979) ......................................... 12

U.S. Copyright Office, Circular No 01: Copyright Basics (2012) .................................. 42

U.S. Patent No. 8,606,297.................................................................................... 10

**Treatises**

Melville B. Nimmer, et al., 2 *Nimmer on Copyright* ................................................. 39, 42

Patry on Copyright (2013) ................................................................................. 40

## INTRODUCTION

Plaintiff Matthew Herrick files this consolidated opposition in response to Grindr, LLC; KL Grindr Holdings, Inc.; and Grindr Holding Company's (collectively "Defendant"[1]) motions to dismiss the First Amended Complaint.[2]

This case is about a company abdicating responsibility for a dangerous product it released into the stream of commerce. Grindr, a gay dating application ("App") owned by two shell companies, has put Plaintiff Matthew Herrick's ("Plaintiff" or "Herrick") life in imminent and ongoing danger. Ignoring foreseeable risks and refusing to implement available safety features, Defendant prioritizes profit over customer safety. The App is a defective and dangerous product, and that is the crucial issue in this case, not Communications Decency Act ("CDA") immunity, or the claim that "JC,[3] not Grindr, is the villain." (Def. Grindr, LLC's Mot. Dismiss 1 (ECF No. 42)).[4] Defendants individually and collectively shirk responsibility in controlling their dangerous product as they try to dodge liability for the hell their product introduced into Matthew Herrick's life.

Desperation commenced this case. For five months, Grindr selected and directed over a thousand strangers wanting sex—sometimes violently insisting on it—to Herrick's home and job. They arrived at all hours and sometimes refused to leave until the police

---

[1] Grindr, LLC is co-owned by two holding companies: KL Grindr Holdings, Inc. ("KLG") and Grindr Holding Company ("GHC"). Together, these companies will be referenced as "Holding Companies." For Plaintiff's analysis on why the defendants are collectively referred to as "Defendant" *see* Part IV, *infra*.

[2] Plaintiff's First Amended Complaint, ECF No. 31, will be cited as (Amended Complaint, at ¶ [paragraph number]).

[3] "JC" refers to Mr. Herrick's tormentor that defendants refuse to take readily available and industry standard steps to prevent from weaponizing their defective product.

[4] Grindr, LLC's Memorandum of Law in Support of Its Motion to Dismiss will be short cited as (Def. Mot. Dismiss [page number]). KL Grindr Holdings, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss, ECF No. 49, will be short cited as (KLG's Mot. Dismiss [page number]). And Grindr Holding Company's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 50-1, will be short cited as (GHC Mot. Dismiss [page number]).

came. Herrick filed this action as a matter of last resort to stop the parade of strangers coming to his door. Unfazed by the litigation or the restraining order originally issued by a New York State court, Grindr has selected and directed hundreds more men to Herrick's doorstep since the litigation began. The dangerous and defective flaws in Defendant's product that actively facilitate this ongoing threat to Mr. Herrick's life continue to this day.

Throughout this litigation, Defendants claimed they are the wrong defendant—that Herrick ought to have sued his disturbed ex, the man who relentlessly stalked him after Herrick exited the abusive relationship, and who retaliated by, among other things, impersonating Herrick on the App. Plaintiff's Amended Complaint and this Memorandum of Law contain sound legal justifications for why Grindr is liable under theories of product liability, copyright, and tort law, and why these claims are all outside the scope of CDA immunity. But, there are also arguments based on humanity, morality, and logic this court should not ignore.

Only Defendant can fix the defective and dangerous state of their product that allows it to be used as a vicious and dangerous cyberstalking weapon. Suing JC, the solution that Defendant suggests as an alternative to fixing their product, is of no avail. Over a dozen police reports did not stop JC's ongoing scorched-earth campaign. Nor did a family court order offer protection. Civil lawsuits and judgments do not deter individuals who are equally judgment-proof, hell-bent, erratic, retaliatory, impulsive, escalatory, unemployed, unemployable, tech-savvy, and untethered to any financial or family or professional responsibilities. This is rarely a solution for victims of intimate partner violence, people who fear the offender. Those who cannot be stopped by arrests and who violate restraining orders willy-nilly are unmoved by the threat of civil court order. If anything, they are delighted by the opportunity to keep up the courtship with their ex—

2

even if it literally happens in a courtroom. The problem Plaintiff's counsel see again and again is that technology products are weaponized by abusers and the victims are left without recourse. Law enforcers de-prioritize tech-based crimes. When they do get investigated, there is no immediate relief because it can take months of warrants and subpoenas before an arrest. Often, overburdened law enforcement agencies are unable to effectively cope with the complicated computer forensics that cyberstalking cases entail. Entering into combat with the abuser in civil court is an unfair and dangerous proposition, one that transforms the court into yet another weapon for the abuser. Defendant, by exercising control over its product, by reading its user complaints, and by implementing available technology to fix its product's defects, can end the hell that Grindr has turned Mr. Herrick's life into. But that is an expenditure they choose not to make.

The facts in this case are extreme—but not just regarding the sexually-crude nature of the attack or the volume of unwanted sex visitors. They are extreme because Defendant was given repeated and explicit notice of the violence Grindr was causing—ignoring dozens of requests from Mr. Herrick and a New York State Court Temporary Restraining Order ordering it stop the weaponization of its product. Yet Defendant did nothing. Now, Grindr seeks legal sanction to turn a blind eye to the vicious and dangerous use of its product, and seeks a laissez faire approach to consumer safety.

The time has come for courts to stop granting blanket immunity under the CDA far beyond the legislative intent originally behind it. The internet is no longer in its infancy, it is a multi-billion-dollar marketplace. Large and lucrative tech companies that knowingly aid and abet abusers must be held accountable. They should not be allowed to profit off of abuse. Grindr is a product. Defendants are being sued for their own acts and omissions, of which they are fully aware. Defendant cannot hide behind its shell companies, nor its shell

3

companies behind Defendant, nor both of them behind JC. This Court has jurisdiction over the Holding Companies, both of whom are culpable for the abuse their dangerous and defective product actively facilitates.

## LEGAL STANDARD

When considering a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must—after accepting all sufficiently pled factual matter as true—consider whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim may be considered "plausible" if a plaintiff pleads facts that enable a court to reasonably infer the defendant's liability for the conduct alleged. *Iqbal*, 556 U.S. at 678 (2009). This standard requires that a plaintiff make factual allegations that raise her entitlement to relief above a speculative level. *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The task of determining whether or not a plaintiff has stated a plausible claim is "context-specific" and requires that a court "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (2009). Detailed factual allegations are not required in order for a complaint to survive a Rule 12(b)(6) motion, the plaintiff need merely "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Threadbare legal conclusions will not create a plausible claim, but the Court must accept all the facts alleged in the Complaint as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 679 (2009); *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).

4

## STATEMENT OF FACTS

The Grindr App is designed to facilitate the coupling of gay and bisexual men. (Amended Complaint, at ¶ 21). The App makes "hook-ups" quick and convenient. (*Id.* ¶ 23). After a user enters their email address (not verified), date of birth (not verified), and password, potential "matches" are selected by Grindr and presented to the user—ranked in distance from closest to furthest. (*Id.* ¶ 23). Additionally, users may add supplemental profile information, such as age, height, body weight, position (bottom or top), ethnicity, tribe (bear, daddy, jock), HIV status, or last tested date. (*Id.* ¶ 32). Importantly, the geolocating functionality of Grindr permits the App to be used with little to no input from a user. (*Id.* ¶ 24). After an account is created, Grindr monitors a user's location and shares that location with the rest of the world. (*Id.* ¶ 24).

### Terms of Service and Privacy Policy

Users are required to agree to Grindr's Terms and Conditions of Service ("ToS") upon creation of an account. (*Id.* ¶ 32). This demonstrates Grindr's awareness of the potential for the abusive use of its product, and that Grindr retains power over its users to ban them if they:

> (1) violate the ToS—i.e., "[y]ou will NOT use the Grindr Services or any information displayed within the Grindr Services to stalk, harass, abuse, defame, threaten or defraud other Users; violate the privacy or other rights of Users; or collect, attempt to collect, store, or disclose without permission location or personal information about other Users";
> (2) break the law with Grindr;
> (3) impersonate another user;
> (4) fake their location[5];

---

[5] Upon information and belief, Grindr fails to use industry standard methods to block the use of Virtual Private Networks to mask a user's Internet Protocol Address. This type of software is commonly used by companies such as NetFlix or Major League Baseball to enforce geographic restrictions on streaming content. *See generally* FREDERICK W. DINGLEDY & ALEX BERRIO MATAMOROS, DIGITAL RIGHTS MANAGEMENT: THE LIBRARIAN'S GUIDE 4-5 (2016).

(5) use Grindr to peddle obscene material;
(6) encourage use in violation of the ToS; and
(7) interfere with another's enjoyment of Grindr.

*(Id.* ¶ 42(a)-(i))*.* Additionally, Grindr's privacy policy affirmatively assumes a duty to "protect[] users from 'behaviors that endanger them.'" *(Id.* ¶¶ 40, 41 & n.5) ("[W]e have a system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about").

### Events Giving Rise to the Complaint

Mr. Herrick joined Grindr around May 2011, and proceeded to use the App to date local men for several years. *(Id.* ¶ 46). Upon downloading Grindr, Mr. Herrick, like all users, agreed to Grindr's ToS. *(Id.* ¶ 47). Sometime in June 2015, Mr. Herrick began dating JC, a man he met through Grindr. *(Id.* ¶ 48). Because of the development of the relationship, around November 2015, Mr. Herrick stopped using his Grindr account. *(Id.* ¶ 48). Starting in October 2016, after Mr. Herrick ended the relationship, JC commenced a campaign of retaliation and cyberstalking against Mr. Herrick, including impersonating Mr. Herrick on Grindr. *(Id.* ¶ 49). Exploiting Grindr's lack of basic consumer safety features, JC weaponized the App and directed over 1100 strangers—to date—to Mr. Herrick's home and workplace seeking sex, including sadomasochistic sex and violent rape fantasies. *(Id.* ¶ 49). This has made Mr. Herrick's life a living, unrelenting hell. All these individuals were selected and directed to Mr. Herrick through Grindr's geolocating function and the App's lack of any easily implemented safety features to screen and block abusive and dangerous cyberstalking.

The impersonation of Mr. Herrick used obviously fake, easily screenable profile names (e.g., "Raw Pig Bottom," "Hi," "hey," "muscle daddy," and "Gang Bang Now!") and touted Mr. Herrick's personal, sensitive information through the dropdown menu—

6

listing Mr. Herrick's height, weight, ethnicity, and body type. (*Id.* ¶¶ 50-51). Grindr presented Mr. Herrick as HIV positive, interested in hardcore and unprotected sex (e.g. fisting), bondage, and as having drugs to provide. (*Id.* ¶ 50).

