UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
MATTHEW HERRICK,                                  :
                                                  :
                              Plaintiff,          :
                                                  :                    17-CV-932 (VEC)
                   -against-                      :
                                                  :                    OPINION AND ORDER
GRINDR, LLC; KL GRINDR HOLDINGS, INC.;  :
and GRINDR HOLDING COMPANY,                       :
                                                  :
                              Defendants.         :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Grindr, LLC ("Grindr") is a web-based dating application ("app") for gay and bi-sexual

men.  Plaintiff Matthew Herrick ("Herrick") is a former Grindr user and the victim of a

campaign of malicious catfishing:[1] since October 2016, Herrick's former boyfriend has used

Grindr to impersonate Herrick by posting fake profiles to Grindr, which describe Herrick as

being interested in fetishistic sex, bondage, role playing, and rape fantasies and which encourage

potential suitors to go to Herrick's home or workplace for sex.  Allegedly hundreds of interested

Grindr users have responded to the false profiles and many of them have physically sought out

Herrick.  This lawsuit is, however, against Grindr, not Herrick's former boyfriend.  Herrick

alleges 14 causes of action, the gist of which is that Grindr is a defectively designed and

manufactured product because it lacks built-in safety features; that Grindr misled Herrick into

believing it could interdict impersonating profiles or other unpermitted content; and that Grindr

has wrongfully refused to search for and remove the impersonating profiles.  Grindr and its two

corporate parents, KL Grindr Holdings, Inc. ("KL Grindr") and Grindr Holding Company

("Grindr Holding" and together with Grindr and KL Grindr, the "Defendants"), have moved to

---

[1]        A "catfish" is "a person who sets up a false personal profile on a social networking site for fraudulent or
deceptive purposes."  *Catfish*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2018).

dismiss on the grounds that Section 230 of the Communications Decency Act of 1996 (the "CDA"), 47 U.S.C. § 230, immunizes Grindr from liability for content created by other users. The Court agrees. The CDA bars Herrick's products liability claims and his claims that Grindr must do more to remove impersonating profiles. Each of these claims depends on holding Grindr responsible for the content created by one of its users. Herrick's misrepresentation-related claims fail on their merits because Herrick has not alleged a misleading or false statement by Grindr or that Grindr's alleged misstatements are the cause of his injury.

## BACKGROUND

Herrick joined Grindr in approximately May 2011. Am. Compl. (Dkt. 34) ¶ 46. Grindr works by matching users based on their interests and location. Am. Compl. ¶¶ 22-24, 31. In order to set up a Grindr profile, a user must enter his email address, accept Grindr's terms of service, and create a profile, including a "display name, profile photo, and 'about me' section." Am. Compl. ¶ 32. Users can customize their profile by selecting from a list of drop-down menus, including, *inter alia*, their age, height, weight, body type, and preferred sexual position. Am. Compl. ¶ 32.

The app's user-interface presents each user with a scroll of thumbnails of compatible profiles. Am. Compl. ¶ 31. Matches are generated by Grindr's algorithmic sorting and filtering software and are based on sexual preferences – as captured by the user's profile – and location. Am. Compl. ¶¶ 31, 53. Grindr accesses a user's location by accessing the latitude and longitude of his mobile device. Am. Compl. ¶ 24. Once two users match, the app allows them to send direct messages. Am. Compl. ¶ 31. Users can also generate and share a map of their location, based on the geolocational data collected by the app. Am. Compl. ¶ 24.

Herrick "matched" with his former boyfriend in June 2015 and deactivated his Grindr account after the relationship became exclusive in November 2015. Am. Compl. ¶ 48. At some

unspecified time, the two parted ways, apparently on bad terms. Beginning in October 2016, Herrick's former boyfriend began impersonating Herrick on Grindr. Am. Compl. ¶ 49. The impersonating profiles suggest that Herrick is interested in "serious kink and many fantasy scenes," hardcore and unprotected group sex, and "hosting" – that is looking for partners to meet him at his location. Am. Compl. ¶ 50. Herrick alleges that "approximately 1100" users responded to the impersonating profiles from October 2016 through the end of March 2017. Am. Compl. ¶ 49; *see also* Am. Compl. ¶¶ 54-62 (describing interactions with numerous men responding to the impersonating profiles at Herrick's home and work). Grindr's direct messaging feature was used to facilitate the scheme. Users were transmitted maps of Herrick's location, Am. Compl. ¶ 52, and some of the men were told to expect that Herrick would resist their approach, which they were told was part of a rape-fantasy or role play, Am. Compl. ¶ 62. Herrick also alleges that Grindr's geolocation functionality directed some of these users to his home and work (even though the app is no longer installed on his phone).[2] Am. Compl. ¶ 52. Herrick and others have reported the impersonating accounts to Grindr approximately 100 times, but Grindr has not responded, other than to send an automated, form response. Am. Compl. ¶ 71.

The Amended Complaint alleges that the design of the Grindr app has enabled this campaign of harassment. More specifically, Herrick alleges that Grindr does not incorporate certain safety features that could prevent impersonating profiles.[3] Herrick alleges that Grindr

---

[2]        This allegation contradicts Herrick's explanation of the scheme at oral argument in respect of his motion for a temporary restraining order. At that hearing, counsel agreed that Grindr does not have Herrick's location, because the app is not installed on his phone, and that users responding to the fake profiles learn of Herrick's location through direct messages from Herrick's former boyfriend (masquerading as Herrick). *See* Declaration of Jacquelyn Schell ("Schell Declr") (Dkt. 43) Ex. B ("TRO Hr'g Tr.") at 8:1-5.