Unsurprisingly, Mr. Herrick endured dangerous encounters. For instance:

> On January 22, 2017, an individual selected and directed to Plaintiff by Grindr got into Plaintiff's apartment building and refused to leave. The man persisted in demanding to see Plaintiff even after Plaintiff's roommate told him to leave. When Plaintiff's roommate went into the hall to tell the intruder he was calling the police, the man lunged at the roommate, grabbed the roommate's phone and they started wrestling. Plaintiff had to break up the fight. The man ran away.

(*Id.* ¶ 59). A disappointed man expecting sex directed to Mr. Herrick's work by Grindr screamed at him: "YOU LYING WHORE!!!" and "ANOTHER WHORE FROM GRINDR!!" and repeated "FUCK YOU"s. (*Id.* ¶ 60). And on January 27, 2017 a Grindr user aggressively tried to barge into Mr. Herrick's home, causing Mr. Herrick to call the police. (*Id.* ¶ 65).

Mr. Herrick is not safe at home or at work. (*Id.* ¶ 63). Grindr has done next to nothing about it, pretending that proven, commonplace software that can remedy the App's glaring safety defects does not exist. From November 2016 through January 2017, Mr. Herrick reported 50 abusive accounts to Grindr. (*Id.* ¶ 68). And from January 27, 2017-March 2017, he reported 50 more fake accounts. (*Id.* ¶ 69). In total, 14 police reports were filed, and Mr. Herrick successfully petitioned New York State Family Court for an Order of Protection that failed to stop JC's relentless and easy use of Grindr as a vicious and dangerous weapon. (*Id.* ¶ 73). Defendant does not screen for individuals offering drugs, remove hateful comments, or warn users that they may become victims of cyberstalking, or even that Grindr has previously been used to facilitate rape and murder. (*See id.* ¶ 6, 63,

7

66, 96, 173). It fails to apply readily available, industry standard software such as facial recognition software, VPN blacklisting, IP blocking, or basic duplication detection techniques. (*See id.* ¶ 79). Furthermore, it fails to properly staff and supervise a customer service department that addresses the known consumer safety problems of its dangerous and defective product. When Mr. Herrick turned to Grindr for help before filing this lawsuit the only response he got was the automated message: "Thank you for your report." (*Id.* ¶ 71). Grindr could easily block malicious users and accounts, but doesn't. (*Id.* ¶¶ 82, 83-86, 89, 90).

Before this, Mr. Herrick was a private person living a quiet and low-key life. He worked at a restaurant full-time and pursued a career in acting and modeling." (*Id.* ¶¶ 94-95). Grindr's dangerous and defective product has ended that existence. Grindr could easily fix the defects in its product, but it puts profit over its customers', and the public's, safety.

## ARGUMENT

### I.      GRINDR IS A DEFECTIVE AND DANGEROUS PRODUCT

Grindr is a product, and Defendant's attempt to evade this obvious point is unavailing. Defendant cites no authoritative case law to support its claim that it is not a product. Instead, the Defendants rely on outdated notions of law.

Plaintiff's complaint pleads sufficient plausible facts to support a cognizable legal theory on all five of Plaintiff's products liability claims. Defendant asserts that it is not liable for the product liability causes of action not because of the CDA, which Grindr concedes does not apply to product liability claims (Def.'s Mot. Dismiss 14-15), but by wishfully declaring itself a service—not a product. Grindr's claim to be a service is conclusory and unsupported by either law or facts. Grindr cannot avoid the fact that

Plaintiff has pleaded sufficient, plausible facts, that this Court must accept as true, that state a legally cognizable claim.

### a. Software Has Been Considered a Product Since the 1980s

It was resolved in the 1980s that software like Grindr's—mass marketed, standardized, based on commercial intellect, and subject to boilerplate agreements—is considered a product. *See, e.g.*, *Winter v. G.P. Putnam's Sons.* 938 F.2d 1033 (9th Cir. 1991); *Rottner v. AVG Technologies*, 943 F. Supp. 2d 222, 230-31 (D. Mass 2013); David Berke, Note, *Products Liability in the Sharing Community*, 33 YALE J. ON REG. 603, 611-12 (2016); Gary D. Spivey, *Computer Software Sales and Licenses as Subject to Article 2 of Uniform Commercial Code*, 26 A.L.R. 7th Art. 10 (2017). In 2017, the law is clear on this point. *See, e.g.*, *Infectious Disease Solutions, P.C. v. Synamed, LLC*, 2012 WL 1106847, at *5 (E.D.N.Y Mar. 30, 2012) (holding software to be a good); *Software AG, Inc. v. Consist Software Solutions, Inc.*, 2008 WL 563449, at *11 (S.D.N.Y. Feb. 21, 2008) (same), *aff'd on other grounds* 323 Fed. Appx. 11 (2d Cir. 2009); *Architectronics, Inc., v. Control Systems, Inc.*, 935 F. Supp. 425, 431-32 (S.D.N.Y. 1996) (same); *Commc'ns Groups, Inc. v. Warner Commc'ns, Inc.*, 138 Misc. 2d 80, 82-83 (N.Y. Civ. Ct. 1988) (same).

Few tech companies bother wasting resources disputing the issue. *See, e.g., Brown v. Snapchat, Inc.*, 2014 WL 12573368, at *1 (C.D. Ca. Feb. 3, 2014) (agreeing that the mobile application "Snapchat" is a "product"). Few tech companies, that is, besides Grindr. *See, e.g.*, *Howell v. Grindr, LLC*, 2016 WL 1668243, at *1 (S.D. Calif. 2016) (continuing to refer to Grindr as a "service"). Treatises, statutes, case law, and academic scholarship are unequivocal, time-tested, and consistent on this topic. Software like Grindr is a product,

not a service. However, even if the court doubts this, it must reserve the issue for summary judgment; because to conclude otherwise requires factual inquiry into Grindr's technical functionality, corporate structure, job titles and functions, recruitment methods, patents, and history of user agreements.

Although further exploration requires discovery, plaintiff invites the court to take judicial notice that Grindr self-identifies as a product in its intellectual property, corporate structure, and recruitment. The term "product" appears twenty times in Grindr's patent filing. *See* U.S. Patent No. 8,606,297 (filed Dec. 10, 2013) ("A computer program product for facilitating location-based social interaction, the computer program product comprising a non-transitory computer-readable medium . . . ."). And, at least until further factual inquiry may be made, it appears that Grindr staffs a product team. A simple search of Linkedin, using the term "Grindr product" produces the names of individual who are on Grindr's "product team." *See* Linkedin Profiles for Grindr Employees: Shawn Gong, Product Owner; Mike Lane, VP of Product; Evelina Rodriguez, Product & UX Design, Quan, Duong, Sr. Product Owner, Ron Elizondo, Product Manager, *available at* https://www.linkedin.com/search/results/index/?keywords=grindr%20product&origin=G LOBAL_SEARCH_HEADER (last visited May 6, 2017).

### i. Grindr is a Product

The Third Restatement of Torts regards software as a product, stating "[w]hen a court . . . decide[s] whether to extend strict liability to . . . software, it may draw an analogy between the treatment of software under the Uniform Commercial Code and under products liability law. Under the Code, software that is mass-marketed is considered a good." RESTATEMENT (THIRD) OF TORTS § 19 cmt. d. (1998). The New York Uniform

Commercial Code shares this expansive definition of "good" which extends to "all things
. . . which are movable at the time of identification to the contract of sale." (N.Y. U.C.C.
Article 2 105(1)). For an App, the "movable" moment occurs at the time of purchase, either
from Google Play or Apple's App Store, when the App is transferred from the website's
server onto the purchaser's mobile device. *See, e.g.*, *Rottner v AVG Technologies*, 943 F.
Supp. 2d 222, 230-31 (D. Mass 2013) (finding software "movable," and therefore clearly
a good, where the user "was able to download and install the full version of the software
after a one-stop payment over the internet")).

By and large, courts have identified mass-produced, standardized, or generally
available software, even with modifications and ancillary services, as a "good" under the
UCC. *See, e.g.*, *Architectronics, Inc., v. Control Systems, Inc.*, 935 F. Supp. 425, 431-32
(S.D.N.Y. 1996) ("Generally, software is considered a 'good,' even though a finished
software product may reflect a substantial investment of programming services."); 
*Commc'ns Groups, Inc. v. Warner Commc'ns, Inc.*, 138 Misc. 2d 80, 82-83 (N.Y. Civ. Ct.
1988) ("Regardless of the software's specific form or use, it seems clear that computer
software, generally, is considered by the courts to be a tangible, and movable item, not
merely an intangible idea or thought and therefore qualifies as a 'good' under article 2 of
the UCC." (collecting cases)). There is a national consensus on the issue. *See Simulados
Software, LTD. V Photon Infotech Private, LTD*, 40 F. Supp. 3d 1191 (N.D. Cal. 2014);
*Olcott Intern v. Micro Data*, 793 N.E.2d 1063 (Ind. Ct. App. 2003) ("generally-available
standardized software" held to be a good under the UCC); *Rottner v AVG Technologies*,
943 F. Supp. 2d 222, 230 (D. Mass. 2013) (noting that the sale of a downloadable computer
software is like the sale of a tangible good and that courts nationally have consistently

classified the sale of a software package as the sale of a good for UCC purposes); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3rd Cir.1991).

Decades of academic commentary also support the view that software is a product—a good under the UCC—and ultimately subject to product liability. *See, e.g.*, David Berke, Note, *Products Liability in the Sharing Community*, 33 Yale J. on Reg. 603, 610 n.43 (2016) (citing Nancy Birnbaum, *Strict Products Liability and Computer Software*, 8 J. Marshall J. Computer & Info 135, 144 (1988) ("[I]t is only a matter of time before strict liability is imposed for defective computer software."); Michael C. Gemignani, *Product Liability and Software*, 8 Rutgers Computer & Tech. L.J. 173, 203 (1981) ("The same policies that first gave rise to strict [products] liability seem to apply well to software."); Susan Nycum, *Liability for Malfunction of a Computer Program*, 7 Rutgers Computer & Tech. L.J. 1, 17 (1979); Frances E. Zollers et al., *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come of Age*, 21 Santa Clara Computer & High Tech. L.J. 745, 768-69 (2005)).

Despite this overwhelming precedent, Defendant attempts to persuade the Court that because Grindr is intangible, it cannot be considered a good. (Def.'s Mot. Dismiss 15). *See James v. Meow Media, Inc.*, 300 F.3d 683, 700-01 (6th Cir. 2002) (finding that ideas are not goods—but Grindr is not an idea); *see also Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d. 315, 324-25 (SDNY 2006) (same)). But Defendant's attempt to escape liability for its dangerous and defective product by claiming it is intangible fails completely.