[3]        According to the Amended Complaint, similar apps are able to remove offensive content within 24 hours and can more effectively block users from creating new accounts. Am. Compl. ¶ 45.

does not use "proven and common image recognition or duplicate-detection software," which could be used to search for profiles using Herrick's picture.  Am. Compl. ¶ 79; *see also* Am. Compl. ¶ 84 (Grindr does not use "PhotoDNA technology" to identify unauthorized photographs).  Grindr does not run keyword searches on direct messages sent through the app.  Am. Compl. ¶¶ 80, 83.  Grindr does not have the ability to search for IP addresses, MAC addresses, and ICC numbers or block the use of spoofing, proxies, and virtual private networks (VPNs), all of which might prevent new impersonating accounts.  Am. Compl. ¶ 82.  And Grindr could use a technique called "geofencing" to determine when an impersonating account is associated either with Herrick's address or the address of his former boyfriend.  Am. Compl. ¶ 85.[4]

According to Herrick, Grindr is on notice of the potential for the app to be misused and nonetheless failed to warn users (including Herrick) of this risk:  "Grindr neither warned users of this location exposure vulnerability, nor that Grindr could be used to direct scores of potentially dangerous individuals to their workplace and home."  Am. Compl. ¶ 38.  Herrick alleges, instead, that Grindr's advertising and terms of service led him to believe that Grindr had effective controls in place to prevent harassment.  "At all relevant times, Grindr represented to users in its advertising and community values page that it protects users from 'behaviors that endanger them.'"  Am. Compl. ¶ 40; *see also* Am. Compl. ¶ 41 (Grindr's website states that "[i]n order for everyone to have the best time possible, we have a system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about.").  Grindr's terms of service (the "Terms of Service") also require

---

[4]       According to the Amended Complaint, Grindr has told Herrick that it can block profiles or Grindr users only if Herrick reports them individually.  Am. Compl. ¶ 87.

users to agree that they will not engage in a list of prohibited behaviors, including: using Grindr to "'stalk,' harass[,] abuse, defame, threaten or defraud other Users"; "impersonat[ing] any person or entity"; or posting "material which a reasonable person could deem to be objectionable . . . , offensive, obscene, indecent, pornographic, harassing, threatening, . . . , intentionally misleading, false, or otherwise inappropriate." Am. Compl. ¶ 42. The Terms of Service warn that Grindr may delete submissions, ban accounts, or terminate access to the app for violations of these policies. Am. Compl. ¶ 42.

Herrick filed suit in state court on January 27, 2017. Not. of Removal (Dkt. 1) ¶ 3. The original complaint included causes of action for negligence, deceptive business practices and false advertising, intentional and negligent infliction of emotional distress, failure to warn, and negligent misrepresentation. *See generally* Not. of Removal Ex. A. Although the state court entered an *ex parte* temporary restraining order against Grindr on January 27, 2017, Am. Compl. ¶ 75, Grindr removed the case to this Court on February 8, 2017. *See* Not. of Removal.

The Court denied Herrick's motion for an extension of the state court's temporary restraining order on February 22, 2017. *Herrick v. Grindr, LLC*, No. 17-CV-932 (VEC), 2017 WL 744605 (S.D.N.Y. Feb. 24, 2017) ("*TRO Op.*"). The Court concluded that each of the claims in the original complaint was either barred by Section 230 of the Communications Decency Act or failed on its merits. To the extent Grindr has a role in creating the impersonating profiles, the Court found that it is through "neutral assistance" – functions which are available to all users and not tortious in their own right – rather than in creating the content that has caused Herrick's injury. *Id.* at *4. Because Herrick's claims are premised on Grindr's failure to monitor and remove content it did not create, the Court found that Herrick's claims were likely to be barred by the CDA. *Id.* Moreover, the Court concluded that Herrick's claims for deceptive practices, false advertising, and misrepresentation were unlikely to succeed because the causal

nexus between Grindr's representations to Herrick in 2011 and the harassment Herrick suffered in 2016 and 2017 is too attenuated to state a claim. *Id.* at *5.

Herrick filed an amended complaint on March 31, 2017, doubling down on his theory that Grindr is responsible for the impersonating profiles. The Amended Complaint alleges that Grindr is responsible for the impersonating profiles because it designed an app that is easily manipulated and misused and because it has not taken adequate steps to stop the impersonating profiles. In addition to the claims raised in the original complaint, the Amended Complaint alleges causes of action for products liability (causes of action I, II, and III), and negligent design (cause of action IV). Herrick has also expanded on his theory that Grindr's advertising and terms of service are misleading, pleading new claims for promissory estoppel and fraud (causes of action VIII and IX). Finally, Herrick has added a claim for copyright infringement, based on the use of his photograph in many of the impersonating profiles (cause of action VII).

Defendants have moved to dismiss. Grindr argues that all of Herrick's claims (with the exception of his copyright claim) are barred by the CDA because Herrick's former boyfriend created the impersonating profiles; not Grindr. Grindr argues that the CDA also bars any claim based on its failure to more effectively search for and to remove the impersonating profiles, or to block the former boyfriend from creating new ones, because these claims treat Grindr as responsible for the false content itself. Herrick's misrepresentation-based claims fail, according to Grindr, because he has not identified any statement by Grindr in which it committed to remove impersonating content, and because Grindr's statements in 2011 are too attenuated from Herrick's injury in 2016 and 2017. KL Grindr and Grindr Holdings have joined in the motion to dismiss and also move to dismiss on personal jurisdiction grounds because the Amended Complaint does not allege any suit-related contacts with this forum by either entity. *See* Dkts. 47, 49, and 50.

**DISCUSSION**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). In reviewing a Rule 12(b)(6) motion to dismiss, courts "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (quoting *Litwin v. Blackstone Grp., LP*, 634 F.3d 707, 715 (2d Cir. 2011)). Nonetheless, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 544). "Plausibility" is not certainty. *Iqbal* does not require the complaint to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 360 (2d Cir. 2013). But "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Brown v. Daikin Am. Inc.,* 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Twombly,* 550 U.S. at 555) (other internal quotations marks and citations omitted).[5]

1. **Products Liability and Negligent Design and Failure to Warn**

---

[5]   Because each of Herrick's claims fails for the reasons given below, the Court does not address personal jurisdiction over KL Grindr and Grindr Holdings. *See Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017) ("In cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants." (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012))). The Court notes, however, that the Amended Complaint contains no factual allegations whatsoever against either KL Grindr or Grindr Holdings and Herrick appears to acknowledge that he has engaged in group pleading. *See* Opp'n (Dkt. 54) at 49 (The amended complaint "clearly identifies the defined term 'Defendant' as collectively owning, maintaining, and controlling the weaponized product. It is apparent from the assertion that all three entities are responsible for the ownership, maintenance and control of the product that Plaintiff's allegations apply fully to each Defendant.").

Grindr argues that Section 230 of the CDA bars Herrick's products liability and negligent design and failure to warn claims. Herrick alleges in these claims that Grindr's "server-side software," Am. Compl. ¶ 112, is defectively and negligently designed and manufactured because it does not incorporate "widely used, proven and common software to flag and detect abusive accounts," which "resulted in Grindr selecting and directing an incessant stream [of] men demanding sex from [Herrick]," Am. Compl. ¶ 109. Herrick's failure to warn claim – also pleaded as products liability and negligence – is based on Grindr's failure to warn that the app can be used as a tool for harassment and that Grindr has limited ability to stop abuse. Am. Compl. ¶¶ 117, 129. The Court agrees with Grindr. To the extent Herrick has identified a defect in Grindr's design or manufacture or a failure to warn, it is inextricably related to Grindr's role in editing or removing offensive content – precisely the role for which Section 230 provides immunity.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). There are three elements to a claim of immunity under Section 230(c). The defendant must show that: "(1) [it] 'is a provider . . . of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat the defendant as the publisher or speaker of that information.'" *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016)) (additional citations omitted). The term "publisher" is borrowed from defamation law (though Section 230 does not apply to defamation claims exclusively). *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997).