### ii.  Intangible Software is a Product

Defendant claims Grindr is not a product because it is "intangible," that "software" should be treated more like an idea or expression. (Def.'s Mot. Dismiss 15). In taking this

position, Defendant mischaracterizes the iconic Ninth Circuit case, *Winter v G.P. Putnam's Sons*. 938 F.2d 1033 (9th Cir. 1991). In *Winter*, the court held that computer software is a product, likening it to an aeronautical chart (held a product) and distinguishing it from a mushroom encyclopedia (held not a product). *See Winter* at 1036 (9th Cir. 1991). What is more, as a matter of physics, Defendant fails to consider that software does indeed exist in the physical world, albeit far from the abstraction most users are familiar with (i.e., the Graphical User Interface). Software, like any part of our digital world, eventually abstracts down to a series of electronic bits, the 1s and 0s residing at the bottom of the abstraction. *See generally* JAMES GRIMMELMANN, INTERNET LAW: CASES AND PROBLEMS 17 (6th ed. 2016), *available at* http://internetcasebook.com.

Regardless, Defendant's insistence on the dispositive nature of "tangibility" misunderstands and mischaracterizes the relevant law. Section 402(A) of the Third Restatement of Torts goes to great lengths to update the Second Restatement and explain that tangibility is not a necessary condition, since "[o]ther items . . . are products when the context of their distribution and use is sufficiently analogous to [that] of tangible personal property." Just like "tangible personal property" Grindr is "purchased" at a web-based "App" store, is a mass produced pre-publication to the App store, and may be contingent on a purchase agreement (i.e., users may purchase the App in exchange for marketing access and data mining).

The Third Restatement also codifies the fact that "a product does not need to be sold outright. Among other transaction forms, the product can be leased, so the licensing transaction model common for software does not present an obstacle to products liability claims." *See* David Berke, Note, *Products Liability in the Sharing Community*, 33 YALE J. ON REG. 603, 611-12 (2016) (citing RESTATEMENT (THIRD) OF TORTS §§ 19 cmt. a., 20(b)

13

(1998); Frances E. Zollers et al., *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come of Age*, 21 SANTA CLARA COMPUTER & HIGH TECH. L.J. 745, 768-69 (2005). Also, a user's ability to personalize, customize or have a unique user experience does not impact software's status as a product. *See, e.g.*, *Data Processing Servs., Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314, 318 (Ind. Ct. App.), *aff'd on reh'g*, 493 N.E.2d 1272, 1273 (Ind. Ct. App. 1986); *Neilson Bus. Equip Ctr., Inc. v Italo V. Monteleone,* MD., P.A., 524 A.2d 1172, 1173-74 (Del. 1987).

While courts do not apply products liability to situations where the matter revolves around ideas or expression in magazines, how-to books, and textbook lessons does not mean Grindr is not a product. *See James v. Meow Media, Inc.*, 300 F.3d 683, 700-01 (6th Cir. 2002) (ideas in a video game); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d. 315, 324-25 (S.D.N.Y. 2006) (ideas in a book)). Grindr ineffectively tries to squeeze itself into the exception, but never explains why it should be likened with things so dissimilar. *See, e.g.*, *Intellect Art Multimedia, Inc. v Milewski,* 2009 WL 2915273, at *7 (Sup. Ct. N.Y. Cnty. Sept. 11, 2009) (questioning whether a forum-based website is a product); *Sanders v Acclaim Entm't, Inc.,* 188 F. Supp. 2d 1264, 1277-78 (D. Col. 2002) (ideas expressed in video games are not products); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d. 315, 324-25 (2006) (ideas in a book are not products). Simply put, Grindr cannot be treated like a third-party publisher, a diet book, or scary ideas expressed in video games. It must be treated like the product it is.

### iii.   All Product Liability Claims Were Adequately Pleaded

The Amended Complaint contains five properly pleaded product liability claims: 1) defect in design; 2) defect in manufacture; 3) defect in warning; 4) negligent design; 5) failure to warn. The Amended Complaint goes into great detail to identify the defects in

design and manufacture and warning and Grindr's negligence vis-à-vis those things. When a product is an App with the company still maintaining end-to-end control, the boundaries of the product are not just limited to the user interface and the code making it work. Rather, the systems for reporting abuse and privacy violations, infringing content, child pornography, locking out abusers, enforcing ToS, etc. are all part of the product and its design. If those things weren't built in, it's a manufacturing defect. If they don't work, it's a design defect. Also, part of any product with end-to-end company control is the response and responsiveness of the company when problems occur for users. The complaint thoroughly details the major glitches with Grindr's product. A list of all the ToS Grindr has and ignored is spread across three pages in the complaint, including its promises to delete and ban accounts for any reason, its ban on using Grindr to "stalk, harass, abuse, defame, threaten or defraud other user" or "the commission or encouragement of any illegal purpose, or in violation of any local, state, national, or international law. . .", its ban on impersonation, its rule against interfering with the enjoyment of other users, its rule against being obscene or malicious, the requirement that users not engage in activity prohibited by the Agreement, how it "RESERVES THE RIGHT TO REFUSE OR SUSPEND ACCESS TO ANY USER, FOR ANY REASON OR NO REASON, AND WITHOUT NOTICE" (Amended Complaint, at ¶ 42).

The amended complaint states how Grindr does not enforce its policies against abuse and how Grindr does not screen or monitor the activities of known abusers, ban their accounts, or use readily available software. (*Id.* ¶ 43) It discusses the standard of care established by other hook-up Apps which confirm the identity of the person making the complaint, navigate the complainant through their system to help them identify the offender, and how within 24 hours, these companies can locate and remove the offending

profiles and ban IP addresses and even see when new accounts are generated from specific devices. (*Id.* ¶ 43). Elsewhere it discusses the well-known privacy flaws with Grindr's geographic pinpointing and how that pinpointing technology led people to Plaintiff. (*Id.* ¶¶ 37, 43). Plaintiff elaborates on the defects in detailing the 100+ reports made, mostly through the interface and most baldly, it details Defendant Grindr's own representations about its inability to "search for IP addresses, block the use of VPN, proxies, spoofing to mask actual IP addresses, or recognize devices through the use of MAC Addresses and ICC Numbers." (*Id.* ¶¶ 68-70, 82). The Amended Complaint details Grindr's omissions of basic design features to make their product safe: geofencing, location verification, user account verification, hire employees to respond to complaints of abuse, banning the use of generic display names. (*Id.* ¶ 83-86).

All of the information above was re-alleged and incorporated into each causes of action. Therefore, any suggestion that the product liability causes of action lacked particularity or were centered around how "JC has weaponized the App" are wrong. At 42 pages, one thing that cannot be alleged is that the Amended Complaint lacks detail and explanation.

## II.     CDA IMMUNITY DOES NOT PROTECT DEFENDANT FROM THE CONSEQUENCES OF ITS DEFECTIVE AND DANGEROUS PRODUCT

### a.  Discovery is Required to Evaluate Any Claim of CDA Immunity

The CDA provides that, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Defendant is entitled to immunity under the CDA if (1) Defendant is an interactive computer service provider or user; (2) Plaintiff's claims are based on "information provided by another information content

provider"; and (3) Plaintiff's claims would treat Defendant as the "publisher or speaker" of such information. *See Doctor's Assocs., Inc. v. QIP Holders, LLC* ("Doctor's Assocs. I"), No. 06-cv-1710, 2007 WL 1186026, at *2 (D. Conn. Apr. 19, 2007) (citing *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007)).

Immunity under the CDA constitutes an affirmative defense that "is generally not fodder for a Rule 12(b)(6) motion." *Doctor's Assocs. I*, 2007 WL 1186026, at *2 (quoting *Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004)). Rather, "such a defense is generally addressed as a Rule 12(c) or Rule 56 motion." *Id.* at *2 (internal quotation marks and citations omitted). Defendant argues that this Court should nonetheless grant it immunity at the motion to dismiss stage despite the fact that Plaintiff has pleaded sufficient plausible facts that entitle him to relief.

The Amended Complaint does not concede that Grindr is an interactive service provider. The CDA defines an interactive computer service as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Defendant does argue, however, that a "digital dating and social networking application designed to provide a platform for gay and bisexual men to connect, based on proximity" constitutes an interactive computer service. (Def.'s Mot. Dismiss 2). Case law cautions against assuming that Grindr is an interactive computer service.[6]

In *Federal Trade Commission v Leanspa, LLC*, the court refused to dismiss the Amended Complaint on CDA grounds because the Amended Complaint never established the company was an interactive service provider and because the motion to dismiss'

---

[6] Plaintiff's Amended Complaint supersedes all other statements it made prior on this point.

argument about what constitutes an interactive service provider included only cases where the defendants were too dissimilar to the *Leanspa* defendant. *See F.T.C. v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 276 (D. Conn. 2013) ("Accordingly, this court finds that, on the face of the Amended Complaint, it is plausible that LeadClick is not an "interactive computer service provider" as that term is defined under the CDA.").

In *Leanspa*, the relevant defendant was an "affiliate marketer" that created fake news sites to promote products. The CDA cases cited in the motion to dismiss at issue in *Leanspa*, however, involved defendants that were not affiliate marketers creating fake news. Instead, they were consumer review companies, message boards, link indexes websites, search engine, and websites. Denying the motion to dismiss, the court said it was simply too unclear to determine whether an "affiliate marketer" was similar enough to the other defendants protected by the CDA and therefore the "plaintiffs should have the opportunity to develop facts, during discovery, showing what is involved in the creation" of the defendant's product. *Id.* at 276.

Except for another of its own cases (one where the plaintiff did not raise the issue of whether Grindr is an interactive computer service provider), the cases cited in the instant motions to dismiss all involve defendants that bear no resemblance to a geolocating dating App like Grindr. Instead, they are online message boards, gossip sites, search engines, business reviews, and online marketplaces. *See, e.g.*, *Saponaro v Grindr*, *LLC*, 93 F. Supp. 3d 319, (D.N.J. 2015); *Green v America Online (AOL)*, 318 F.3d 465 (3d Cir. 2003) (online message board), *Barnes v Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) (search engine), *Gibson v Craigslist, Inc*., 2009 WL 1704355 (S.D.N.Y. June 15, 2009) (online marketplace); *Jones v Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) (gossip site); *Zeran v America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) (search engine);

18

*Jane Doe No. 1 v Backpage.com*, *LLC,* 817 F.3d 12 (1st Cir. 2016) (online marketplace);

*Seldon v Magedson,* 2012 WL 4475274 (S.D.N.Y. July 10, 2012) (business review); *FTC*

*v Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009) (search); *Fair Hous. Council of San*

*Fernando Valley v Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (marketplace);

*O'Kroley v Fastcase Inc.,* 2014 WL 2881526 (M.D. Tenn, June 25, 2014) (search engine).