Although Herrick contends that Grindr is not an "interactive computer service" (or an "ICS"), the Court finds that there is no plausible basis to argue that it is not. An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." 47 U.S.C. § 230(f)(2). Courts applying this definition have had no trouble concluding that social networking sites like Facebook.com, and online matching services like Roommates.com and Matchmaker.com, are "interactive computer services." *See Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156-57 (E.D.N.Y. 2017); *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). Like those services, Grindr provides its subscribers with access to a common server. *See Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 323 (D.N.J. 2015) (Grindr is an ICS because "its website gives subscribers access to a common server for purposes of social networking."). Herrick has not identified any legally significant distinction between a social networking platform accessed through a website, such as Facebook, and a social-networking platform accessed through a smart phone app, such as Grindr. In either case, the platform connects users to a central server and to each other.[6]

The second element of immunity under Section 230(c) is satisfied because Herrick's design and manufacturing defect, negligent design, and failure to warn claims are all based on content provided by another user – Herrick's former boyfriend. An ICS is not the creator of offensive content unless it contributes to the "development of what [makes] the content unlawful." *LeadClick Media, LLC*, 838 F.3d at 174 (quoting *FTC v. Accusearch Inc.*, 570 F.3d

---

[6] Herrick's allegation that it is Grindr's "server-side" software that is defective is in tension with his argument that Grindr is not an ICS. Moreover, Herrick's counsel conceded that Grindr is an ICS at oral argument on Herrick's motion to renew the TRO. *See* TRO Hr'g Tr. at 25:14-18.

1187, 1201 (10th Cir. 2009)).  An ICS may not be held liable for so-called "neutral assistance,"

*id.* at 176, or tools and functionality that are available equally to bad actors and the app's

intended users, *Roommates.Com, LLC*, 521 F.3d at 1169.  To the extent Grindr contributes to the

impersonating profiles, it is through such "neutral assistance."  Categorization features, such as

Grindr's drop-down menu for "preferred sexual position," constitute quintessential "neutral

assistance."  *See Carafano*, 339 F.3d at 1124 ("[T]he fact that Matchmaker classifies user

characteristics into discrete categories and collects responses to specific essay questions does not

transform Matchmaker into a "developer" of the "underlying misinformation.");

*Roommates.com*, 521 F.3d at 1169 ("A dating website that requires users to enter their sex, race,

religion and marital status through drop-down menus, and that provides means for users to

search along the same lines, retains its CDA immunity insofar as it does not contribute to any

alleged illegality.").   These features are available equally to all users and are not intrinsically

offensive or unlawful.  Grindr's algorithmic filtering, aggregation, and display functions are

similar.  *See Dyroff v. Ultimate Software Grp., Inc*., No. 17-CV-5359-LB, 2017 WL 5665670, at

*10 (N.D. Cal. Nov. 26, 2017) (explaining that it is "the users' voluntary inputs that create the

content . . . not [defendant's] proprietary algorithms," and relying on *Carafano* and

*Roommates.com*); *Roommates.com, LLC*, 521 F.3d at 1169, 1172 (explaining that allowing users

to sort dating profiles based on user inputs does not constitute content "development" for

purposes of the CDA); *see also O'Kroley v. Fastcase Inc.*, No. 3-13-0780, 2014 WL 2881526, at

*1-2 (M.D. Tenn. June 25, 2014) (finding that providing search returns based on automated

algorithms and user inputs does not constitute creating content).  They apply equally to

legitimate and improper inputs, and they constitute "neutral assistance."

 Relying on *Roommates.com*, Herrick argues that Grindr contributes to what makes the

impersonating profiles offensive.  *See* Opp'n at 20-21.  The Court has previously rejected this

argument.  *See TRO Op.*, 2017 WL 744605, at *4.  In *Roommates.com*, the Ninth Circuit

concluded that a website connecting potential roommates was potentially liable for violations of

the Fair Housing Act.  521 F.3d at 1166-67.  The website in question required users to respond to

questions regarding protected personal characteristics and then used the answers to those

improper questions to determine which users learned about what available housing.  "[T]he act

of hiding certain listings [was] itself unlawful under the Fair Housing Act," *id.* at 1169, as were

the underlying questions themselves, *id.* at 1164-65; *see also id.* at 1167 ("Roommate's search

engine . . . differs materially from generic search engines such as Google, Yahoo! and MSN Live

Search, in that Roommate designed its system to use allegedly unlawful criteria so as to limit the

results of each search, and to force users to participate in its discriminatory process.").  There is

nothing similarly illegal about Grindr's drop-down menus, its geolocational function, or its

sorting, aggregation, and display functions.  *See Saponaro*, 93 F. Supp. 3d at 324 (rejecting

analogy between Grindr and the offensive questions and filtering at issue in *Roommates.com*);

*see also Dyroff*, 2017 WL 5665670 at *11 (explaining that algorithmic sorting and filtering tools

are "neutral assistance" and rejecting an analogy to the "substantial and affirmative conduct . . .

promoting the use of such tools for unlawful purposes" in *Roommates.com* (quoting

*Roommates.com*, 521 F.3d at 1174 n.37)).

 The third element of immunity under Section 230(c) is satisfied because the Amended

Complaint seeks to hold Grindr liable as the "publisher" or "speaker" of the impersonating

profiles.  "Publication" describes the choice by an author to include information, the

communication or transmission of information, and the failure to remove information

communicated by another party.  As the Ninth Circuit has explained, it includes "reviewing,

editing, and deciding whether to publish or to withdraw from publication third-party content."

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).  Courts have interpreted

"publication" capaciously to reach claims that, although pleaded to avoid the CDA, "implicitly require recourse to that content [posted by a third party] to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [content]." *Cohen*, 252 F. Supp. 3d at 156. "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Id.* (quoting *Leadclick Media, LLC*, 838 F.3d at 175) (additional citations omitted); *see also Roommates.com, LLC*, 521 F.3d at 1170-71 (explaining that "publishing" includes "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online"); *see also Backpage.com, LLC*, 817 F.3d at 19-20 (explaining that plaintiffs' claims were unlikely to succeed because "there would be no harm to [the plaintiffs] but for the content of the postings").