Here, the Amended Complaint does not allege that Defendants operated online message boards, gossip sites, search engines, business review sites or online marketplaces. Rather, the Amended Complaint merely alleges that Grindr is a gay hook-up App that relies upon a matching algorithm, geo-locating technology, and that profits from in-App advertisements. This is a different scenario. Defendant has not established that it provides or enables computer access by multiple users to a computer server in the way that hosting online message boards, gossip sites, search engines or online marketplaces does. *See* 47 U.S.C. § 230(f)(2). Moreover, Grindr's geo-locating technology driving users' offline behavior, the advertising, and the matching, make Grindr substantially different from all cases it cites. At minimum, Plaintiff needs the opportunity to develop facts, during discovery, showing what is involved in being a "digital dating and social networking application designed to provide a platform for gay and bisexual men to connect, based on proximity."

### b.  Grindr is an Information Content Provider

Even if Defendant is considered an interactive computer service provider, it still cannot hide behind the CDA. This is because it created and developed the content in controversy. The fact that third parties also contribute to Grindr's content does not allow Defendant to escape liability on this front. Tortious tech companies cannot escape responsibility by asserting CDA immunity simply because they run an online business and

19

a third-party is also involved.

The CDA defines "information content provider" as an entity that is "responsible, *in whole or in part*, for the creation or development of information provided through the Internet or any other interactive computer service." *LeanSpa*, 920 F. Supp. 2d at 276 (quoting 47 U.S.C. § 230(1)(3)) (emphasis in original). This is a "broad" exception to immunity "covering even those who are responsible for the development of content only 'in part.'" *Accusearch,* 570 F.3d at 1197 (quotation omitted). "[T]here may be several information content providers with respect to a single item of information (each being 'responsible,' at least 'in part,' for its 'creation or development')." *Id.* at 1197 (quoting § 230(f)(3)); *Roommates.com,* 521 F.3d at 1165 (same); *LeanSpa,* 920 F. Supp. 2d at 276 (quoting *Accusearch*)). "'[A] party may be responsible for information created or developed by a third party without actually creating or developing the information itself.'" *Doctor's Assocs., Inc. v. QIP Holder, LLC,* No. 06-cv-1710, 2010 WL 669870, at *24 n.5 (D. Conn. Feb. 19, 2010) (Bryant, J.) (quoting *MCW, Inc. v. Badbusinessbureau.com, LLC,* No. 02-cv-2727-G, 2004 WL 833595, at *10 n.12 (N.D. Tex. Apr. 19, 2014) (adding: "Some courts have ignored this distinction.")). A "collaborative effort" between Grindr and JC that caused Plaintiff harm is not protected by the CDA. *Roommates.com,* 521 F.3d at 1166-67.

"[T]o be 'responsible' for the development of offensive content, one must be more than a neutral conduit for that content. [A] service provider is 'responsible' . . . if it in some way specifically encourages development of what is offensive about the content." *Accusearch,* 570 F.3d at 1198-99; *accord, Roommates.com,* 521 F.3d at 1171-72 & n.33, 1175. An entity "helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct."

20

*Roommates.com,* 521 F.3d at 1167-68.

Not only is Grindr the content developer for all categories in its dropdown menus, some of which led users to believe Plaintiff was interested in hardcore, immediate, submissive sex and HIV positive men, but as soon as Grindr was put on notice that its product was being abused to commit a crime against Plaintiff, any claims to CDA immunity fall by the wayside. Recent cases demonstrate a heightened accountability to users who become victims of sexual violence through direct use of the app. *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 848 (9th Cir. 2016) ("*Model Mayhem*").

In *Model Mayhem*, an aspiring model created a profile on the Model Mayhem website in hopes of procuring employment. *Id.* at 848-49. Simultaneously, two persons were using the site for a rape scheme. *Id.* They would contact female members, invite them to a fake audition, then drug and rape their victims. *Id.*[7] The complaint alleged that Internet Brands, shortly after purchasing the website in 2008, learned of the illegal activities transpiring on the site and failed to warn its users of this danger. *Id.* Internet Brands sought to bar Doe's claim by asserting CDA immunity. *Id.* The court ruled that this claim fell outside the scope of the CDA because Jane Doe was not seeking to hold the defendant liable for its content, but rather for "failing to warn her…about how third parties targeted and lured victims through Model Mayhem." *Id.* at 852. The "failure to warn claim had nothing to do with Internet Brands' efforts, or lack thereof, to edit, monitor, or remove . . . content . . . [t]hus, liability would not discourage the core policy of section 230(c), 'Good

---

[7] Related to this concern of fake profiles and trolling is the pending New York State Senate Bill S5871A, which would impose harsher penalties of those who impersonate others via website or other electronic channels. *See* Alison Leigh Cowan, *Fighting a Fake Dating Profile, Together,* N.Y. Times, Mar. 19, 2016, http://www.nytimes.com/2016/03/20/fashion/weddings/brett-barakett-meaghan-jarensky-marriage.html?_r=0.

Samaritan' filtering of third party content." *Id.*

While Grindr may not have originally known its product was being used for criminal and malicious purposes, as soon as it knew—or should have known—they became complicit in the illegality. Defendant was put on constructive notice approximately 100 times between November 2016 and January 2016 through Plaintiff and his friends and relatives reporting it. (Amended Complaint, ¶¶ 68-69). On January 24, 2017 Defendant received a cease and desist and preservation letter from Plaintiff's counsel and on January 27, 2017, Defendant was served with a Temporary Restraining Order from New York State Supreme Court. *See Herrick v Grindr, LLC,* Index No. 150903/2017. (Amended Complaint, at ¶ 75). The original Complaint provided Defendant with lurid detail of the horrors Plaintiff was experiencing through Grindr, undeniably putting Defendant on notice that Grindr was contributing materially to illegal conduct.[8] Yet, during the 27 days when the TRO was in effect, the abuse did not slow. Approximately 57 more men showed up to Plaintiff's home and work because of the impersonating accounts

Grindr has nearly-exclusive, end-to-end control over the user experience—telling users who to meet, when to meet, and where to meet. (Amended Complaint, at ¶¶ 3, 22, 24, 32, 68-69). Most importantly, Grindr has—or should have—the ability to shut down accounts. It advertises this control in its ToS, content that Grindr developed. (Amended Complaint, at ¶ 42). The CDA was not meant to immunize these actions. To be sure, "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852-53 (9th Cir. 2016); *see also Roommates.com*, 521 F.3d at 1164 ("The Communications

---

[8] *See, e.g.*, 18 U.S.C § 2261.

Decency Act was not meant to create a lawless no-man's-land on the Internet."). This Court

should not allow the novelty of an App, clinging to the mantle of free speech, to wear the

CDA as a shield, absconding it from due responsibility owed for its defective product.

### c. Grindr is Being Sued for its Own Bad Acts—Not JC's

The CDA requires *third party* conduct for a company to benefit from immunity.

When the company does bad all by itself, no luck. Nobody is suing Grindr for the actions

of somebody else. It isn't necessary. Grindr is liable for its own actions and omissions that

involve no third parties. Grindr cannot use JC as a shield to deflect lawsuits that center

around Grindr's own actions. If all tech companies followed its lead, they would be

incentivized to attract sociopaths and perverts to hide behind when sued.

### III.   ACCEPTING ALL OF PLAINTIFF'S FACTUAL ALLEGATIONS AS TRUE, PLAINTIFF STATES PLAUSIBLE CLAIMS ON WHICH RELIEF MAY BE GRANTED

Defendant attempts to argue that Plaintiff's claims lack merit based on its well-

pleaded complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (finding that

detailed factual allegations are not required in order for a complaint to survive a Rule

12(b)(6) motion). Most of these contentions stem simply from Defendant's

misunderstanding of this case. As Plaintiff has repeatedly asserted, this is not a CDA case.

Plaintiff's claims sound in torts that do not involve publication, and any attempt to contort

that fact is clearly an unavailing masquerade in order to evade legal responsibility. For the

sake of clarity, however, Defendant's remaining causes of action are addressed in turn.

### a. Negligence
#### i. General Negligence (Count VI)

To state a claim for general negligence, Plaintiff must show that Grindr owed it a

"duty, or obligation, recognized by law," Grindr breached that duty, there existed a

"reasonably close causal connection between [Grindr's] conduct and the resulting injury," and Plaintiff has suffered loss or damage because of Grindr's breach. *See McCarthy v. Olin Corp*, 119 F.3d 148, 156 (2d Cir. 1997) (citing PROSSER AND KEETON ON THE LAW OF TORTS § 30, at 164-65 (5th ed. 1984)); *see also Solomon by Solomon v. City of New York*, 489 66 N.Y.2d 1026, 1027-28 (N.Y. Ct. App. 1985). Defendant contends that Plaintiff's complaint fails to state a proper general negligence claim because: (1) there exists no duty for it to control the conduct of third parties; (2) the "harm" to Plaintiff was not "caused" by Grindr; and (3) Plaintiff failed to show that the harm would not have occurred absent Grindr's breach. (Def.'s Mot. Dismiss 18-19). To be sure, Plaintiff's sufficiently pled complaint does give rise to a cognizable claim sounding in negligence.

Although couched in terms of negligence, the thrust of Defendant's contention stems entirely from its general argument under Section 230. *See* (Def.'s Mot. Dismiss 1, 4-5, 6, 11-12, 13, 17). As Part II demonstrated, that argument is baseless. But to be sure, even beyond Section 230, Plaintiff's complaint has: (1) stated a sufficient duty by demonstrating Defendant's role as the progenitor of Grindr; and (2) adequately stated facts giving rise to a tenable nexus between Defendant's duty and Plaintiff's harm.

First, Defendant does not dispute its role as owner—designing, manufacturing, researching, coding, developing, promoting, and distributing a product into the stream of commerce. (Def.'s Mot. Dismiss 21); (Amended Complaint, at ¶ 109). And, as it is well established, the role of owner comes with the responsibility to "exercise reasonable care so as to avoid the occurrence of injuries by any product which can reasonably be expected to be dangerous if negligently manufactured or sold." *Noveck v. PV Holdings Corp.*, 742 F. Supp. 2d 284, 299-300 (E.D.N.Y. 2010) (quoting *Gebo v. Black Clawson Co.*, 92 N.Y.2d 387, 394 (N.Y. Ct. App. 1998)); *see also supra* Part I (illustrating Plaintiff's sufficiently

pled argument concerning products liability). Therefore, it may be generally stated that Defendant has a legal duty not produce a dangerous product. (Amended Complaint, at ¶ 132).