Herrick's claim that Grindr is liable because it failed to incorporate adequate protections against impersonating or fake accounts is just another way of asserting that Grindr is liable because it fails to police and remove impersonating content. The Fifth Circuit rejected a similar theory in *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008). In *Doe*, a minor was sexually assaulted by an adult she met through the MySpace platform. The child's guardians sued, alleging that MySpace had inadequate features in place to prevent communications between children and adults. 528 F.3d at 416. The Fifth Circuit rejected Doe's theory. It explained that a claim based on MySpace's failure to implement additional safety features was "merely another way of claiming that MySpace was liable for publishing the communications" themselves. *Id.* at 420; *see also Gibson v. Craigslist, Inc.*, No. 08-CV-7735 (RMB), 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009) (rejecting claim that the defendant failed to "monitor, police, maintain and properly supervise the goods and services sold on its . . . website," partially relying on *MySpace, Inc.*). As in *Doe*, Herrick's claims depend on a connection between the safety features

Grindr allegedly is missing and Grindr's failure to remove the impersonating profiles. The existence *vel non* of safety features is meaningless in a vacuum, and their existence is only relevant to Herrick's injury to the extent that such features would make it more difficult for his former boyfriend to post impersonating profiles or make it easier for Grindr to remove them.

That Herrick has based his claim on the design of Grindr's "server-side software" does not change the result. To the contrary, it brings his theory closer to the facts in *Backpage.com*. In *Backpage.com*, victims of sex trafficking alleged that the "structure and operation" of the Backpage.com website facilitated use of the site as a bazaar for illegal sex services. 817 F.3d at 21. Among other things, Backpage.com did not verify phone numbers or limit posts after use of forbidden terms, and the website permitted "e-mail anonymiziation, forwarding and auto-reply" – all features that made it particularly well-suited to illicit use. *Id.* The First Circuit explained that these features, and the lack of safety features, reflected "choices about what content can appear on the website and in what form" and therefore were the sort of "editorial choices that fall within the purview of traditional publisher functions." *Id.*; *see also Universal Comm'cn Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007) ("[Plaintiff] is ultimately alleging that the construct and operation of [Defendant's] web sites contributed to the proliferation of misinformation; [Defendant's] decision not to reduce misinformation by changing its web site policies was as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting."). The Court finds the First Circuit's reasoning persuasive and applicable to Herrick's design and manufacturing defect and negligent design claims. Like the claims in *Backpage.com*, Herrick's claims are based on features or missing safety features, such as Grindr's geolocational tools and Grindr's inability to block profiles based on ICC numbers and MAC address or to search for profiles by photograph. As in *Backpage.com*, these features (or the lack of additional capabilities) are only relevant to Herrick's injury because they bear on

Grindr's ability to search for and remove content posted to the app – exactly the sort of "editorial choices" that are a function of being a publisher.

Herrick's failure to warn claims (causes of action III and V) also require treating Grindr as the "publisher" of the impersonating profiles.[7] A duty to warn claim "implicitly require[s] recourse to the impersonating profiles themselves and the traditional function of a publisher to supervise content. *See Cohen*, 252 F. Supp. 3d at 156. The warning proposed by Herrick is only necessary because Grindr (as publisher) does not police or remove objectionable content. Although it is indirect, liability under such a theory nevertheless depends on Grindr's decision to publish the impersonating profiles without reviewing them first. Alternatively, the Court is persuaded that requiring Grindr to post a warning at the outset or along with each profile is no different than requiring Grindr to edit the third-party content itself. *See McDonald v. LG Elec. USA, Inc.,* 219 F. Supp. 3d 533, 538-39 (D. Md. 2016) (rejecting on CDA grounds an "independent duty to speak alongside content posted by third parties"). The fact that the proposed warning would potentially operate at a general level, rather than be appended to specific posts, is not significant. The CDA applies at both the individual and systemic or architectural level. *See Lycos, Inc*., 478 F.3d at 422.

Herrick argues that there is an exception to Section 230(c) – or at least "heightened accountability"– when an ICS is on notice that its service is being used to commit a crime or sexual violence. Opp'n at 21. Herrick's argument relies entirely upon *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), and therefore a description of the facts of that case is in order. The ICS in *Internet Brands* provided a networking website for models and aspiring models. *Id.*

---

[7]     Although Plaintiff asserts two claims, New York law does not distinguish between negligent failure to warn and failure to warn under a products liability theory. There is only one cause of action for failure to warn. *See In re N.Y. City Asbestos Litig.*, 27 N.Y.3d 765, 787 (2016).

at 848.  After viewing Doe's profile on the website, two individuals contacted her, ostensibly for

a modeling shoot.  *Id.* at 849.  The modeling shoot was fake, and the two men raped Doe and

recorded the act for sale as pornography.  *Id.* at 849.  Doe sued the networking website.  She

alleged that it knew that the two men had previously used the site to scout for victims but failed

to warn users of the risk.  *Id.* at 849.  The Ninth Circuit held that the CDA did not provide

immunity against plaintiff's negligent failure to warn claim.  In reaching that conclusion, the

Court noted that the two men did not post any content to the website, the defendant did not learn

of the scheme through its oversight of the website, and the defendant's monitoring of postings on

its site was not at issue.  *Id.* at 851.

  *Internet Brands* is best read as holding that the CDA does not immunize an ICS from a

failure to warn claim when the alleged duty to warn arises from something other than user-

generated content.  The bad actors in *Internet Brands* did not post any content to the website, and

they contacted Doe offline.  To the extent any web content was involved, it was Doe's own

profile, which she did not allege to be tortious.  *Id.* at 851; *see also id.* at 852 ("[T]here [was] []

no allegation that [the defendant] transmitted any potentially harmful messages between [] Doe

and the [two men].").  Finally, knowledge of the misuse of the site arose not from any content on

the site but from an outside source.  *Id.* at 849.

  By contrast, the proposed warning in this case would be about user-generated content

itself – the impersonating profiles or the risk that Grindr could be used to post impersonating or

false profiles.  Unlike in *Internet Brands*, Herrick's failure-to-warn claim depends on a close

connection between the proposed warning and user-generated content.  Additionally, Herrick's

proposed warning is about Grindr's publishing functions.  He proposes that Grindr should warn

users that the app can be used to impersonate or harass individuals, that the "features on the

interface to report abusive accounts are merely decorative" and that Grindr "shun[s] the basic

15

technology widely used in their industry to prevent or stop known abuse."[8]  Am. Compl. ¶ 117.