Moreover, Defendant's statement that there is no duty to control the actions of third parties is unavailing. (Def.'s Mot. Dismiss 18). While it is a generally true statement, it omits the fact that the duty owed to Plaintiff (regardless of his "user" status) springs from Defendant's role in the creation and management of a defective product—not to mention its own affirmative acts toward Plaintiff (*see supra* Part II.B). *See Purdy v. Public Adm'r of Westchester County*, 72 N.Y.2d 1, 8 (N.Y. Ct. App. 1988) ("[C]ommon law in the State of New York does not impose a duty to control the conduct of third persons [yet] liability for the negligent acts of third persons generally arises when the defendant has authority to control the actions of such third persons."); *Noveck*, 742 F. Supp. 2d at 299 (finding that industry practice, and a departure from that practice, may demonstrate evidence of negligence) (quoting *Cruz v. New York City Transit Auth.*, 136 A.D.2d 196, 199 (N.Y. Sup. Ct. 1988)). (Amended Complaint, at ¶ 7 (illustrating what commonly available tools there are for keeping with the industry standard of securing mobile applications)). As the owner of Grindr, Defendant had a duty to exercise reasonable care over the App, one which extended to all reasonably foreseeable plaintiffs—even those non-users of the App—and encompassed protecting those plaintiffs against blatant security flaws inviting easily-weaponized products.

Second, Defendant's causal arguments likewise miss the mark. As stated, this case is not about the actions of a third party. It is about a defective product's ability to relentlessly torment Plaintiff, surely the foreseeable outcome of designing a defective App and stonewalling Plaintiff's repeated requests for help. While it is true that, generally, third-

25

party criminal acts sever the chain of causation between a resultant harm and an original tortfeasor, that "doctrine has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable." *In re September 11 Litigation*, 280 F. Supp. 2d 279, 302 (S.D.N.Y. 2003). (Amended Complaint, at ¶¶ 68, 89, 134). Here, accepting Plaintiff's complaint as true, it is at least a question for the jury as to whether Plaintiff's injury was foreseeable. *In re September 11 Litigation*, 280 F. Supp. 2d at 295-96 (finding that foreseeability is typically a question reserved for the fact finder); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 321-22 (2015) (failing to verify age two years ago, Grindr is involved in a sexual abuse case involving a minor); Nguyen Phong Hoang, Yasuhito Asano, Masatoshi Yoshikawa, *Your Neighbors Are My Spies: Location and Other Privacy Concerns in GLBT-Focused Location-Based Dating Applications*, *in* Advanced Communication Technology (2016), https://perma.cc/9X83-CUDG (discussing how a non-novel technique—trilateration—allows attackers to identify a user's location on Grindr). (Amended Complaint, at ¶¶ 92-96). In summary, though more factual development is warranted, Plaintiff's claim at least surpasses the low threshold established by *Iqbal* and *Twombly*: Defendant had a duty not to design injurious software, and designing the software in this fashion (as the Complaint proves) plus deliberately ignoring Plaintiff's requests for help caused Plaintiff to suffer harm. (Amended Complaint, at ¶¶ 7, 92-96, 132-33).

### ii.  Negligent Misrepresentation (Count XIV)

The elements of negligent misrepresentation include a defendant's duty (per a special relationship) to provide accurate information, a false representation made by defendant that it should have known to be false and that defendant knew was desired by plaintiff for a serious purpose, and plaintiff's detrimental reliance on the representation.

26

*Hydro Investors, Inc., v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000). Here, Defendant attempts to argue that Plaintiff was not in a "special relationship" with Grindr and, as the District of New Jersey discussed in *Saponaro*, Grindr does not owe a duty to third parties affected by malicious users of its App. (Def.'s Mot. Dismiss 29-30). *See also Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 321-22 (2015) (failing to mention "negligent misrepresentation"). Again, Plaintiff has demonstrated adequate facts to prove its special relationship with Grindr and, as stated above, is not suing Grindr based on the actions of third parties (i.e., the duty owed to Plaintiff pursuant to third-party action, as was the driving force in *Saponaro*), but on the actions of Grindr itself. *See supra*, Part II.

Concerning the special relationship, courts in New York—after "proceeding with marked caution because, under New York law, 'determining whether a special relationship exists ordinarily requires a fact-intensive, case-by-case inquiry—generally consider three factors: "(1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (N.Y. Ct. App. 1996); *see also Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 350-51 (E.D.N.Y. 2014); *Icahn Sch. Med. Mount Sinai v. Health Care Serv. Corp.*, at *2 n.1 2017 WL 635648 (S.D.N.Y. Feb. 15, 2017) (reiterating that "[a] 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in Kimmell.'" (citing *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001)).

27

Plaintiff's complaint demonstrates its special relationship with Defendant through the following facts: (1) in designing Grindr, Defendant held itself out as having special expertise in the software's purpose and intended use, embodied generally in the ToS; (2) by agreeing to the ToS, Grindr and Plaintiff entered into a special relationship of trust, which was further developed by Plaintiff's direct and ongoing contact with Defendant and by the very nature of Grindr, which necessitates it to house intimate details of users' lives, thereby bolstering the quantum of "trust" users must place in the software; and (3) by requiring users to agree to a ToS and including certain statements in its privacy policy, Grindr demonstrated its knowledge that users not only rely on these communications, but also seek them out when considering downloading the App. (Amended Complaint, ¶¶ 32, 42, 139, 171, 186, 207, 213). *See Kimmell*, 89 N.Y.2d at 264-65 (finding a special relationship where defendant sought to induce business based on providing certain information to plaintiff). It is axiomatic that inquiries into the special relationship between Plaintiff and Defendant is a fact-intensive investigation. Regardless of whether Rule 9(b) is applied, it would be inappropriate at this juncture to rely on the scantly developed record to determine the outcome of this case. Plaintiff has met the base standard, illustrating that Defendant's false representations found in its ToS, which it knew were unenforceable, and it stated anyways to induce user trust, were reasonably relied on and led to Plaintiff's injury. (Amended Complaint, at ¶¶ 206-16); (Transcript of Hearing for Expiration of Temporary Restraining Order at 19, ECF No. 43-2)).[9] *See also Telenor E. Invest AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 441-42 (S.D.N.Y. 2008) (summarizing Rule 9(b)'s

---

[9] The February 22, 2017 Hearing will be cited as (TRO Transcript, at [page number]).

standard as requiring plaintiff to set forth "set forth the who, what, when, where[,] and how of the alleged fraud.").

### b. Promissory Estoppel (Count VIII)

A claim under promissory estoppel is satisfied when there is: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." *Weinreb v. Hospital for Joint Disease Orthopaedic Institute*, 404 F.3d 167, 172-73 (2d Cir. 2005) (quoting *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 79 (2d Cir. 1996)); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 85 (2d Cir. 2001); *see also Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995); *Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 824 (2d Cir. 1994) (finding that promissory estoppel may be enforced in the absence bargained-for consideration). Defendant here argues that Plaintiff has failed to state a legally sufficient promise, and, in the alternative, even if there was a promise (i.e., via the ToS), it was unreasonably relied on because Grindr's ToS are merely one sided. Defendant is off base on both accounts. Plaintiff's complaint states a valid promissory estoppel claim.

First, it is axiomatic that the ToS in this case were a promise. *See Meyer v. Kalanick*, 200 F. Supp. 3d 408, 416 (S.D.N.Y. 2016) (finding that click-wrap "agreements are more readily enforceable, since they 'permit courts to infer that the user was at least on inquiry notice of the term of the agreement, and has outwardly manifested consent by clicking a box.'") (citing *Cullinane v. Uber Technologies, Inc.*, 2016 WL 3751652 (D. Mass. July 11, 2016)); *Bassett v. Electronic Arts Inc.*, 2015 WL 1298644, at *1 (E.D.N.Y. Feb. 9, 2015) (enforcing a click-wrap agreement's arbitration clause); (Amended Complaint, at ¶¶ 32, 47 (requiring Plaintiff to "accept" the ToS prior to using the App)).

Second, it would defy logic to conclude that Grindr's ToS were merely one sided; essentially, that when Grindr said, users "will NOT" use Grindr to "stalk, harass, abuse, defame, threaten, or defraud other Users," it actually meant, "Grindr is not responsible for your use of the [App] or the actions of other[s]." (Amended Complaint, at ¶ 42); (Def.'s Mot. Dismiss 22). Surely this flips the entire idea of a ToS (i.e., a mutually agreement) on its head. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 382-83 (E.D.N.Y. 2015) (finding the owner of a ToS to be the offeror—as in, the party agreeing to be bound upon acceptance by the offeree). (Amended Complaint, at ¶¶ 157, 159). If an offeror would prefer to not be bound by particular provisions found in its own ToS, surely the answer to re-draft the terms—not argue that the ToS are unenforceable. Truly, this is—at its core—yet again another attempt to fancifully argue for CDA immunity. *See* Part II, *supra*. Plaintiff's complaint states well-pled facts giving rise to a claim under promissory estoppel: Defendant made a promise through its ToS that it would not let third parties use its App to "stalk, harass, abuse" or otherwise generally weaponize the software. (Amended Complaint, at ¶¶ 157-59). Plaintiff reasonably relied on this promise (i.e., the offeror's terms) and has been injured due to the promise's fraudulent nature. (TRO Transcript, at 19). If the court now fails to intervene, further injustice will surely haunt Plaintiff's life. (Amended Complaint, at ¶¶ 9, 160).

### c.   Fraud (Count IX)

Plaintiff's fraud claim must set forth the following elements: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 403-04 (S.D.N.Y. 2012) (quoting *Banque Arabe et Internationale D'Investissement*

*v. Md. Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995)). Moreover, the claim must satisfy the heightened pleading standard of Rule 9(b), requiring Plaintiff to "state with particularity the circumstances constituting fraud." *Jalee Consulting Group, Inc. v. XenoOne, Inc.*, 908 F. Supp. 2d 387, 394 (S.D.N.Y. 2012) (citing FED. R. CIV. P. 9(b)). Here, Defendant argues that Plaintiff has not: (1) identified specific facts of fraudulent statements needed to survive Rule 9(b); (2) shown Grindr's intent to defraud; and (3) shown how Plaintiff has been damaged by Defendant's fraud. (Def.'s Mot. Dismiss 23-24). To be sure, Plaintiff has satisfied each of these concerns, as its well-pled complaint illustrates.

First, to be clear, Plaintiff's claims sounding in fraud center around Defendant's material misrepresentations regarding its product's safety. (Amended Complaint, at ¶¶ 42, 162-64). Making much of the fact that Plaintiff asserts no "affirmative statements," Defendant glosses over the fact that its own ToS and Privacy Policy work to provide users with material representations, material representations that Grindr is safe—when it clearly is not. (Amended Complaint, at ¶¶ 42, 92-96). *See also Mazzola*, 849 F. Supp. 2d at 403-04 (finding that a ToS agreement may state material representations). In fact, Grindr, apparently, has no way of enforcing these provisions at all. (TRO Transcript, at 19) (concluding that although Grindr's ToS "make it sound like Grindr reserves the right to bar accounts [of those] who are engaging in unacceptable behavior," the truth is that a user "can just jump to a different e-mail account and continue bad behavior"). Therefore, the representation underlying a user's trust in Grindr—arguably the entire reason users pick Grindr over other services—is built on the false premise that Grindr actually has the ability to enforce its ToS.