Because Herrick's proposed warning is about user-generated content and goes to Grindr's

publishing functions, *Internet Brands* does not apply.[9]

## 2. Negligence, Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress

The CDA also bars Herrick's claims for negligence (cause of action VI),[10] intentional

infliction of emotional distress ("IIED") (cause of action XII), and negligent infliction of

emotional distress ("NIED") (cause of action XIII).  These claims are based on Grindr's role in

matching users, through its filtering and aggregation algorithm, and its allegedly inadequate

response to Herrick's complaints.  *See* Am. Compl. ¶¶ 136, 138 ("Grindr negligently failed to

investigate and respond to [Herrick's] reports of abuse, impersonation, and stalking."), 189

(Grindr improperly "handled" Herrick's "pleas for it to control its product and disable the

accounts used to destroy his life"), 192 (Grindr "directly caused" Herrick's injury by "select[ing]

and direct[ing] hundreds and hundreds of visitors to Plaintiff."), 198 (Grindr ignored "numerous

complaints and requests for [it] to control its product and disable the [impersonating] accounts

being used to destroy [Herrick's] life.").  To the extent these claims are premised on Grindr's

---

[8]      As the Court has explained, *supra*, a warning about third-party content is a form of editing, just as much as a disclaimer printed at the top of a page of classified ads in a newspaper would be.  To the extent *Internet Brands* can be read to hold that, notwithstanding the CDA, an ICS could be required to publish a warning about the potential for misuse of content posted to its site, this Court respectfully disagrees.

[9]      The Court does not address Grindr's argument that it is not a "product" for purposes of products liability. It appears to be common ground between the parties that strict products liability may apply to standardized and mass-downloaded software but does not apply to information or "expressive" content.  *See* Opp'n at 14; Reply Br. (Dkt. 58) at 8 (assuming that standardized software is a product); *see also Simulados Software, Ltd. v. Photon Infotech Private Ltd.*, 40 F. Supp. 3d 1191, 1200-01 (N.D. Cal. 2014); *Rottner v. AVG Tech. USA, Inc.*, 943 F. Supp. 2d 222, 230 (D. Mass. 2013); *cf. Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 324-25 (S.D.N.Y. 2006) (applying the same distinction to the "intangible" information contained in a book and the book's "tangible" form). As the Court has explained, Herrick's real complaint is with the impersonating profiles, which are expressive content that was not created by Grindr.  To the extent Herrick takes issue with Grindr's software architecture and features, the CDA applies and the Court need not address whether those aspects of the software are "products" for purposes of strict products liability.

[10]      This negligence claim is distinct from Herrick's negligence claims for defective design and failure to warn.

"neutral assistance" and software architecture, they fail for the reasons already given. *See supra* at 9-10, 13; *Backpage.com*, 817 F.3d at 21. To the extent these claims are based on Grindr's alleged obligation to police and remove content, they are also barred by the CDA. As the Court has explained previously, allegations premised on an ICS's failure to "block, screen, or otherwise prevent the dissemination of a third party's content," seek to hold the defendant liable in its capacity as a "publisher." *TRO Op.*, 2017 WL 744605, at *4 (quoting *Gibson*, 2009 WL 1704355, at *4); *Barnes*, 570 F.3d at 1102. There is no basis to treat Grindr differently simply because it operates a smart phone app rather than a website. *See Saponaro*, 93 F. Supp. 3d at 323) (rejecting claims based on Grindr's failure to search for and remove underage users).

Even if the CDA did not bar these claims, Herrick has not alleged plausibly the necessary elements of intentional infliction of emotional distress. New York follows the Restatement (Second) of Torts's approach to intentional infliction of emotional distress.[11] *See Coraggio v. Time Inc. Magazine Co.*, No. 94-CV-5429 (MBM), 1995 WL 242047, at *6 (S.D.N.Y. April 26, 1995). In order to state a claim, a plaintiff must allege "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another." *Fischer v. Maloney*, 43 N.Y.2d 553, 557 (1978) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (AM. LAW INST. 1965)). "The element of outrageous conduct has been described as 'rigorous, and difficult to satisfy,'" *Taggart v. Costabile*, 14 N.Y.S.3d 388, 394 (2d Dep't 2015) (quoting W. Page Keeton

---

[11] The Terms of Service include a choice of law provision selecting for California law. *See* Schell Declr. Ex. A § 21.2. That provision applies to "Covered Dispute Matters," which is defined to include "any dispute that has arisen or may arise between us relating in any way to Your use of or access to [Grindr], . . . , or otherwise relating to Grindr in any way." Schell Declr. Ex. A. § 21.1. Nonetheless, both parties cite and apply New York law and the Court will do the same. *See Star Ins. Co. v. A&J Constr. of N.Y., Inc.*, No. 15-CV-8789 (CS), 2017 WL 6568061, at *4 (S.D.N.Y. Dec. 22, 2017) ("[E]ven when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law." (quoting *Cargill, Inc. v. Charles Kowsky Res., Inc.,* 949 F.2d 51, 55 (2d Cir. 1991))). The Court notes, however, that the elements of certain of Herrick's causes of action differ meaningfully under California law, and it is at least curious that neither party saw fit to raise this issue. The Terms of Service also include an arbitration provision that is potentially applicable to Herrick's claims. *See* Schell Declr. Ex A § 21.3.

et al., PROSSER AND KEETON ON THE LAW OF TORTS § 12 at 61 (5th ed. 1984)), and Herrick has

not met this high bar.  While the creation of the impersonating profiles may be sufficiently

extreme and outrageous, Grindr did not create the profiles.  *See supra* at 9-11.  "Ordinarily, the

failure to respond appropriately to complaints of harassment, on its own, will not be sufficiently

egregious – 'outrageous' – to amount to intentional infliction of emotional distress under New

York law."  *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 161 (2d Cir. 2014); *see also Taggart*,

14 N.Y.S.3d at 394 (landlord's failure to prevent a tenant from burglarizing other tenants is not

sufficiently extreme and outrageous).  For example, in *Turley*, the defendant, in addition to

ignoring ongoing harassment, actively impeded investigations into the harassment and appeared

to encourage it further.  774 F.3d at 161.  Grindr's role in the impersonating profiles is not

equivalent.  Grindr's involvement is limited to "neutral assistance" – which it provides to all

users – and its failure to affirmatively intervene and stop the impersonating profiles.