Secondly, Defendant tries to undercut Plaintiff's fraud claim with the conclusory statement: "Plaintiff has not alleged any facts whatsoever suggesting why Grindr would

purposefully deceive Plaintiff about the safety of the App." (Def.'s Mot. Dismiss 24). Yet, this is plainly not true. Plaintiff has adequately pled that Defendant's motive would be to induce trust, a commodity weighing heavily for any App, much less an App that users share some of their most intimate secrets with. (Amended Complaint, at ¶¶ 171, 213). *See also In re LightSquad Inc.*, 504 B.R. 321, 349 (Bankr. S.D.N.Y. 2013) ("Although a plaintiff need not allege scienter in detail, it must allege facts that are at least suggestive of intent to defraud.").

Finally, Plaintiff has patently demonstrated its injury in this case, the fact that Plaintiff's life has become a living hell. (Amended Complaint, at ¶¶ 86, 92-96). And, though Defendant seems persistent to deny it, the cause of these actions is not a third party, but Defendant itself. (Def.'s Mot. Dismiss 24) (tying Plaintiff's injuries solely to JC); Part II.B, *supra* (explaining how Grindr's own role in this matter has led to Plaintiff's injuries).

### d.  Deceptive Business Practices (Count X) & False Advertising (Count XI)

To state claims under New York General Business Law (NYGBL)—specifically, §§ 349, 350, 350-a—Plaintiff must demonstrate: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009); *King v. N.Y. City Emps. Retirement Sys.*, 212 F. Supp. 3d 371, 405-06 (E.D.N.Y. 2016). Stated otherwise, Plaintiff must show acts that are "likely to have a 'broader impact on customers at large," would have misled a reasonable customer, and were the proximate cause of damage. *King*, 212 F. Supp. 3d at 406 (quoting *Lane v. Fein, Such & Crane, LLP*, 767 F. Supp. 2d 382, 390 (E.D.N.Y. 2011)). Notably, the "gravamen of a section 349 or 350 claim is 'consumer injury or harm to the public interest.'" *New World Solutions, Inc., v.*

*NameMedia Inc.*, 150 F. Supp. 3d 287, 330 (S.D.N.Y. 2015) (quoting *Tropical Sails Corp. v. Yext, Inc.*, 2015 WL 2359098, at *3 (S.D.N.Y. May 18, 2015)).

Moreover, under § 350, Plaintiff must set forth facts demonstrating some form of reliance—i.e., "point to [a] specific advertisement or public pronouncement"—though New York courts are not completely consistent on this point. *See Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005) (finding that § 350 requires demonstration of reliance on false advertising), *impliedly overruled by New World Solutions, Inc., v. NameMedia Inc.*, 150 F. Supp. 3d 287, 330 && n.26 (S.D.N.Y. 2015) ("Additionally, neither Section 349 nor 350 require proof of reliance, . . . nor proof that defendants intended to mislead consumers." (citing *In re Scotts EZ Seed Litigation*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015)). And finally, it should be noted that "[a]n action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), Fed. R. Civ. P., but need only meet the notice-pleading requirements of Rule 8(a)." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 459 (S.D.N.Y. 2014) (citing *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)).

Defendant's contentions here orbit around: (1) a facile statement that Plaintiff's claims are time barred; (2) Defendant's misstatements of fact alleging that Plaintiff has not identified consumer-oriented practices; and (3) an argument sounding in causation, which is, in reality, another attempt to argue § 230 immunity. (Def.'s Mot. Dismiss 25-28). All three of Defendant's points are nugatory. Plaintiff's well-pled complaint and the low threshold provided by *Iqbal* and *Twombly* should bring this Court to find that Plaintiff has sufficiency pled claims under NYGBL.

Defendant's attempt to undermine Plaintiff's NYGBL claims starts with the creative argument that these claims are time barred, because, from Defendant's standpoint,

Plaintiff's grievance with Defendant is supported entirely by his interactions with the App. (Def.'s Mot. Dismiss 25-26). This is plainly not true, and legally unsupported by case law. *See supra* Part II.B. And even beyond the Defendant's argument's substantive defects, timeliness is an affirmative defense, requiring dismissal at this stage of pleadings only if "the defense is clear from the face of the complaint." *Hidalgo v. Johnson & Johnson Consumer Companies, Inc.*, 148 F. Supp. 3d 285, 297 (S.D.N.Y. 2015) (finding a complaint *not* time barred when it simply stated that the offending products were purchased "within the last five years"). (Amended Complaint, at ¶¶ 68-69 (showing injury in November 2016, when Defendant's false promise of "safety" was unambiguously exposed as false)). What is more, Defendant would additionally have to establish that equitable tolling is inapplicable, clearly not the case here, as Plaintiff was unable to bring his action before, approximately, November 2016, when the falsity of Defendant's representations were revealed. *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 469, 462-63 (S.D.N.Y. 2014) (reiterating that equitable tolling or equitable estoppel is invoked when, because of Defendant's misrepresentation, Plaintiff could not have brought its claim until a later time). (Amended Complaint, at ¶¶ 92-96).

Legally, the clock begins to run for claims under NYGBL when a plaintiff suffers a measurable damage. *See Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 211-12 (N.Y. Ct. App. 2002) (finding the statute of limitations to run at the point in time when plaintiffs suffered "measurable" damages; noticeably, not when plaintiffs purchased premiums with false guarantees, but when those fraudulent guarantees were realized). In this case, that point was not reached until November, 2016—clearly within the statutory period. (Amended Complaint, at ¶ 68). On November 2016, the statute of limitations started to run because it was then that Grindr's false promise of "safety" was unambiguously

34

exposed. (Amended Complaint, at ¶¶ 68-69). That Plaintiff relied upon Defendant's false statement of safety when downloading the App, does not displace the fact that Grindr's illusion of safety was not realized until the App became weaponized. (Amended Complaint, at ¶ 41 ("We strive to create a safe space"; "we have a system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about.")). Defendant's arguments concerning the timeliness of Plaintiff's complaint are unsupported by the record before the Court, both factually and legally.

Secondly, Defendant's contention that Plaintiff failed to state any misleading statements and, in the alternative, that those statements are not consumer oriented is patently baseless. (Def.'s Mot. Dismiss 26-27). Plaintiff has pointed to multiple, material representations giving rise to a *reasonable* implication that Grindr held itself out as "safe"—clearly a misrepresentation. *See* Part III.c, *supra* (explaining how Grindr's ToS and privacy policy—in effect, fostering a relationship built on security and trust with its user—are literally unenforceable); Part III.b (explaining how it is reasonable to expect that a company will adhere to their own ToS); (Amended Complaint, at ¶¶ 41-42, 161, 171, 178). And the test for consumer-oriented statements only bolsters Plaintiff's claim: "Plaintiff . . . must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25-26 (N.Y. Ct. App. 1995). What more could the court ask for than an App with over 426,000 customers in New York, and nearly 10,000,000 customers around the world? (Amended Complaint, at ¶ 29). To allow these innocent product owners to continue laboring under the delusion of security surely contradicts NYGBL's legislative history. *See Oswego*, 85 N.Y.2d at 25 ("[T]he legislative history makes plain that this law

35

was intended to 'afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds.'"). To be sure, Plaintiff has stated a consumer-oriented, materially misleading statement.

Finally, Defendant again takes the opportunity to wrap a CDA immunity argument in the guise of causation. (Def.'s Mot. Dismiss 27-28). As stated throughout this memorandum, this case is about Grindr's defective product, and the affirmative acts Defendant committed that turned Plaintiff's life into a living hell. *See generally supra* Part I, Part II. Defendant's failure to uphold to its own product's representations is what led to this case.

In summary, Defendant deceived Plaintiff, and millions of other users, by materially representing that it was a "safe" product. *See supra* Part III(b)&III(c). This deception is what ultimately led to Plaintiff's injury. (Amended Complaint, at ¶¶ 92-96). Based on the well-pled facts found in its complaint, Plaintiff has satisfied the liberal standards of *Iqbal* and *Twombly* for claims regarding NYGBL.

### e.   IIED (Count XII) and NIED (Count XIII)

To be successful in its claim for Intentional Infliction of Emotional Distress (IIED), Plaintiff must show: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Chanko v. Am. Broadcasting Companies Inc.*, 27 N.Y.3d 46, 56-57 (N.Y. Ct. App. 2016) (citing *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121 (N.Y. Ct. App. 1993)). And to be successful for a claim of Negligent Infliction of Emotional Distress (NIED), Plaintiff must show, under the "direct duty" theory, that he "suffered an emotional injury from defendant's breach of a duty which unreasonably endangered [his] own physical safety." *Mortise v. U.S.*, 102 F.3d

36

693, 695 (2d Cir. 1996) (citing *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504 (N.Y. Ct. App 1983)). While Defendant does not dispute that JC's conduct was "extreme and outrageous," it does argue that (1) the failure to stop JC is not, in itself, extreme and outrageous; (2) Plaintiff failed to allege intent, a causal connection, or a severe emotional distress for IIED; and (3) Plaintiff failed to allege a duty, breach, or proximate cause for NIED. (Def.'s Mot. Dismiss 28-29). Each of Defendant's contentions are unavailing.

Firstly, the failure to stop the outrageous actions of another may itself be outrageous. *See Travis v. Alcon laboratories, Inc.*, 202 W. Va. 369, 382 (W. Va. Sup. Ct. App. 1998) (finding a supervisor to have "caused" or "contributed to" or "acquiesced" in IIED for failing to stop the obscene behavior of an employee); *Burrow By and Through Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193, 1210 (N.D Iowa 1996) (considering as plausible the argument that failing to stop the obscene acts of another may be "outrageous[]"). And since Defendant admits that JC's conduct was extreme and outrageous, the only question would be whether its failure to act, at least in part, contributed to Plaintiff's injury—which Plaintiff's complaint adequately states. (Amended Complaint, at ¶¶ 68, 84, 89, 117, 129, 163 (discussing how Defendant could have implemented basic, industry-standard security features to stop the continued attacks and ignored Plaintiff's over fifty reported fake profiles)).