Additionally, Grindr's conduct was not lacking in any reasonable justification.  *See Martin v.*

*Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) ("The conduct must also be intentionally

directed at the plaintiff and lack any reasonable justification.").  Even assuming Section 230 did

not apply, Grindr had a good faith and reasonable basis to believe (correctly, it turns out) that it

was under no obligation to search for and remove the impersonating profiles.  The Court finds

that Herrick has not plausibly alleged sufficiently outrageous and extreme behavior by Grindr to

constitute intentional infliction of emotional distress.[12]

---

[12]     "Extreme and outrageous" conduct is not a necessary element of a claim for negligent infliction of emotional distress.  *See Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 411 (S.D.N.Y. 2015).  Rather, negligent infliction of emotional distress requires a showing of a duty owed to the plaintiff, negligence resulting directly in emotional harm, and a showing the claim possesses "some guarantee of genuineness." *Id.* (quoting *Taggart*, 14 N.Y.S.3d at 252).  The duty owed must be specific to the plaintiff.  *Id.*  The Court need not address whether these elements are satisfied because the duty Herrick seeks to impose is barred by the CDA.  *See supra* at 16-17.

### 3.    Fraud, Negligent Misrepresentation, Promissory Estoppel, and Deceptive Practices

Next are Herrick's misrepresentation claims.  Although Herrick alleges separate claims for promissory estoppel, fraud, negligent misrepresentation, deceptive practices, and false advertising, these claims share a common theory that Grindr misled Herrick (as a user) into believing it had a system in place to monitor for impermissible content and the tools to remove such content.  Grindr moves to dismiss on the grounds that the CDA bars these claims and that Herrick has not alleged the essential elements of any of these causes of action.  The Court need not decide whether the CDA applies to claims based on Grindr's own statements because each of these claims is inadequately pleaded.[13]

**Fraud**

Fraud has five elements.  A plaintiff must allege: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).  Unlike Herrick's other causes of action, fraud claims must be pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.  To plead the circumstances constituting fraud with particularity, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

---

[13]    The parties do not address application of the CDA to these causes of action specifically.  In *Barnes*, the Ninth Circuit concluded that Section 230(c) did not bar a promissory estoppel claim based on the defendant's own statements.  *See Barnes*, 570 F.3d at 1108-09.  To the extent liability is premised on Grindr's own statements, Herrick's misrepresentation claims are directed at Grindr's own content, at least in part.  Additionally, these claims do not clearly implicate Grindr's actions as a publisher of user-generated content.  The duty allegedly violated is the duty to speak candidly to one's customers – not to edit and remove content.  On the other hand, the statements at issue describe Grindr's conduct and policies as a publisher and the ultimate injury in this case remains associated with user-generated content.  The statements are false, according to Herrick, because Grindr does not police and remove content.  The Court need not resolve this issue because the claims fail on their merits.

explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).

The Amended Complaint identifies two sets of potentially misleading statements. "At all relevant times," Grindr's community values page has stated that it has a "system of digital and human screening tools to protect our users from actions and behaviors that endanger them and go against what we're about." Am. Compl. ¶¶ 40, 41. The Amended Complaint also quotes from the Terms of Service, which warn users that their content may be deleted and their accounts may be disabled if they violate Grindr's guidelines or the Terms of Service. Am. Compl. ¶ 42. The Court understands Herrick's theory to be that these statements are false because they are implicit representations that Grindr "will take a hard line against anyone who uses Grindr's products in abusive ways," when, in fact, Grindr makes "little to no effort to screen and monitor the activities of its members or to ban abusive accounts." Am. Compl. ¶¶ 43-44; *see also* Opp'n at 31 (the Terms of Service "work to provide users with . . . material representations that Grindr is safe. . . . In fact, Grindr, . . . , has no way of enforcing these provisions . . . .").

The Terms of Service and community values page do not say what Herrick alleges they say. The community values page represents that Grindr has tools to protect users from dangerous "actions and behaviors." It does not represent or imply that Grindr will take a "hard line" against users who post illicit content. The Terms of Service are similar. They reserve Grindr's right to remove illicit content, but they do not represent that Grindr will do so. Put differently, Grindr does not warrant that it *will* remove illicit content; instead, it merely represents that it *may* do so. *See* Am. Compl. ¶ 42; *cf. Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1064 (N.D. Cal. 2016) (rejecting a similar argument that Facebook's terms of service amount to a representation that it will monitor third party content and explaining that the relevant terms of service are intended to impose an obligation on the user, not Facebook). The

other provisions of the Terms of Service identified in the Amended Complaint are agreements by users (not Grindr) to refrain from posting impermissible content. Almost all of these statements begins with the prefatory clause "You will NOT." Am. Compl. ¶ 42; *see e.g. id.* ("You will NOT impersonate any person or entity . . . ."). Other provisions of the Terms of Service are also directly at odds with Herrick's theory. Section 10.4, for example, states that "Grindr has the right, but does not have any obligation, to monitor [user] content for any purpose." Terms of Service § 10.4. Section 12.4 provides that "Grindr assumes no responsibility for actively monitoring User Content for inappropriate content." Terms of Service § 12.4; *see also id.* ("Grindr does not endorse and has no control over the content of User Content submitted by other Users."). Given those disclaimers, it is not plausible that a reasonable person could conclude from the Terms of Service and community values page that Grindr has made any representation regarding its commitment to remove improper content.

For similar reasons, the Court finds that Herrick has not plausibly alleged reasonable reliance on Grindr's alleged misstatements. Reliance is unreasonable as a matter of law where the alleged inference or misrepresentation is contradicted directly by another statement by the defendant. *See Dovitz v. Rare Medium Grp., Inc.,* No. 01-CV-10196 (LLS), 2003 WL 1057426, at *3 (S.D.N.Y. Mar. 10, 2003) (citing *Bonacci v. Lone Star Int'l Energy, Inc.*, No. 98-CV-0634 (HB), 1999 WL 76942, at *2 (S.D.N.Y. Feb. 16, 1999)). A closely related principle is that reliance on an inference drawn from one document is unreasonable when it contradicts a more specific representation in another document. *See Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 334 (S.D.N.Y. 1993). Sections 10.4 and 12.4 of the Terms of Service state explicitly that Grindr is not committing to monitor or remove content posted by users. *See* Terms of Service §§ 10.4 ("Grindr has the right, but does not have any obligation, to monitor [user] content for any purpose."), 12.4 ("Grindr assumes no responsibility for actively

monitoring User Content for inappropriate content. . . . Grindr does not endorse and has no control over the content of User Content submitted by other Users.").  In light of these clear warnings, it was unreasonable for Herrick to rely on the Terms of Service to conclude that Grindr would take a "hard line" against illicit content.  *See* Am. Compl. ¶¶ 43-44.  This is particularly true because the disclaimers are far more specific than the statements in the Terms of Service upon which Herrick relies, and they address specifically Grindr's disavowal of any responsibility to monitor and block content.  Terms of Service §§ 10.4, 12.4.  The community values page is also too general to be reasonably relied upon.  *See Ashland Inc. v. Morgan Stanley & Co., Inc.*, 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) (reliance on vague and indefinite assurances is unreasonable).  The community values page does not specify what it means to have a "system of digital and human screening tools in place," or what "actions and behaviors" the system protects against.  It simply cannot be read to represent that Grindr's tools are effective at blocking "improper" content.