Second, Defendant has stated a plausible claim for IIED. Defendant's failure to design a safe product combined with its refusal to act, in the face of Plaintiff's real-life nightmare, is extreme and outrageous conduct. (Amended Complaint, at ¶ 189-90). And these purposeful refusals to act also demonstrate Defendant's disregard of a substantial probability of causing severe emotional distress—i.e., man after man was showing up on Plaintiff's doorstep, while Defendant merely sat back and crossed its arms. (Amended

37

Complaint, at ¶¶ 8-9, 66). Finally, surely Plaintiff has experienced severe emotional distress in this case. (Amended Complaint, at ¶¶ 92-96 (describing how Plaintiff lives in a state of "hyper-vigilance," afraid that Grindr has again directed its sexual marketplace towards him)).

Lastly, as stated in Plaintiff's negligence claims, *supra*, Defendant had a duty not to design injurious software, and designing the software in this fashion plus deliberately ignoring Plaintiff's requests for help caused Plaintiff to suffer harm. (Amended Complaint, at ¶¶ 7, 92-96, 132-33). And Plaintiff's contention that physical harm is no where to be found in Plaintiff's complaint is equally as untenable, for physical harm is not required of NIED. *See Rivers v. Towers, Perrin, Forster & Cosby Inc.*, 2009 WL 817852, at *10 (E.D.N.Y. Mar. 27, 2009) (citing Dawkins v. Williams, 413 F. Supp. 2d 161, 179 (N.D. N.Y. 2006)).

### f. Copyright Infringement (VII)

#### i. There is an Open Issue of Whether an Application is Sufficient to Satisfy the Registration Requirement

Defendants acknowledge, as they must, that the Second Circuit has not ruled on whether the Copyright Act's filing requirement means that a party must have applied to register its copyright with the Copyright Office before filing, or must have been issued a certificate with the Copyright Office. The Second Circuit has made clear that it has not yet ruled on this issue: "Our Court has not yet determined, however, whether a merely pending application for registration satisfies the Act's requirement that a work be registered before a related infringement suit is filed." *A Star Grp., Inc. v. Manitoba Hydro*, 621 F. App'x 681, 683 (2d Cir. 2015) (*citing* 17 U.S.C. § 411), *Psyihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 125 (2d Cir. 2014).

Other Courts of Appeals explicitly hold that a copyright infringement claim may proceed based on a plaintiff's application to register a copyright with the Copyright Office, pending the Copyright Office's registration or refusal. The Ninth and Fifth Circuits follow this approach. *Cosmetic Ideas Inc. v. IAC/InteractiveCorp*, 606 F.3d 612, 618–19 (9th Cir. 2010); *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 365 (5th Cir. 2004), *abrogated in part by Muchnick*, 559 U.S. 154; *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386–87 (5th Cir. 1984); *see also* Melville B. Nimmer, et al., 2 *Nimmer on Copyright* § 7.16[B][3][b][v] (2016).

Recognizing the split in jurisprudence, most Second Circuit courts have either allowed claims to proceed where the application to register the copyright is pending, at most dismissing the claims without prejudice and allowing the plaintiff to amend the complaint upon registration or refusal. Courts are consistent, however, that a Plaintiff cannot proceed with a copyright infringement claim for a domestic copyright if they do not allege that the plaintiff applied to register it. *See, e.g.* S*ullivan v. Duncan*, No. 13-CV-1640 SAS, 2015 WL 4393316, at *4 (S.D.N.Y. July 17, 2015).

### ii. Most Courts in the Second Circuit Have Allowed Claims to Proceed While Applications to Register Copyrights are Pending

District Courts in New York generally allow claims to proceed where the application to register the copyright is pending, allowing them to amend their complaints upon registration. *See, e.g.*, *Gattoni v. Tibi, LLC*, No. 16 CIV. 7527 (RWS), 2017 WL 2313882 (S.D.N.Y. May 25, 2017). In some circumstances their claims are dismissed, but without prejudice – the plaintiff is permitted to proceed with his other claims and amend the complaint when the copyrights are registered. *Id at *5.* (allowing plaintiff leave to amend the complaint showing either a valid copyright registration or rejection of the

39

application). *See also Membler.com LLC v. Barber*, No. 12–CV-4941 JS GR, 2013 WL 5348546, at *5 (E.D.N.Y. Sept. 23, 2013) (granting plaintiff's motion to amend complaint after copyright was registered); *Conan Properties, Inc. v. Mattel, Inc.*, 601 F. Supp. 1179, 1182 (S.D.N.Y. 1984) (If, in fact, the copyrights have been registered, the defect in the Amended Complaint can be cured simply by filing a second amended complaint, which relates back to the commencement of the action, and which includes a recitation that the registration requirement has been satisfied"); Patry on Copyright § 19:4 (2013) ("Where plaintiff has received registrations subsequent to the filing of the complaint, the complaint should be amended.")

By contrast, courts have sometimes refused to exercise discretion to allow a plaintiff to amend a complaint where the lawsuit was at its final stages. This is obviously not the case here. The parties are at the pleading stage and Defendants have not filed their respective answers. No discovery had been conducted. Defendants are on notice that the copyright registrations are pending, and suffer no prejudice if Plaintiff amends its complaint when the registrations are complete.

The decision Defendants rely on is easily distinguished on this point. In *Psihoyos*, the Second Circuit did not hold that a court must dismiss claims where the copyrights are not yet registered. Instead, it affirmed that the District Court did not violate its "wide discretion" by denying the plaintiff leave to amend his complaint to assert those claims because the plaintiff waited until after the close of discovery and the filing of a summary judgment motion to even submit his applications to the Copyright Office. *See Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d at 125–26. *Wu v. John Wiley & Sons, Inc.*, No. 14 CIV. 6746 AKH AJP, 2015 WL 5254885, at *9 (S.D.N.Y. Sept. 10, 2015).

By contrast, in *Wu*, the plaintiff successfully registered photographs while the case was ongoing, and promptly filed an amended complaint thereafter. The court permitted amendment of the complaint to reflect the registrations. *Wu v. John Wiley & Sons, Inc.*, No. 14 CIV. 6746 AKH AJP, 2015 WL 5254885, at *10 (S.D.N.Y. Sept. 10, 2015). Many other district courts have followed the same approach. *See, e.g., Laine v. Pride,* 08 Civ. 3057, 2010 WL 199927 at *4 (S.D.N.Y. Jan. 19, 2010) ("[W]here a plaintiff files an infringement suit prior to registration of the copyright at issue, district courts have discretion to allow a plaintiff to amend their complaint if they obtain registration after the suit's initiation."); *J. Racenstein & Co. v. Wallace,* 96 Civ. 9222, 1997 WL 605107 *1 (S.D.N.Y. Oct. 1, 1997) ("Where an action is commenced without registration being effected, the defect can be cured by subsequent registration, and an appropriate amendment to the complaint may be made to provide the necessary basis for subject matter jurisdiction."); *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 775 F.Supp. 554, 557 (E.D.N.Y.1991), *aff'd in relevant part,* 982 F.2d 693 (2d Cir.1992); *Demetriades v. Kaufmann,* 680 F.Supp. 658, 661 (S.D.N.Y.1988).

Yet, Defendants insist that the applications were filed at the "eleventh hour." This is highly misleading. Unlike in *Psyihoyos*, Plaintiff is not seeking to amend the complaint after discovery has been completed. Discovery has not yet begun. Nor have the defendants moved for summary judgment. The Amended Complaint alleges that Defendants are on notice of the infringing copyrights because his lawyer has issued demands to Defendant's attorney to take them down. Thus no party would suffer prejudice by allowing Plaintiff to amend the complaint when the copyrights are registered.

41

### iii.   The Principles of Copyright are Best Served by Allowing Claims to Proceed on Their Merits

Allowing Plaintiff's claims to proceed pending registration will best serve the principles of copyright law and the civil justice system. In order to understand why, several undisputable tenets of copyright law must be acknowledged.

The first of these is that copyright exists automatically upon creation and fixation. See U.S. Copyright Office, Circular No 01: Copyright Basics, p. 3 (2012); *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 7373 (1989). No substantive right is dependent on the copyright registration. It is merely a procedural condition for filing a lawsuit. 17 U.S.C. § 408(a). *See* Nimmer on Copyright § 7.16[A][I] ("it is clear that, as to works created on and after January 1, 1978, the effective date of the current Copyright Act, registration is not a condition to obtaining copyright"). At the moment that Plaintiff took his photographs, he enjoyed copyright protection. The copyright registration carries the advantage of a presumption of validity, but does not otherwise affect the outcome of copyright litigation. *See, e.g. Lennon v. Seaman,* 84 F.Supp.2d 522 (S.D.N.Y. 2000). For instance, foreign copyright owners are permitted to file a lawsuit in the United States without applying to register their copyrights, 17 U.S.C. § 411(a), and copyright cases have proceeded where domestic copyright holders did not enjoy the presumption of validity because their registration was not within five years of publication of the work under 17 U.S.C. § 410(c)[10]. Moreover, a copyright claim is permitted to proceed if the Copyright Office denies registration. In all these circumstances, the court, and not the Copyright Office, determines the validity the copyrights.

---

[10] Plaintiff does not allege that his copyrights were "published" as defined under 17 U.S.C. § 101.

The second is that the copyright registration is distinct from the copyright itself. *See, e.g., Mackenzie Architects, PC v. VLG Real Estates Developers*, LLC, No. 1:15-CV-1105, 2016 WL 4703736, at *14 (N.D.N.Y. Sept. 8, 2016) ("the Plaintiff correctly points out that the Defendants have conflated the validity of a registration with the underlying question of the validity of a copyright"). Thus, defendants are incorrect in arguing that "the Amended Complaint does not demonstrate a valid, pending copyright," because this assertion conflates Plaintiff's inherent copyrights with the Copyright Office's registrations. Defendants are entitled to challenge the validity, ownership, and any other aspect of the copyright regardless of a registration. *See, e.g., Whimsicality, Inc. v. Rubie's Costume Co, Inc.,* 891 F.2d 452 (2d Cir. 1989) (acknowledging that presumption of validity is rebuttable).

The third is that the Supreme Court held that copyright registration is not a jurisdictional requirement. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169, 130 S. Ct. 1237, 1248, 176 L. Ed. 2d 18 (2010) ("[we] conclude that § 411(a) does not implicate the subject-matter jurisdiction of federal courts"). It is merely a precondition to filing suit. *Id. See also Sullivan v. Duncan*, No. 13-CV-1640 SAS, 2015 WL 4393316, at *4 (S.D.N.Y. July 17, 2015).

The fourth is that, as discussed above, any dismissal of these copyright claims would be without prejudice. Plaintiff would be within his rights to immediately file again upon registration of his copyrights.

It follows that, although the Copyright Act requires pre-registration or registration as a condition to a lawsuit, it is merely a formality. The registration affects no substantive or jurisdictional rights. And since Plaintiff has alleged that he applied to register the copyrights with the Copyright Office in his Amended Complaint, there is no value in

dismissing otherwise valid claims and requiring him to file a second, independent lawsuit at the same time this one proceeds.