The Amended Complaint also fails to allege that Herrick's injuries were proximately caused by Grindr's alleged misstatements.  A misstatement is a proximate cause of an injury if the "injury 'is the natural and probable consequence of the [] misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'"  *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 447 (S.D.N.Y. 2013) (quoting *Suez Equity Inv'r, L.P. v. Toronto-Dominion Bank*, 205 F.3d 87, 104-05 (2d Cir. 2001)) (additional citations omitted).  "Many considerations enter into the proximate cause inquiry including the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection."  *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 457-58 (S.D.N.Y. 2007) (quoting *First Nationwide*

*Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)) (additional citations omitted and internal quotation marks).

Herrick's injury has only an attenuated connection to his use of the Grindr app and agreement to the Terms of Service.  According to Herrick he joined Grindr in 2011 in reliance on the Terms of Service and community values page; some four years later, in 2015, he met his former boyfriend and de-activated his Grindr account; one year later, in 2016, and after they broke up, his former boyfriend began using Grindr to terrorize him.  Am. Compl. ¶¶ 48-49.  Thus, although Herrick alleges that Grindr's misstatements caused him to join Grindr, he has not been a Grindr user at any point since 2015, including during the events giving rise to this lawsuit.  As the facts of this case illustrate, one does not need to be a Grindr user to be impersonated on Grindr; what happened to Herrick could, unfortunately, have happened to him even if he never saw the Terms of Service and never used Grindr.  At best (for Herrick), his decision to join Grindr in 2011 in reliance on the Terms of Service is a "but-for" cause of his injuries – had he not joined Grindr, Herrick would never have met his former boyfriend – but the Terms of Service and community values page have no other connection to the harassment directed at Herrick in 2016 and 2017.

Herrick has essentially conceded this point.  His brief addresses proximate causation relative to his negligence claims, i.e. his claim that Grindr's features contribute to the impersonating profiles but addresses proximate causation relative to his misrepresentation claims only in passing.  *Compare* Opp'n at 25-26 (arguing that Herrick's injury is a proximate result of Grindr's negligent design of the app), *with* Opp'n at 36 (arguing that causation is adequately alleged as to Herrick's deceptive practices claim by reference to sections of the opposition that do not discuss proximate causation).  Assuming Herrick intended his negligence arguments to apply to his misrepresentation claims, his analogy is unavailing.  There is a critical difference

between Grindr's design of the app and decision not to monitor and remove user-generated content in 2016 and 2017 (which bears directly on Herrick's injury, but is protected by the CDA) and Grindr's long ago, alleged misstatements relative to Herrick's decision to use the Grindr app in the first place.

In sum, the Court finds that Herrick has not plausibly alleged a misstatement, reasonable reliance on that misstatement, or that Grindr's misstatements are a proximate cause of his injury.

**Promissory Estoppel**

Herrick's promissory estoppel claim fails because he has not alleged a sufficiently unambiguous promise by Grindr. There are three elements of a claim for promissory estoppel: "(1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 360-61 (S.D.N.Y. 2017) (quoting *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571, 577 (1st Dep't 2011)). Promissory estoppel is "a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason." *Paxi, LLC v. Shiseido Am. Corp.*, 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009) (quoting *DDCLAB Ltd. v. E.I. DuPont De Nemours and Co.*, No. 03-CV-3654 (GBD), 2005 WL 425495, at *6 (S.D.N.Y. Feb. 18, 2005)).

Herrick contends that the community values page and Terms of Service constitute a promise to monitor and remove content. *See* Am. Compl. ¶ 157 ("Plaintiff and Grindr entered a [sic] clear and unambiguous promise when Plaintiff signed up to use the software products."). For the same reasons that Grindr's statements are not false or misleading, they also do not constitute a "clear and unambiguous promise" to search for and remove offensive content. *Cf. Green v. Am. Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) (rejecting argument that AOL's terms of service amounted to a promise to police offensive content). Herrick's reliance on

Grindr's statements was also unreasonable in light of the clear disclaimer in the Terms of Service of any obligation to police user content. *See supra* at 21-22; Terms of Service §§ 10.4, 12.4; *see also Prestige Foods, Inc. v. Whale Secs. Co., L.P.*, 663 N.Y.S.2d 14, 15 (1st Dep't 1997) (Promissory estoppel claim was "properly dismissed as 'flatly contradicted' by the letter agreements in issue . . . .").

**Negligent Misrepresentation**

"To allege a claim for negligent misrepresentation a plaintiff must assert '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914 (NSR), 2017 WL 4277187, at *4 (S.D.N.Y. Sept. 25, 2017) (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012)). Proximate causation is an element of a claim for negligent misrepresentation. *See Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002). For the reasons already given, Herrick has not adequately alleged a false or misleading statement, that his reliance was reasonable in the face of Grindr's more specific disclaimers of a duty to monitor user content, or that Grindr's alleged misrepresentations were a proximate cause of his injury.