This is why, under similar factual circumstances, this court has said:

"It is hard to see what public, private, or statutory interest is served or harmed by requiring him to wait, and re-file his action after his application is approved or denied, when he has already done everything he can to obtain that result." As stated in 2 Nimmer on Copyright § 7.16[B][3][b][ii], at 7-170.2 to 7-171: Given that the claimant who has submitted an application that has yet to be acted upon at that juncture has done all that she can do, and will ultimately be allowed to proceed regardless of how the Copyright Office treats her application, it makes little sense to create a period of "legal limbo" in which suit is barred." *Chevrestt v. Am. Media, Inc.*, 204 F. Supp. 3d 629, 631 (S.D.N.Y. 2016).

Defendants acknowledge that Plaintiff cited its application numbers in its Amended Complaint. The applications to register the copyrights are pending. It is in the best interests of copyright and respective parties' rights to allow the infringement claims to proceed and permit Plaintiff to amend his complaint upon registration or denial of registration.

## IV.    THIS COURT HAS JURISDICTION OVER ALL DEFENDANTS TO HEAR THIS CASE

KLG's and GHC's motions to dismiss are unpersuasive. These motions, centering on lack of personal jurisdiction and impermissible "lumping" arguments, fail to demonstrate how Plaintiff has not met the liberal pleading standard required of it at this stage of proceedings.

### a.  This Court Has Jurisdiction Over All Defendants

In a diversity action, the amenability of a foreign corporation to suit in federal court is determined by the law of the forum state. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In assessing whether it may assert jurisdiction, a court must look first to the forum state's long arm statute, and if the exercise of jurisdiction is

appropriate under that statute, it must decide whether such exercise comports with due process. *Winston & Strawn v. Dong Won Sec. Co.*, 2002 WL 31444625, at *3 (S.D.N.Y. Nov. 1, 2002).

The determination of whether a defendant has minimum contacts with the forum state is considered a contextual inquiry. *Metro. Life*, 84 F.3d at 571. When deciding if personal jurisdiction exists, courts may not examine each of the defendants' contacts with the forum state in isolation, but must examine such contacts *in toto*. *Id.* (citing *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 779 (5th Cir.1986), *cert. denied,* 481 U.S. 1015 (1987)). While evaluating personal jurisdiction, courts may consider other factors such as the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interest of interstate judicial system's in obtaining efficient resolution of controversies. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

District courts are afforded "considerable procedural leeway" in deciding motions to dismiss for lack of personal jurisdiction. *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir. 1999). Prior to engaging in discovery, a plaintiff need only show sufficient facts that constitute a prima facie showing of personal jurisdiction to defeat a motion to dismiss. *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 70 (E.D.N.Y. 2006). "Plaintiffs may rely entirely on allegations of fact, and they will prevail even if the moving party makes contrary allegations which controvert their prima facie case." *Id. (citing Sodepac, S.A. v. Choyang Park In Rem,* 2002 WL 31296341, at *2 (S.D.N.Y. Oct.10, 2002)). Courts in the Second Circuit have ordered jurisdictional discovery even when plaintiffs have made less than a prima facie showing but "made a sufficient start toward establishing personal jurisdiction." *See Burchette v. Abercrombie & Fitch Stores, Inc.*,

2009 WL 856682, at *5 (S.D.N.Y. Mar. 30, 2009). "[A] court should take care to give [a] plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id.* The Second Circuit has authorized jurisdictional discovery when plaintiffs have alleged more than conclusory statements without additional supporting facts. *See Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 71 (E.D.N.Y. 2006); *see also Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 F. App'x 738, 740 (2d Cir. 2002) (plaintiffs were entitled to jurisdictional discovery to develop the factual record required for a showing of personal jurisdiction); *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 208 (2d Cir. 2003) (district court dismissal was premature prior to allowing plaintiff's discovery on the relationship between foreign parent and subsidiary); *Winston & Strawn v. Dong Won Secs. Co. Ltd.,* 02 Civ. 0183, 2002 WL 31444625, at *5 (S.D.N.Y. Nov.1, 2002) (allowing discovery and denying motion to dismiss where the facts needed to establish personal jurisdiction lied exclusively within the defendant's knowledge).

Defendants Grindr Holding Company and KL Grindr Holdings move to dismiss on the grounds that this Court lacks personal jurisdiction. Grindr Holding Company asserts that this Court lacks personal jurisdiction because, among other reasons, it allegedly does not have its principal place of business in New York, is not incorporated in New York, it does not own or lease any property in New York, and has not solicited business in New York. Grindr Holding Company also asserts that Plaintiff has not alleged specific jurisdictional facts in its Amended Complaint. Likewise, KL Grindr Holdings argues in its motion to dismiss that this Court lacks personal jurisdiction because it is not incorporated in New York nor does it have its principal place of business in New York, and KL Grindr's status as a member of Grindr LLC is too attenuated to "comport with notions of fair play and substantial justice."

46

Plaintiff seeks limited jurisdictional discovery to oppose the motions to dismiss of defendants Grindr Holding Company and KL Grindr. Plaintiff has made a "sufficient start toward establishing personal jurisdiction." *Burchette* 2009 WL 856682, at *5. Defendants Grindr Holding Company and KL Grindr are both corporate members of Grindr LLC, which affirmatively and routinely transacts business in the state of New York and has committed a tortious act within the state. N.Y. C.P.L.R. 302. Defendants Grindr Holding Company and KL Grindr directly profit from Grindr's unique geo-location features, which are designed to enable users in New York to locate each other in different areas of the state. This special mapping technology defines the business model of Grindr LLC and is largely responsible for the App's popularity and profitability. Prior to investing in Grinder LLC, Grindr Holding Company and KL Grindr were well aware of this distinguishing feature, which likely factored into their decisions to purchase a membership interest in Grindr. Both Grindr Holding Company and KL Grindr have availed themselves of the privilege of conducting business in New York, and as a result have had prior notice that they may be subject them to suit in the state. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980).

Additionally, Plaintiff has made a prima facie showing that requiring Grindr Holding Company and KL Grindr to litigate in New York would favor the forum state's interest in obtaining redress for an injury of a resident that was harmed in state, and would provide the most convenient and effective relief for the Plaintiff. Further, jurisdictional discovery is necessary and appropriate to oppose the motions to dismiss of Grindr Holding Company and KL Grindr. Permitting such discovery is consistent with precedent of this Court and would further the overriding interest of allowing parties to resolve their dispute on the merits.

### b. Plaintiff Did Not "Lump" Defendants

Plaintiff appropriately grouped all defendants together in a single defined term because he contends that all are responsible for alleged conduct. Under Federal Rule of Civil Procedure 8(a)(2), "a pleading that states a claim for relief must contain…a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In determining whether this standard has been met, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The pleading requirements under Rule 8(a) are to be construed liberally, in order to focus litigation on the merits of a claim. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 514, 122 S. Ct. 992, 999, 152 L. Ed. 2d 1 (2002) ("[T]he liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim."). The Second Circuit has made it clear that Rule 8 is a lenient standard, and that, "dismissal pursuant to the rule 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *See Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004). The Second Circuit has noted that "although Fed. R. Civ. P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *See Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001).

Defendants GHC and KLG argue that Plaintiff's claim fails for failure to ascribe actionable conduct to them by "lumping" them with Grindr under the defined term

"Defendants." They contend that this is in violation of Federal Rule of Civil Procedure Rule 8(a)'s requirements. (KLG's Mot. Dismiss 6); (GHC's Mot. Dismiss 10-12). GHC and KLG misapply the lenient standard used to ascertain compliance with Rule 8(a) that is controlling within the Second Circuit.

GHC and KLG rely on the Second Circuit case *Atuahene v. City of Hartford* for the proposition that "lumping" defendants together fails to satisfy Rule 8(a) because it does not adequately inform them of the allegations against each entity. GHC goes further, claiming that, "the FAC does not contain a single allegation of misconduct of wrongdoing that is specific to GHC." (GHC's Mot. Dismiss 11). This is simply untrue.

Here, the Amended Complaint provided fair notice to each defendant of all claims directed against them and clearly established the grounds upon which those claims rest. It not only differentiates the entities named as defendants in its "Parties, Jurisdiction, and Venue" section, but clearly identifies the defined term "Defendant" as collectively owning, maintaining, and controlling the weaponized product. (Amended Complaint, at ¶ 1). It is apparent from the assertion that all three entities are responsible for the ownership, maintenance and control of the product that Plaintiff's allegations apply fully to each Defendant. Because of this clarity, Defendants are not "left guessing," as claimed by GHC, as to which allegations apply to it, and cannot fairly claim that no specific allegations are leveled at each entity. (GHC's Mot. Dismiss 12). As stated *supra*, under Rule 12(b)(6), the Court must accept sufficiently pled factual matters as true. This includes Plaintiff's contention that GHC and KLG, "own maintain and control" Grindr. This pleading provides sufficient information for the Court, but also for the Defendants, to reasonably infer that they are liable for all actions alleged in the Amended Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

49

Both KLG and GHC's motions to dismiss mischaracterize Plaintiff's Amended Complaint's use of "defined" as "lumping." From the deliberate choice to define all three entities as "Defendant," KLG and GHC are clearly provided with "fair notice" of Plaintiff's claims against them.

## CONCLUSION

For the foregoing reasons, the court should deny all three motions to dismiss in their entirety. Grindr is a product. The CDA does not apply because the court lacks information to conclude that Grindr is an interactive computer service provider or merely re-posting third-party content. Grindr is being sued for the bad acts of nobody but itself. The court has jurisdiction over all three culpable defendants.

Should the court decide to grant any of the motions to dismiss, in whole or in part, Plaintiff requests it be granted leave to amend the complaint again. Courts are liberal about the right to amend in early stages of litigation. Under such circumstances "leave to amend shall be freely given," especially as "justice so requires." Fed.R.Civ.P. 15(a) *Shane*

Courts must recognize the limits to the CDA and to its scope. There are plenty of reasons why tech company liability exceptionalism is unfair. The facts of this case establish why it is *unjust*. The legal underpinnings contained here establish *how* it is unjust.

Dated: June 14, 2017                                  Respectfully Submitted,


*/s/Tor Ekeland*                                      */s/Carrie Goldberg*
Tor Ekeland (TE5608)                                 Carrie Goldberg (CA7873)
Tor Ekeland, P.C.                                    C. A. Goldberg, PLLC
43 West 43rd Street                                  16 Court Street
Suite 50                                             Suite 2500
New York, NY 10036-7424                              Brooklyn, NY 11241
Tel: 646 287 0135                                    Tel: 646 666 8908
Fax: 718 504 5417                                    carrie@cagoldberglaw.com
tor@torekeland.com