The Amended Complaint also fails to allege a sufficient "special relationship." There are three factors relevant to whether a special relationship exists: whether the defendants "held or appeared to hold unique or special expertise," whether there is a special relationship of "trust or confidence," and whether there are allegations that the "speaker was aware of the use to which the information would be put and supplied it for that purpose." *Izquierdo v. Mondelez Int'l Inc.*,

No. 16-CV-4697 (CM), 2016 WL 6459832, at *8 (S.D.N.Y. Oct. 26, 2016). Herrick does not claim a special relationship of trust or confidence and the relationship between the parties was typical of an arm's length transaction. *See Beckman v. Match.com, LLC*, No. 13-CV-97 JCM, 2017 WL 1304288, at *3-4 (D. Nev. Mar. 10, 2017) (applying Nevada law and holding there is no special relationship between Match.com and its users); *see also Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 539 (S.D.N.Y. 2007) ("Courts have routinely held that an arms-length commercial transaction, without more, does not give rise to a special duty to speak with care."). Where New York courts have found a representation of special expertise, they have done so based on detailed statements or professional expertise. *See e.g.*, *Eidelman*, 2017 WL 4277187, at *5 (representations that dermatologists recommended a product and that it was "clinically proven" suggest special expertise); *Fallman v. Hotel Insider Ltd.*, No. 14-CV-10140 (SAS), 2016 WL 316378, at *9 (S.D.N.Y. Jan. 15, 2016) ("This standard has been applied to professionals such as lawyers and doctors, and technical experts such as engineers."). The fact that Grindr has knowledge of its own internal monitoring practices is not enough to establish special expertise. *See KCG Am. LLC v. Brazilmed, LLC*, No. 15-CV-4600 (AT), 2016 WL 900396, at *7 (S.D.N.Y. Feb. 26, 2016) ("Allegations that a party has 'superior knowledge about the particulars of his own business practices is insufficient to sustain' a negligent misrepresentation claim." (quoting *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235-36 (1st Dep't 2011))). Additionally, there are no factual allegations in the Amended Complaint to suggest Grindr was aware that Herrick intended to rely on the community values page or the Terms of Service. The disclaimers in the Terms of Service suggest the opposite; that any representation of an ability to police and monitor content should not be relied upon. *See* Terms of Service §§ 10.4, 12.4. In short, the Court finds that Herrick has not sufficiently alleged a "special relationship."

**Deceptive Practices and False Advertising**

Herrick's deceptive business practices and false advertising claims fail because he has not plausibly alleged that a reasonable consumer would be misled by Grindr's statements. *See Merck Eprova AG v. Brookstone Pharm., LLC,* 920 F. Supp. 2d 404, 425 (S.D.N.Y. 2013) (to allege a deceptive business practice under Section 349 of New York's General Business Law, a plaintiff must allege: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000))). Herrick's false advertising claim fails for the additional reason that he has not alleged reasonable reliance. *See Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005) (elements of false advertising under General Business Law Section 350 are the same as under Section 349, but plaintiff must also allege reliance).[14]

### 4.      Copyright Infringement

Last is Herrick's claim for copyright infringement. The Amended Complaint alleges that some of the impersonating profiles use photos of Herrick for which he has filed copyright registration applications. Am. Compl. ¶¶ 147, 150. This claim is inadequately pleaded. In order to plead copyright infringement a plaintiff must allege "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." *Zuma Press, Inc. v. Getty Images (US), Inc.*, No. 16-CV-6110 (AKH), 2017 WL 2829517, at *2 (S.D.N.Y. June 29, 2017) (quoting *Kelly v. L.L.*

---

[14]        The New York Court of Appeals has not decided whether proximate cause is an element of a deceptive practices claim under General Business Law § 349 or a false advertising claim under General Business Law § 350. *See Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 207 (2004). Because Herrick's deceptive practices and false advertising claims fail for other reasons, the Court need not address whether he has adequately alleged causation for purposes of Section 349.

*Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992)). Herrick has filed four applications for registration of copyrights, but he concedes that the Copyright Office has not acted upon his applications. *See* Opp'n at 42 (arguing that "[a]llowing Plaintiff's claims to proceed pending registration will best serve the principles of copyright law"). There is an "'overwhelming' consensus in the Southern District of New York that under the registration approach, a pending 'application for copyright registration cannot sustain a claim for infringement prior to its approval or rejection by the Copyright Office.'" *Zuma Press, Inc.*, 2017 WL 2829517, at *4 (quoting *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13-CV-0275 (KBF)(JCF), 2014 WL 2465273, at *4 n.1 (S.D.N.Y. May 30, 2014)). Under the circumstances, the proper course is to dismiss Herrick's complaint without prejudice so that he can amend and allege that the Copyright Office has either granted or denied his applications. *See LLM Bar Exam, LLC v. Barbri, Inc.*, No. 16-CV-3770 (KPF), 2017 WL 4280952, at *31 (S.D.N.Y. Sept. 25, 2017) ("[c]ourts within this Circuit have consistently held that failing to meet a statutory precondition to suit precludes adjudication on the merits and warrants dismissal without prejudice."[15] (quoting *Senisi v. John Wiley & Sons, Inc.*, No. 13-CV-3314 (LTS), 2016 WL 1045560, at *3 (S.D.N.Y. Mar. 15, 2016))).

**5.     Leave to Amend**

This is Herrick's second attempt to state a claim against Grindr, and he has not attached a proposed second amended complaint. Under the circumstances, Herrick's bare request for leave to amend is inadequate. *See Gazzola v. Cty. of Nassau*, No. 16-CV-0909 (ADS), 2016 WL

---

[15]     Herrick has not responded to Grindr's other arguments that his copyright claim fails because he has not alleged a theory of infringement against Grindr or when and how Grindr infringed his copyrights. *See* Reply Br. (Dkt. 58) at 15 (noting Herrick's failure to respond). Websites and social networking sites are not liable *per se* for infringing content posted by their users. *See BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 354 (S.D.N.Y. 2014) ("The fact that Defendants own the sites, standing alone, does not create copyright liability for the actions of third parties."). Herrick is forewarned that any amendment to his copyright claims must address these deficiencies.

6068138, at *9 (E.D.N.Y. Oct. 13, 2016) ("Courts have held that a 'bare request to amend a pleading' contained in a brief, which does not also attach the proposed amended pleading, is improper under [Rule] 15."); *see also Copeland ex. rel. NBTY, Inc. v. Rudolph*, 160 F. App'x 56, 59 (2d Cir. 2005) (conclusory requests for leave to amend are insufficient under Rule 15). Accordingly, with the exception of Herrick's copyright claim, the Court DENIES leave to amend.

**CONCLUSION**

With the exception of Herrick's seventh cause of action for copyright infringement, the Defendants' motions to dismiss pursuant to Rule 12(b)(6) are GRANTED WITH PREJUDICE. The Defendants' motions to dismiss Herrick's claim for copyright infringement are GRANTED WITHOUT PREJUDICE.  To the extent Herrick wishes to file an amended complaint, curing the deficiencies in his copyright claim, he must file a motion for leave to amend by **January 31, 2018**.

The Clerk of the Court is directed to close the open motions at docket entries 41, 47, and 60.

**SO ORDERED.**

Date:  **January 25, 2018**                              **VALERIE CAPRONI**
       **New York, New York**                            **United States District Judge**